UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

THOMAS WILLIAMS,

                                        Plaintiff,

                v.                                                      9:18-CV-1041
                                                                       (BKS/TWD)


R. ADAMS, et al.,

                                        Defendants.
_____

APPEARANCES:

THOMAS WILLIAMS, *Pro Se*
96-A-3375
Fishkill Correctional Facility
P.O. Box 1245
Beacon, NY 12508

BRENDA K. SANNES
United States District Judge

## DECISION AND ORDER

### I.      INTRODUCTION

        Pro se plaintiff Thomas Williams ("plaintiff"), a prison inmate in the custody of the New

York State Department of Corrections and Community Supervision ("DOCCS"), commenced

this action on or about August 31, 2018, with the filing of a complaint, accompanied by an

application to proceed in the action in forma pauperis ("IFP").  Dkt. No. 1 ("Compl."); Dkt. No.

2 ("IFP Appl.").  Following its review of plaintiff's IFP Application, the Court issued a Decision

and Order dated November 5, 2018, determining that plaintiff had acquired "three strikes" for

purposes of 28 U.S.C. § 1915(g) prior to commencing this action and that the complaint

failed to allege any facts that would support a finding that plaintiff was in imminent danger at the time of filing. Dkt. No. 5 ("Nov. Order"). Accordingly, the Court denied plaintiff's IFP Application and directed him to pay the full statutory filing fee of $400 if he wished to proceed in the action. Nov. Order at 7. On or about December 6, 2018, the Court received the full filing fee from plaintiff. Dkt. No. 8. The Clerk of the Court has now forwarded to the Court plaintiff's complaint for review.

## II.    DISCUSSION

### A.    Standard of Review

In accordance with 28 U.S.C. § 1915A ("Section 1915A"), a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint. . . is frivolous, malicious, or fails to state a claim upon which relief may be granted; or . . . seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A; *see also Carr v. Dvorin*, 171 F.3d 115, 116 (2d Cir. 1999) (per curiam) (holding that Section 1915A applies "to all civil complaints brought by prisoners against governmental officials or entities regardless of whether the prisoner has paid the filing fee"); *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) (finding that both 28 U.S.C. §§ 1915(e)(2)(B) and 1915A provide a basis for screening prisoner's complaints).

In reviewing a pro se litigant's complaint, the Court has a duty to liberally construe the pleadings, *Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam), and should exercise "extreme caution . . . in ordering sua sponte dismissal of a pro se complaint *before*

the adverse party has been served and both parties (but particularly the plaintiff) have had an opportunity to respond." *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983) (emphasis in original). Therefore, a court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). Although the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not 'show[n]'–'that the pleader is entitled to relief.'" *Id*. at 679 (quoting Fed. R. Civ. P. 8(a)(2)). Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* at 678 (citing *Twombly*, 550 U.S. at 555). Thus, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Id*. (internal quotation marks and alterations omitted).

### B.     Summary of the Complaint

The following facts are as alleged in plaintiff's complaint.

Between 2005 and 2007, plaintiff was confined in Clinton Correctional Facility ("Clinton C.F."), a prison operated by DOCCS, and under the care of defendant Medical

Director Vivian Johnson.  Compl. at 4.  Similarly, between 2009 and 2010, defendant Doctor

R. Adams was plaintiff's medical provider during a separate period of confinement in Clinton

C.F.  *Id.*  As a result of acting as plaintiff's medical providers during those time periods,

defendants Johnson and Adams became aware of plaintiff's medical conditions, which are

described as follows:

> [L]ife long chronic neck and lower back spinal conditions that
> required use of backbrace; hammer toes, wide feet and flat feet
> that required customized medical boots; and pain medication
> 'Ultram' helping serious, daily, pain and suffering.

*Id.* (errors in original).

On or about October 13, 2015, plaintiff returned to Clinton C.F.  Compl. at 5.

Defendant Adams was assigned as plaintiff's medical care provider.  *Id.*  Plaintiff informed

defendant Adams in appointments in November 2015 and February 2016 that his customized

back brace and medical boots were stolen in June 2015.  *Id.* at 5-6.  Plaintiff notified

defendant Adams during those appointments that he experienced "daily, serious" pain in his

back and needed an ankle brace for an old Achilles tendon injury "that causes soreness and

weakness in plaintiff's right ankle."  *Id.*  Plaintiff requested that defendant Adams prescribe

Ultram (morphine) for his pain.  *Id.*  At the November appointment, defendant Adams told

plaintiff that he could not prescribe plaintiff anti-inflammatory medications because plaintiff is

allergic to them, and that he would not prescribe Ultram "or any other medication" to plaintiff.

*Id.* at 5.  At the February appointment, defendant Adams promised plaintiff that he would

consult with defendant Johnson about prescribing plaintiff morphine pain medication.  *Id.* at

6.  During both appointments, defendant Adams denied plaintiff's requests for back and

ankle braces and medical boots.  *Id.* at 5-6.

4

On November 30, 2016, plaintiff had a third appointment with defendant Adams. Compl. at 7. Plaintiff requested replacement of his customized back brace and medical boots, a right ankle brace, and "pain medication." *Id.* Plaintiff informed defendant Adams that he was experiencing pain from his back and foot conditions and showed defendant Adams the "blisters, corns and calluses developing o[n] plaintiff's feet from being forced to wear State issued non medical boots." *Id.* Defendant Adams told plaintiff that he was going to request x-rays and for plaintiff to be seen by a specialist for his "feet, neck and back." *Id.* Defendant Adams also "took plaintiff's defective, old, customized medical boots" so he could "take pictures of [them]."[1] *Id.* at 8. The boots were returned to plaintiff on December 5, 2016. *Id.*

On November 23, 2016, plaintiff was again seen by defendant Adams. Compl. at 8. At that appointment, defendant Adams told plaintiff that the x-rays showed that plaintiff has "severe degenerative disc disease in plaintiff's neck," "a herniated disc in plaintiff's lower back," and "hammer toes deformities on both feet." *Id.* Defendant Adams ordered an MRI of plaintiff's back and told plaintiff that his foot condition required customized medical boots. *Id.*

Plaintiff arrived at the Clinton C.F. clinic on January 25, 2017, and was given a "pair of regular State boots with a different outter [sic] sole." Compl. at 8. Plaintiff was told by the nurse that defendant Adams ordered the boots for plaintiff and directed that "plaintiff . . . try them on." *Id.* at 9. The boots caused plaintiff pain because they were "to[o] tight and narrow, had no arch support insoles, [did not] support plaintiff's weak right old achilles tendon

---

[1] The complaint explains that plaintiff's customized boots were stolen in June 2015 and that they were thereafter replaced by "defective customized medical boots." Compl. at 7. The complaint does not explain why the second pair of medical boots were defective. *Id.*

injury and had no boot high toe for plaintiff's hammer toes to have space." *Id.* Accordingly, plaintiff refused the boots. *Id.*

On May 19, 2017, plaintiff complained to defendant Adams again about his pain and asked for pain medication and customized medical boots. Compl. at 9-10. Defendant Adams told plaintiff he would request that plaintiff receive "the orthopedic medical boots plaintiff [was] suppose[d] to receive." *Id.* at 10.

Defendant Adams prescribed plaintiff physical therapy, and plaintiff attended sessions between February 6, 2017 and June 6, 2017. Compl. at 9. Physical therapy provided plaintiff pain relief for "less than a half hour after [each session]." *Id.* Upon completion of physical therapy in June 2017, plaintiff received a permit for a Tens-Unit device, but it "was not effective in reducing plaintiff's serious, daily[] pains alone." *Id.* at 9, 11.

On unknown dates, defendant Adams (1) referred plaintiff to an orthopedic specialist for approval of customized medical boots, (2) prescribed plaintiff Motrin for his pain, (3) informed plaintiff that narcotic pain medication is not prescribed in New York State prisons, and (4) denied plaintiff's request for back and ankle braces. Compl. at 11. At some point in time, plaintiff stopped taking Motrin because it was ineffective. *Id.* Plaintiff then received a prescription for Cymbalta. *Id.* It was also ineffective in treating his pain and caused him to suffer allergic reactions. *Id.* Plaintiff stopped taking Cymbalta on August 29, 2017.

Plaintiff learned on September 4, 2017, during a "sickhall" visit, that defendant Adams "never put plaintiff in to be seen by an outside foot specialist," and that the reason plaintiff was denied medical boots was because defendant Adams "failed to give adequate information to support plaintiff's need for [them]." Compl. at 12.

6

Plaintiff was transferred to Bare Hill Correctional Facility on September 11, 2017, and his medical provider at that facility ordered plaintiff back and ankle braces in November 2017, and plaintiff received "new, customized replacement medical boots on or about July 5, 2018." Compl. at 12-13.

In her capacity as Medical Director, defendant Johnson was complicit in defendant Adams' inadequate medical treatment of plaintiff while he was confined in Clinton C.F. between October 2015 and September 2017. Compl. at 14-16. Defendant Carl Koenigsmann, the Chief Medical Officer for DOCCS, adopted an unwritten policy in or about May 2015, discontinuing the practice of recommending and prescribing narcotic pain medications to DOCCS inmates. *Id.* at 17. Defendant Koenigsmann also contributed to defendant Adams' inadequate medical treatment by failing to properly train, manage, and supervise him. *Id.*

Plaintiff's complaint asserts Eighth Amendment deliberate medical indifference claims against defendants Adams, Johnson, and Koenigsmann. Compl. at 18-20.

## C.   Analysis

Plaintiff brings this action pursuant to 42 U.S.C. § 1983 ("Section 1983"), which establishes a cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights[ but] provides . . . only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir. 1993). To state a cognizable claim under Section 1983, a complaint must allege "(1) 'that some person has deprived [the plaintiff] of a federal right,' and (2) 'that person who has

7

deprived [the plaintiff] of that right acted under color of state law.'" *Velez v. Levy*, 401 F.3d 75, 84 (2d Cir. 2005) (quoting *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)) (alteration omitted); *accord, Byng v. Delta Recovery Servs. LLC*, 568 F. App'x 65, 65-66 (2d Cir. 2014).

The Eighth Amendment prohibits punishment that is "incompatible with the evolving standards of decency that mark the progress of a maturing society[,] or which involve the unnecessary and wanton infliction of pain[.]" *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976) (internal quotation marks and citations omitted)). While the Eighth Amendment "does not mandate comfortable prisons, . . . neither does it permit inhumane ones[.]" *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (internal quotation marks and citation omitted). "These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration." *Estelle*, 429 U.S. at 103. Failure to provide inmates with medical care, "[i]n the worst cases, . . . may actually produce physical torture or lingering death, [and] . . . [i]n less serious cases, . . . may result in pain and suffering which no one suggests would serve any penological purpose." *Id.* (internal quotation marks and citations omitted).

A claim alleging that prison officials have violated an inmate's Eighth Amendment rights by inflicting cruel and unusual punishment must satisfy both objective and subjective requirements. *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009); *Price v. Reilly*, 697 F. Supp. 2d 344, 356 (E.D.N.Y. 2010). To meet the objective requirement, the alleged deprivation must be "sufficiently serious." *Farmer*, 511 U.S. at 844; *see also Salahuddin v. Goord*, 467 F.3d 263, 280 (2d Cir. 2006) ("[T]he objective test asks whether the inadequacy in medical care is sufficiently serious."). Factors informing this inquiry include "whether a reasonable doctor or patient would find it important and worthy of comment, whether the

8

condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain." *Salahuddin*, 467 F.3d at 280 (internal quotation marks and alterations omitted). Determining whether a deprivation is sufficiently serious requires a court to examine the seriousness of the deprivation, and whether the deprivation represents "a condition of urgency, one that may produce death, degeneration, or extreme pain[.]" *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (quotation marks omitted). Importantly, it is "the particular risk of harm faced by a prisoner due to the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant for Eighth Amendment purposes." *Smith v. Carpenter*, 316 F.3d 178, 186 (2d Cir. 2003).

To satisfy the subjective requirement, a plaintiff must demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.'" *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999). "In medical-treatment cases . . ., the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin*, 467 F.3d at 280. "Deliberate indifference," in a constitutional sense, "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.*; *see also Farmer*, 511 U.S. at 837 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin*, 467 F.3d at 280 (citing *Farmer*, 511 U.S. at 839-40).

## 1. Defendant Adams

Because the Court assumes, for purposes of this Decision and Order, that the complaint sufficiently alleges facts that satisfy the objective element of a deliberate medical indifference claim, the Court has confined its analysis to the subjective element.

According to the complaint, between November 2015 and November 2016, defendant Adams learned from plaintiff at two separate appointments that he was suffering from chronic back, neck, ankle, and foot conditions that left him in serious chronic pain. Compl. at 5-7. Defendant Adams responded to plaintiff's complaints at an appointment on February 3, 2016, by indicating to plaintiff that he would consult with defendant Johnson about prescribing plaintiff morphine medication. *Id.* at 6. According to plaintiff, defendant Adams never consulted with defendant Johnson. *Id.* Otherwise, during the one-year period between November 2015 and November 2016, defendant Adams took no action to address plaintiff's conditions or complaints, despite his role as plaintiff's primary care provider. *Id.* at 5-7. In light of the Court's obligation to liberally construe a pro se litigant's pleadings, defendant Adams will be required to respond to plaintiff's medical indifference claim for his treatment of plaintiff between November 2015 and November 2016.

The Court reaches a different conclusion with respect to the medical indifference claim arising between November 2016 and September 2017. According to plaintiff's complaint, during that period of time, defendant Adams took a number of steps to treat plaintiff's conditions and symptoms. In particular, defendant Adams (1) ordered x-rays of plaintiff's back, feet, and neck; (2) ordered an MRI of plaintiff's lower back; (3) special-ordered a pair of (non-customized) boots for plaintiff; (4) prescribed four months of physical therapy; (5)

10

prescribed plaintiff 400 milligrams of Motrin for his pain, and then Cymbalta when plaintiff stopped taking the Motrin; and (6) told plaintiff that he would refer him to an orthopedic specialist for customized medical boots.[2] *Id.* at 7-9, 11. In addition, both in February 2016 and November 2016, defendant Adams promised to discuss with defendant Johnson the possibility of prescribing plaintiff morphine for his pain. *Id.* at 6, 8. Presumably defendant Adams' ability to prescribe morphine pain medications was hampered by the prison and/or DOCCS policy (to which the complaint refers) regarding a restriction against prescribing inmates narcotic pain medications. Even assuming these allegations are true, however, defendant Adams' consistent treatment of plaintiff – through diagnostic examinations, prescription of non-narcotic pain medications, physical therapy, and consultations with other medical providers – reflects constitutionally adequate care in the context of a prison facility. Moreover, there are no allegations in the complaint that the failure to prescribe plaintiff's preferred choice of pain medication was in reckless disregard to plaintiff's health and safety, especially in light of the other treatment defendant Adams provided between November 2016 and September 2017.

In summary, even liberally construed, the allegations in the complaint concerning the period between November 2016 and September 2017 amount to a mere disagreement with the course of treatment administered by defendant Adams, which is not sufficient to state a plausible deliberate medical indifference. *See, e.g., Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998) ("[M]ere disagreement over the proper treatment does not created a

---

[2] Although it is alleged that plaintiff later learned that defendant Adams never took the necessary steps for plaintiff to be seen by a specialist, there are no allegations supporting an inference that the failure to do so amounted to deliberate indifference (rather than, for instance, negligence). Compl. at 12.

constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation."); *see also Hill*, 657 F.3d at 123(finding that plaintiff's complaint failed to state a deliberate medical indifference claim where it alleged that defendants prescribed plaintiff Motrin instead of a stronger pain medication and declined to order a nerve conduction study as requested by the plaintiff). Accordingly, plaintiff's deliberate medical indifference claim asserted against defendant Adams with respect to the period of treatment between November 2016 and September 2017 is dismissed for failure to state a claim on which relief may be granted pursuant to Section 1915A(b)(1).

### 2. Defendants Johnson and Koenigsmann

"Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [Section] 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (citing *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991); *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977)). As the Supreme Court has noted, a defendant may only be held accountable for his actions under Section 1983. *See Iqbal*, 556 U.S. at 683 ("[P]etitioners cannot be held liable unless they themselves acted on account of a constitutionally protected characteristic."). In order to prevail on a Section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). With respect to individuals sued based on their supervisory capacities (like defendants Johnson and Koenigsmann in this action) it is well settled that "vicarious liability is inapplicable to . . . [Section] 1983 suits." *Iqbal* 556 U.S. at 676.

The complaint alleges that defendant Johnson learned of the allegedly inadequate medical treatment plaintiff was being provided at Clinton C.F. and did not take any action to resolve the problem, and that defendant Koenigsmann enacted the policy on which defendant Adams relied in denying plaintiff narcotic pain medication.  Prior to the Supreme Court's decision in *Iqbal*, the Second Circuit held that supervisory personnel may be considered "personally involved" under five different circumstances.  *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).  In particular, supervisors can be found personally involved if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring.  *Colon*, 58 F.3d at 873 (citing *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986)).

In *Iqbal*, however, the Supreme Court explained that "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676.  The Court noted that "[t]he factors necessary to establish a Bivens violation will vary with the constitutional provision at issue." *Id.*  There, the alleged constitutional violation was discrimination based on race, religion, or national origin in violation of the First and Fifth Amendments. *Id.* at 668-69.  For such claims, "the plaintiff must plead and prove that the defendant acted with discriminatory purpose." *Id.* at 677.  The Court rejected the plaintiff's argument that a supervisor may be liable for "knowledge and acquiescence in their subordinates' use of discriminatory criteria to make classification

13

decisions among detainees," because "purpose, rather than knowledge is required" to impose liability. *Id.* at 677.

In this Circuit, "*Iqbal* has engendered conflict . . . about the continued vitality of the supervisory liability test set forth in *Colon*," *Reynolds v. Barrett*, 685 F.3d 205 n.14 (2d Cir. 2012), and the Second Circuit has not resolved the conflict. *See, e.g., Hogan v. Fischer*, 738 F.3d 509, 519 n.3 (2d Cir. 2013) ("We express no view on the extent to which the Supreme Court's decision in *Ashcroft v. Iqbal*, . . . 'may have heightened the requirements for showing a supervisors' personal involvement with respect to certain constitutional violations.'" (quoting *Grullon v. New Haven*, 720 F.3d 133, 139 (2d Cir. 2013))).

Recently, this Court had occasion to consider the impact of *Iqbal* on the supervisor liability/personal involvement test set forth in *Colon. Montanez v. City of Syracuse*, No. 16-CV-0550, 2019 WL 315058 (N.D.N.Y. Jan. 25, 2019). In that case, the Court concluded that the *Colon* analysis still applies where the constitutional claim asserted does not require a showing of discriminatory intent, "insofar as it is 'consistent with the particular constitutional provision alleged to have been violated.'" *Id.* at 18 (citing *Delgado v. Bezio*, No. 09-CV-6899, 2011 WL 1842294, at *9 (S.D.N.Y. May 9, 2011) (quoting *Qasem v. Toro*, 737 F. Supp. 2d 147, 151-52 (S.D.N.Y. 2010)); *see also Marom v. City of N.Y.*, No. 15-CV-2017, 2016 WL 916424, at *15 (S.D.N.Y. Mar. 7, 2016); *Sash v. United States*, 674 F. Supp. 2d 531, 544 (S.D.N.Y. 2009). Because the constitutional claim asserted in this case (Eighth Amendment deliberate medical indifference) does not require a showing of discriminatory intent and is based, instead, on whether defendants acted with deliberate indifference to the plaintiff's health and safety, the Court will apply the *Colon* factors.

14

### a. Defendant Johnson

Plaintiff alleges that he wrote defendant Johnson three letters during his confinement in Clinton C.F. in July 2016, October 2016, and May 2017. Compl. at 15-16. In each of the letters, plaintiff complained of the medical treatment he was receiving from defendant Adams. *Id.* Defendant Johnson did not respond to any of the letters. *Id.* According to plaintiff, defendant Johnson contributed to defendant Adams' deliberate medical indifference by failing to respond to his letters. *Id.* Given the nature of these allegations, the Court has considered whether they plead sufficient facts to plausibly allege that defendant Johnson was personally involved in denying plaintiff constitutionally adequate medical treatment under the second *Colon* factor.

In this Circuit, "[a] supervisor may be liable in an action brought under [section] 1983 if he exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Vincent v. Yelich*, 718 F.3d 157, 173 (2d Cir. 2013) (internal quotation marks and emphasis omitted); *Toliver v. City of N.Y.*, 530 F. App'x 90, 93 (2d Cir. 2013) (remanding to allow the plaintiff to file an amended complaint that included allegations of ongoing injuries "and that supervisory personnel were, as he claims, aware that particular officers were harassing and assaulting inmates"). In the context of a medical indifference claim, the Second Circuit has recognized that individual defendants who hold supervisory positions may be held liable where they learned of ongoing constitutionally deficient treatment being provided to a plaintiff and took no action to remedy the violation. *See McKenna v. Wright*, 386 F.3d 432, 437-38 (2d Cir. 2004) (determining that the complaint included sufficient allegations against the defendant-supervisor where the plaintiff alleged the

defendant rejected his grievance complaining of inadequate medical treatment and the defendant was responsible for the prison's medical program); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (reversing the district court's summary judgment determination in favor of the DOCCS Commissioner because the record contained a dispute of material fact concerning whether the plaintiff sent a letter to the commissioner complaining of the ongoing inadequate medical treatment being provided to him at the prison in which he was confined). Regardless of the specific ongoing constitutional violation alleged, to find that the supervisor was personally involved under the second *Colon* factor, a complaint must allege sufficient facts to place the supervisor on notice of the continuing constitutional violation and that the supervisor had the authority and ability to remedy the violation. *See Grullon v. City of New Haven*, 720 F.3d 133, 141 (2d Cir. 2013) (concluding that, at the pleading stage, a plaintiff is "entitled to have the court draw the reasonable inference–if his . . . complaint contain[s] factual allegations indicating that [a l]etter was sent to [the defendant] at an appropriate address and by appropriate means–that [the defendant] in fact received the [l]etter, read it, and thereby became aware of the alleged conditions of which [the plaintiff] complained"); *McKenna*, 386 F.3d at 437-38 (noting that the defendant-supervisor was responsible for the prison's medical program); *Richardson*, 347 F.3d at 435 (noting that whether the defendant-supervisor was personally involved under the second *Colon* factor depended on the contents of the plaintiff's letter because the contents would reflect what the defendant-supervisor knew); *Rahman v. Fisher*, 607 F. Supp. 2d 580, 585 (S.D.N.Y. 2009) ("[A] supervisor may be liable for her failure to remedy a violation only in those circumstances where the violation is ongoing and the defendant has an opportunity to stop the violation after being informed of

it.").

In this case, the allegations in plaintiff's complaint against defendant Johnson do not plausibly suggest that she was sufficiently on notice of a constitutional violation. According to the complaint, plaintiff wrote to defendant Johnson on July 25, 2016, "[c]omplaining about the deliberate denial/ and or delay of adequate medical care and treatment by [defendant] Adams, for plaintiff's daily, serious, neck and lower spinal pains; replacement of stolen 'customized backbrace; customized medical boots; hammer toes, flat feet, corns and calluses serious pains; right ankle achilles tendon soreness and weakness; right anklebrace and pain medication." Compl. at 15 (errors in original). Plaintiff wrote defendant Johnson again on October 18, 2016, "about the same medical issues and needs," and then a third letter on May 22, 2017, "[c]omplaining about [defendant] Adams['] continous, deliberate, denial in providing plaintiff the needed medical care and treatment plaintiff's medical conditions warranted." *Id.* at 16. Even assuming defendant Johnson received plaintiff's letters and read them, the contents of the letters, as alleged in plaintiff's complaint, do not give rise to a plausible inference that defendant Johnson was on notice that plaintiff was receiving constitutionally inadequate medical treatment. As described in plaintiff's complaint,[3] the letters describe only plaintiff's specific requests and then conclusorily accuse defendant Adams of "deliberate . . . [in]adequate medical care and treatment." *Id.* at 15. And, as described above, plaintiff's disagreement with defendant Adams' course of treatment does not create a constitutional claim. Without more, the Court finds that the complaint fails to allege sufficient facts to plausibly allege defendant Johnson's personal involvement in any

---

[3] The Court notes that plaintiff only described the contents of the letters in his complaint and did not attach the letters to the complaint or otherwise provide them as exhibits.

deliberate medical indifference claim. For that reason, that claim is dismissed as asserted against defendant Johnson for failure to state a claim upon which relief may be granted pursuant to Section 1915A(b)(1).

### b. Defendant Koenigsmann

With respect to defendant Koenigsmann, plaintiff alleges that he created an unwritten DOCCS policy and/or custom discontinuing the prescription of narcotic pain medications to prison inmates. Compl. at 17. Given the nature of these allegations, the Court has considered whether they plead sufficient facts to plausibly allege that defendant Koenigsmann was personally involved under the third *Colon* factor.

Although the complaint alleges that defendant Adams indicated to plaintiff that there was a policy in place in which inmates were being denied narcotic pain medication, the complaint otherwise alleges no facts whatsoever concerning the details or scope of the policy. Plaintiff's allegations that defendant Adams promised to consult with defendant Johnson about the possibility of prescribing plaintiff narcotic pain medication suggests that whatever policy was in effect (if any) had contours and exceptions, and that it was not (as plaintiff suggests) a blanket policy that refused all inmates narcotics under all circumstances. Accordingly, plaintiff's complaint does not sufficiently allege facts plausibly suggesting that defendant Koenigsmann enacted an unconstitutional policy or that the policy, as alleged, was carried out in a manner in which defendant Koenigsmann knew or should have known violated plaintiff's constitutional rights.

Plaintiff's additional allegation that defendant Koenigsmann is responsible for the alleged inadequate medical treatment provided by defendant Adams because he failed to "train, manage and supervise [defendant] Adams," Compl. at 19, is vague and conclusory

18

and does not support a cognizable constitutional claim.

For all of these reasons, plaintiff's deliberate medical indifference claim asserted against defendant Koenigsmann is dismissed for failure to state a claim pursuant to Section 1915A(b)(1).

## III.    SERVICE OF PROCESS

As indicated above, the only claim that survives the Court's initial review is plaintiff's Eighth Amendment medical indifference claim asserted against defendant Adams concerning defendant Adams' treatment of plaintiff between November 2015 and November 2016. Because plaintiff paid the filing fee in this action (following the denial of his application for in forma pauperis status), plaintiff is responsible for serving the summons and complaint on defendant Adams.  In light of the fact that plaintiff is incarcerated and proceeding pro se, and in order to advance the disposition of this action, plaintiff may request an order from the Court directing service by the United States Marshal, **provided** that plaintiff pays the service fee to the United States Marshal in full **in advance** by money order or certified check.[4]  For service by mail, the fee is $8.00 per summons and complaint.  Plaintiff is advised that, if initial service is unsuccessful, he will be required to pay the United States Marshal any additional fee, also in advance, for subsequent service attempts according to the fee schedule set by the United States Marshal.

---

[4]  Payment in cash or by personal check is not acceptable.

IV.    **CONCLUSION**

**WHEREFORE**, it is

**ORDERED** that plaintiff's complaint (Dkt. No. 1) is **accepted for filing** to the extent it asserts an Eighth Amendment deliberate medical indifference claim against defendant Adams concerning the medical treatment defendant Adams provided to plaintiff at Clinton C.F. between November 2015 and November 2016; and it is further

**ORDERED** that the remainder of plaintiff's Eighth Amendment deliberate medical indifference claims asserted against defendant Adams, Johnson, and Koenigsmann are **DISMISSED without prejudice** for failure to state a claim on which relief may be granted pursuant to 28 U.S.C. § 1915A(b)(1);[5] and it is further

**ORDERED** that plaintiff is afforded an opportunity to request an order from the Court directing service by the United States Marshal and provide payment of the service fee ($8.00) to the United States Marshal in full by money order or certified check; and it is further

**ORDERED** that, upon plaintiff's submission of a request for assistance with service of process, the Clerk shall return the file to the Court for consideration; and it is further

**ORDERED** that, if plaintiff does not submit a request for assistance with service of process **within 14 days** of the filing date of this Decision and Order, the Clerk shall issue a summons and forward it to plaintiff, who shall be responsible for effecting service of process on defendant Adams.  Upon issuance of the summons, the Clerk shall send a copy of the

---

[5]  Should plaintiff seek to pursue any of the claims dismissed without prejudice, he must file an amended complaint.  Any amended complaint, which shall supersede and replace the original complaint in its entirety, must allege claims of misconduct or wrongdoing against each named defendant that plaintiff has a legal right to pursue, and over which jurisdiction may properly be exercised.  Any amended complaint filed by plaintiff must also comply with the pleading requirements of Rules 8 and 10 of the Federal Rules of Civil Procedure.  Plaintiff's deadline to amend his pleading as a matter of course is set forth in Rule 15(a) of the Federal Rules of Civil Procedure.

summons and complaint to the Office of the New York State Attorney General, together with a copy of this Decision and Order; and it is further

ORDERED that the Clerk of the Court serve on plaintiff a copy of this Decision and Order, along with a copy of any unreported cases cited to in this Decision and Order.

**IT IS SO ORDERED.**

Dated: January 29, 2019

Brenda K. Sannes
U.S. District Judge

KeyCite Yellow Flag - Negative Treatment
Disagreed With by Jamison v. Fischer, S.D.N.Y., September 27, 2012

2011 WL 1842294
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Felix DELGADO, Plaintiff,
v.
Norman R. BEZIO et al., Defendants.

No. 09 Civ. 6899(LTS).
|
May 9, 2011.

## MEMORANDUM ORDER

LAURA TAYLOR SWAIN, District Judge.

**\*1** Plaintiff Felix Delgado ("Delgado" or "Plaintiff"), proceeding *pro se,* asserts he was deprived of due process of the law when he was tried and adjudged guilty in a prison disciplinary hearing for attempting to acquire a parole officer's home address. He alleges, among other things, that he was given insufficient notice of the critical facts of the accusation against him, was found guilty without sufficient evidentiary support and was not informed or evidence the hearing officer relied upon in reaching his conclusion. Delgado further alleges tna he was held in special housing unit confinement for 125 days in conditions that constituted a deprivation of liberty and cruel and unusual punishment.

Delgado filed these allegations in an Amended Complaint made pursuant to 42 U.S.C. § 1983 against the Director of Special Housing and Inmate Disciplinary Program for the New York State Department of Correctional Services, Norman R. Bezio ("Bezio"); Acting Director of Special Housing and Inmate Disciplinary Program, Albert Prack ("Prack"); Superintendent of Otisville Correctional Facility, Catherine Cook ("Cook"); Deputy Superintendent of Administration of Otisville Correctional Facility, Steven Brandow ("Brandow"); Captain for Otisville Correctional Facility, Charles Weeden ("Weeden"); Sergeant at Otisville Correctional Facility, Charles Howerter ("Howerter"); and Inmate Records Coordinator I at Otisville Correctional

Facility, Joan M. Pauley ("Pauley" and, collectively, "Defendants") in their official and individual capacities.

Defendants filed the instant motion to dismiss the Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), and the Plaintiff has not opposed the motion. This Court herein reviews the merits of the motion to determine whether the movants have carried their burden. *See McCall v. Pataki,* 232 F.3d 321, 322 (2d Cir.2000) ("If a complaint is sufficient to state a claim on which relief can be granted, the plaintiff's failure to respond to a Rule 12(b)(6) motion does not warrant dismissal.") The Court has considered carefully the parties' submissions and, for the following reasons, the Defendants' motion is granted in part and denied in part.

## BACKGROUND

The following facts are drawn from the Amended Complaint unless otherwise indicated. [1] On October 24, 2007, Delgado was moved from the general prison population into the Special Housing Unit ("SHU") and given notice that he would be tried in a Tier III disciplinary hearing. The Inmate Misbehavior Report, which constituted Delgado's notice of the charge against him, read in pertinent part, as follows:

2) Location of Incident[:] Bld. 17 Hearing Room. Incident Date[:] 10/22/07. Incident Time[:] Approx 6:15 p.m.

3) Rule Violation(s) [:] 113.26 Inmates shall not solicit personal identifying information of department employees.

4) Description of Incident[:] On above date and time I Sgt. Howerter recieved [sic] confidential information that inmate Delgado 93A0549 has been attempting to acquire the home address of SR. Parole Officer Cassel.

**\*2** (Compl.Ex.I.) The date and time written in section 2 as the "Incident Date" and "Incident Time" are the only indications of date and time found in the report. The language in section 4 indicates that the date and time listed refer to the date and time when Howerter interviewed Foley and not, in fact, the date of the alleged misconduct-that is, they do not refer to the date

and time when Delgado is alleged to have violated rule 113.26 by attempting to acquire Parole Officer Cassel's home address. The Inmate Misbehavior Report was signed by defendants Howerter and Weeden. (*Id.*) Delgado's prison disciplinary hearing was held on October 26 and November 2, 2007. Delgado selected Counselor Candelaria "to assist him with gathering evidence and information for his defense" prior to the hearing. (Am.Compl.¶ 29.) At the hearing, Delgado denied the charged behavior, arguing that it would not have been in his interests to jeopardize his parole prospects and that he had no reason to seek his parole officer's home address. Parole officer Cassel testified that Delgado had not spoken with him since approximately June of the prior year. Delgado asked that the attorney who had been handling his parole matters, Cheryl Kates ("Kates"), be permitted to testify, but this request was denied on the grounds that Kates "can provide no relevant testimony related to [the] incident in question." (Compl.Ex. M.) The confidential informant who had accused Plaintiff was an inmate named John Foley. Foley did not testify at the hearing, confidentially or otherwise, and Plaintiff was not informed of Foley's identity until after the hearing. Plaintiff was also not informed that Foley had originally told prison officials that a single, unnamed inmate was trying to acquire parole officer Cassel's address and that, when interviewed by Howerter, Foley said that two inmates, Delgado and someone named Peretti, were both seeking Cassel's address.

Delgado was found guilty and sentenced to six months in SHU with 30 days suspended and "loss of package, loss of commissary, [and] loss of phone" privileges. In rendering this disposition, defendant Brandow, the hearing officer, described the evidence he had relied upon as follows:

> I find you guilty. The reason why I find you guilty, okay, first[ ] let's see, confidential information which was established during the investigation, various documents, listen to me now, related to the confidential investigation, corroborated charges with the misbehavior report. That's why I came to my decision.

(*Id.*) Delgado asked Brandow whether he had "conducted a[n] independent assessment of this confidential source or whoever this person was that provided confidential information." (Compl. Ex. L p14.) Brandow responded that he had "reviewed all the documents and came to a conclusion from [Delgado's] testimony, from the confidential informant's testimony, and the confidential informant's to-froms." (*Id.* p15.) Delgado was given a copy of the hearing disposition on November 2, 2007. Under the heading "Statement of Evidence Relied Upon," it stated in its entirety:

> **\*3** [The] evidence relied upon was confidential information which was established during an investigation. Various documents relating to the confidential investigation corroborate charges within the misbehavior report written by Sgt. Howerter.

(Compl.Ex.P–1.) Under the heading "Reasons for Disposition," it stated in its entirety:

> This disposition is intended to dissuade this inmate for [sic] acting in this manner in the future and to punish him for this unacceptable behavior. This type of behavior will not be tolerated and this disposition should serve as a future deterrent to inmate population.

(*Id.*)

For six weeks following the entry of disposition, Kates attempted to get a copy of the record of the disciplinary hearing and to have Delgado's SHU sentence reversed or reduced. After receiving the hearing record, she submitted a 23–page legal memorandum on Delgado's behalf, citing to the hearing transcript and applicable law, dated December 11, 2007. The sentence was summarily affirmed by defendant Cook on November 23, 2007, by defendant Prack on December 14, 2007, and by defendant Bezio

on January 28, 2008. Delgado was released from SHU in February 2008.

*Conditions of Delgado's Confinement*

Delgado served 125 days at the Southport Correctional Facility, a maximum security facility exclusively for SHU inmates. In his Complaint, Delgado alleges he was "stripped of all personal property, including nutritional foods, cosmetics, and clothing, as well as blankets to keep warm." During the "severe winter season," he was deprived of warm clothing and personal blankets; heat in his cell was kept at a minimum, and at night officers would open the windows, which inmates were unable to close. On most days, Delgado was locked in his cell 23 of the 24 hours and was given one hour to exercise in a steel metal cage. He was escorted in metal restraints when moving to and from his cell and the exercise cage. He was allowed only two showers and one visit each week. Once a month, he was allowed to receive cosmetics and stationery from the commissary but was denied any other commissary privileges. He was not permitted to receive packages except books by mail. These allegations are taken as true for the purposes of this motion practice. Upon release from SHU, Delgado was transferred to the Wende Correctional Facility, also a maximum security facility.

## *DISCUSSION*

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009). In the case of a *pro se* litigant, the Court reads pleadings leniently and construes them to raise "the strongest arguments that they suggest." *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999). While this guidance applies with particular force when a *pro se* plaintiff's civil rights are at issue, *McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004), the pleadings still must contain factual allegations that raise a "right to relief above the speculative level." *Dawkins v. Gonyea,* 646 F.Supp.2d 594, 603 (S.D.N.Y.2009) (quoting *Bell Atl. Corp v. Twombly,* 550 U.S. 544, 555 (2007)).

*Claims Against Defendants in their Official Capacities*

**\*4** A state official is entitled to Eleventh Amendment sovereign immunity to the extent that state official is sued in his or her official capacity. *See Kentucky v. Graham,* 473 U.S. 159, 169 (1985); *Spencer v. Doe,* 139 F.3d 107, 111 (2d Cir.1998). "A suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71 (1989); *see also Huminski v. Corsones,* 396 F.3d 53, 70 (2d Cir.2005). "The Eleventh Amendment, through the doctrine of sovereign immunity, bars suits in federal court against a state absent a waiver of immunity or congressional legislation specifically overriding immunity." *Robinson v. Fischer,* No. 09 Civ. 8882, 2010 WL 5376204 (S.D.N.Y. Dec. 29, 2010) (citing *Pennhurst State Sch. & Hospital v. Halderman,* 465 U.S. 89, 99 (1984)). New York State has not consented to § 1983 suits in federal court. *Mamot v. Board of Regents,* 367 F. App'x 191, 192 (2d Cir.2010). Plaintiff's claims against Defendants in their official capacities will, accordingly, be dismissed on sovereign immunity grounds.

*Fourteenth Amendment Due Process Claim*

Plaintiff asserts he was denied due process because: (1) he did not receive adequate notice of the critical facts of the accusation against him; (2) he was improperly denied the opportunity to call a certain witness; (3) he was founding guilty without a sufficient evidentiary basis and without the facts supporting the finding being disclosed to him; (4) he was denied effective assistance of counsel; and (5) he was denied a copy of his hearing transcript in adequate time to prepare a meaningful appeal.

*Plaintiff's Liberty Interest*

To proceed on a due process claim, a plaintiff must plead sufficient facts to show the deprivation of a liberty interest without due process of law. *Dawkins v. Gonyea,* 646 F.Supp.2d 594, 605 (S.D.N.Y.2009). "Prison discipline implicates a liberty interest when it imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Id* . (citation omitted). When assessing whether confinement constitutes an "atypical and significant hardship," courts take into account the duration and the conditions of the confinement. *Id.* at 606 (citation omitted). There is no

bright line rule but, generally, a period of confinement in SHU lasting fewer than 101 days does not by itself amount to atypical and significant hardship, while confinement in SHU for 305 days or more has been found to be "atypical and significant without any further aggravating conditions." *Id.* at 606 (citation omitted). A confinement lasting 125 to 288 days is "relatively long and thus necessitat[es] specific articulation of factual finding." *Sims v.. Artuz,* 230 F.3d 14, 23 (2d Cir.2000), cited in *Dawkins,* 646 F.Supp.2d at 606. Delgado was confined in SHU for 125 days, and he has alleged additional facts that could support a finding of atypical and significant hardship. He has therefore pleaded sufficiently that he suffered the deprivation of a protected liberty interest.

*Inadequate Notice*

 **\*5** "Due process requires that, in a prison disciplinary hearing resulting in the imposition of solitary confinement, an inmate must be afforded advance written notice of the charges against him ...." *Dawkins v. Gonyea,* 646 F.Supp.2d at 608. Notice should provide enough information to enable the inmate to prepare a defense. *Id.* Further, "notice should include information about the date, place, and manner of the alleged misconduct" where possible. *Id.* An inmate has "a heightened need for adequate notice" when "the majority of the evidence presented against him [i]s not made available to him." *Id.*

In *Dawkins v. Gonyea,* inmate Dawkins was served a misbehavior report identifying him as "one of two inmates responsible for distributing a large amount of heroin throughout the facility." 646 F.Supp.2d at 602. On the misbehavior report, "the incident date and time recorded [we]re the date and time [a] confidential informant conveyed information to the officers, not the date and time Dawkins actually participated in the alleged violations." *Id.* at 608. The report did not identify any "sites within the facility where Dawkins allegedly engaged in the charged conduct." *Id.* at 609. Furthermore, the report failed to specify the particulars of the incident of misbehavior involved and it failed to identify the other inmate involved in the alleged misconduct. *Id.* The court held that "a report lacking one of the categories of information about the violation ... the date and time, the place the inmate is alleged to have participated, the manner in which it was perpetrated, the identity of any other persons involved, and the roles the participants played" might still be sufficient to constitute adequate notice; however, a report

lacking all of these details does not provide the accused enough information to defend himself. *Id.*

In the instant case, as in *Dawkins,* the misbehavior report Delgado received disclosed the date, time and place when and where the investigating officer acquired the confidential accusation but lacked the more critical information of the date, time and place of the alleged misconduct. The report provided no indication of the circumstances or nature of Delgado's alleged attempt to obtain the address information, and the report did not indicate that the "confidential information" on which it relied came from an informant, let alone that there was a single informant. The pleadings indicate that the confidential informant was concerned for his safety; this concern may have justified Defendants' withholding some information from the Plaintiff but it does not, on the current record, excuse the complete denial of meaningful information that Delgado could have used to prepare a defense. Therefore, the motion to dismiss the due process claim of inadequate notice will be denied.

*Calling Witnesses*

Due process requires that an inmate in a disciplinary hearing be permitted to call witnesses and present evidence in his defense. *See Kingsley v. Bureau of Prisons,* 937 F.2d 26, 30 (2d Cir.1991) (citations omitted). This right, however, is "subject to the mutual accommodation between institutional needs and objectives and the provisions of the Constitution...." *Id.* (citation and internal quotation marks omitted). A prisoner's right to call witnesses may be denied if granting the request would be "unduly hazardous to institutional safety or correctional goals" or the proposed testimony would be irrelevant or unnecessary. *Id.* "The burden is ... upon the official to prove the rationality of the position." *Id.* (citation omitted). Here, Delgado sought to call Kates, the lawyer who had been handling his parole application. Hearing officer Brandow denied this request because he concluded that Kates could provide "no relevant testimony related to [the] incident in question." Brandow did not explain the basis for this conclusion. At this stage, the Court need not, and does not, make a finding on whether Kates' testimony would have been relevant, but the facts alleged in the Complaint support a plausible inference that the testimony would have been highly relevant to questions of Delgado's motive and the credibility of his accuser, given that the substance of the confidential informant's accusation was that Delgado

requested the address in order to obtain a document relevant to his parole effort and Kates was the attorney who was responsible for communicating with that parole officer on Delgado's behalf. The motion to dismiss Delgado's due process claim that he was improperly prohibited from calling Kates as a witness will be denied accordingly.

*The "Some Evidence" Standard and Presentation of Evidence*

**\*6** Due process dictates that a finding of guilt in a prison disciplinary hearing must be supported by "some evidence." *Dawkins v. Gonyea,* 646 F.Supp.2d at 610 (citation omitted). Additionally, "an inmate facing disciplinary proceedings is entitled to know the evidence upon which a disciplinary ruling is based" or, if evidence is withheld, to receive a reasonable explanation as to why it was withheld. *Id.* at 611–12 (citation omitted). "[T]he 'some evidence' standard may be met even if the sole evidence was supplied by a confidential informant, as long as there has been some examination of indicia relevant to the confidential informant's credibility." *Id.* (citation and some internal punctuation omitted). "When sound discretion forecloses confrontation and cross-examination, the need for the hearing officer to conduct an independent assessment of informant credibility to ensure fairness to the accused inmate is heightened." *Id.* (citation omitted).

All of the evidence supporting the charge against Delgado was derived from a single, confidential informant, and the documentation before the Court on this motion practice is ambiguous as to whether the informant ever actually testified before Brandow, the hearing officer. When asked whether he had conducted an assessment of the informant's credibility, Brandow said that he had "conducted an investigation of all the relevant documents" and "reviewed all the documents and came to a conclusion from [Delgado's] testimony, from the confidential informant's testimony, and the confidential informant's to-froms." However, nowhere in the copy of the hearing record that is annexed to the original complaint is there any testimony attributable to the informant. Rather, Brandow's knowledge as to the informant's accusation appears to have come entirely from the report and hearsay testimony of officer Howerter. Further, Brandow's response that he "conducted an investigation" is ambiguous as to whether it refers to

the overall investigation into Delgado's guilt or to an assessment specifically of the informant's credibility.

When Brandow rendered his decision, he did not reveal to Delgado what evidence was relied on, stating only that:

> The evidence relied upon was confidential information which was established during an investigation. Various documents relating to the confidential investigation corroborate charges within the misbehavior report written by Sgt. Howerter.

Accordingly, the Court will deny the motion to dismiss Delgado's claim that his due process rights were violated when a decision was rendered against him without a sufficient evidentiary basis and without disclosure of the evidence relied upon.

*Inadequate Assistance of Counsel*

Inmates are not entitled to counsel in prison disciplinary proceedings. *Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993) (citation omitted). Delgado's constitutional claim will be dismissed insofar as it is based on inadequate assistance of counsel.

*Production of Hearing Record in Time for Administrative Appeal*

**\*7** It is well established that an inmate does not have a constitutional due process right to receive a transcript of his disciplinary hearing. *See, e.g., Dixon v. Goord,* 224 F.Supp.2d 739, 744 (S.D.N.Y.2002) (citations omitted). Accordingly, Petitioner's due process claim will be dismissed insofar as it is premised on his lawyer receiving a transcript only after his administrative appeal was filed. Because defendant Pauley's only alleged misconduct is failing to promptly produce the hearing record, she will be dismissed from this suit.

*Eighth Amendment Claim*

"Restraints on an inmate do not violate the [Eighth] amendment unless they are totally without penological justification, grossly disproportionate, or involve the

unnecessary and wanton infliction of pain." *Dixon v. Goord,* 224 F.Supp.2d 739, 748 (S.D.N.Y.2002) (citation and internal punctuation omitted). To establish an Eighth Amendment violation, "an inmate must show (1) a deprivation that is objectively, sufficiently serious that he was denied the minimal civilized measure of life's necessities, and (2) a 'sufficiently culpable state of mind' on the part of the defendant official, such as deliberate indifference to inmate health or safety ." *Id.* at 751.

Delgado alleges he was "stripped of all personal property, including nutritional foods ... and clothing." To the extent this allegation can be understood to mean that Plaintiff had no nutritional food and no clothing for 125 days, the Court finds it implausible without more detailed allegations demonstrating the factual basis of the claim. The Court construes the allegation, instead, to mean that, although the Plaintiff was given *prison-issued* clothing, he could not keep any *personal* clothing, and that although he received *prison-provided* food, he was not allowed to obtain or possess *additional* food that he considered to be more nutritious. So construed, this allegation does not state a plausible claim that Plaintiff was denied the "minimal civilized measure of life's necessities"—the basic necessities of food and clothing having been provided by the prison.

Plaintiff also alleges that during the winter months, he was made to sleep with the windows open and the heat at a minimum and that he was without his "personal blankets." Again, the Court construes the word "personal" to mean "owned by the inmate" and in contrast to "prison-issued." As such, the Court does not read the Amended Complaint to allege that Plaintiff was completely deprived of bedding but, rather, that he was deprived of additional blankets that he may have purchased or received from outside the prison. Plaintiff concedes that the heat was kept on, albeit at a minimal level. Sleeping with the windows open and heat low during the winter in New York might constitute an atypical and significant hardship, as in *Corselli v. Coughlin,* where an inmate alleged that prison officials had subjected him to cruel and unusual punishment when they forced him to sleep in solitary confinement with the windows open in sub-zero temperatures that caused ice to form in the toilet bowl and the inmate to became ill for over a month with a cold, fever and cramps. 842 F.2d 23, 27 (2d Cir.1988). In light of these allegations, the Second Circuit reversed a district court's grant of summary judgment against

the inmate, holding that the inmate had stated a claim sufficiently to be resolved by the trier of fact. *Id.*

**\*8** However, incarceration with bedding of some sort, the heat kept on and no allegation of illness or sub-zero temperatures inside the cell does not constitute a denial of the minimal civilized measure of life's necessities. Petitioner's other allegations of hardship are all less severe than his allegations of being denied sufficient food, clothing and heat during the winter, and they do not rise to the level of depicting cruel and unusual treatment either. Therefore, Petitioner's claim that he was subjected to cruel and unusual punishment will be dismissed.

*Personal Involvement*
As explained above, the Court will dismiss Delgado's Eighth Amendment claim and his due process claims premised upon ineffective assistance of counsel and untimely issuance of the hearing record, and all claims asserted against the Defendants in their official capacities. Delgado's other personal-capacity claims may proceed against only those Defendants who are alleged to have been personally involved. "Imposition of liability under section 1983 requires a defendant's direct involvement in the alleged constitutional violation." *Prescott v. Riker Island Med. Staff,* No. 09 Civ. 255, 2011 WL 1435218, at *4 (S.D.N.Y. Apr. 12, 2011) (citation omitted). Defendants do not dispute that Howerter, Weeden and Brandow were personally involved in the conduct giving rise to Delgado's claims, so the remaining claims against them will be permitted to go forward.

Defendants Prack, Bezio and Cook are each alleged to have affirmed, or declined to reconsider, the disposition of Delgado's disciplinary hearing. Until recently, it was clear that the personal involvement of a supervisor was to be evaluated in this Circuit by reference to the five-category test articulated in *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). *See Qasem v. Toro,* 737 F.Supp.2d 147, 151 (S.D.N.Y.2010). A supervisor's personal involvement could be demonstrated by evidence that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal,

failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon,* 58 F.3d at 873. The continuing vitality of this test has been called into question in light of the Supreme Court's holding in *Ashcroft v. Iqbal* that "[b]ecause vicarious liability is inapplicable to ... § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." 129 S.Ct. 1937, 1948 (2009); *see also Qasem,* 737 F.Supp.2d at 151.

**\*9** The Second Circuit has not yet addressed the impact, if any, of *Iqbal* on the *Colon* standard. Courts in this district have reached contrary conclusions, holding in some cases that only the first and third *Colon* categories remain viable bases for liability, *see, e.g., Bellamy v. Mt. Vernon Hosp.,* 07 civ 1801, 2009 WL 1835939, at *4 (S.D.N.Y. June 26, 2009) and, in other cases, that "the personal involvement required to overcome a 12(b)(6) motion varies depending on the constitutional provision alleged to have been violated" such that the applicability of each Colon category will depend on the nature of the violation alleged, *see Qasem,* 737 F.Supp.2d at 151–52; *see also D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 346–47 (S.D.N.Y.2010).

This Court agrees with the latter line of reasoning. The *Iqbal* Court specifically observed that "[t]he factors necessary to establish a *Bivens* violation will vary with the constitutional provision at issue," *Iqbal,* 129 S.Ct. at 1948, and that a *Bivens* action is the "federal analog to suits brought against state officials under ... 42 U.S.C. § 1983." *Id.* (citation omitted). "It was with intent-based constitutional claims in mind, specifically racial discrimination, that the Supreme Court rejected [in

*Iqbal* ] the argument that a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." *Sash v. United States,* 674 F.Supp.2d 531, 544 (S.D.N.Y.2009). Thus, where the claim does not require a showing of discriminatory intent, the *Colon* analysis should still apply, insofar as it is "consistent with the particular constitutional provision alleged to have been violated." *Qasem,* 737 F.Supp.2d at 151–52. Here, Plaintiff does not assert an intentional discrimination claim of the sort that was at issue in *Iqbal,* and intent is not an element of his due process claims.

Plaintiff's due process claims against Prack, Bezio and Cook fall into the second *Colon* category of personal involvement—namely, that "the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong." *Colon,* 58 F.3d at 873. The *Iqbal* decision would clearly preclude liability of a supervisor on the basis of mere knowledge that a subordinate had rendered a decision that was intentionally discriminatory, and would likely preclude as well a claim based on affirmance of such a decision (at least absent a proffer that the affirmance was intentionally discriminatory). However, it cannot be said that the *Iqbal* holding precludes liability where, as is alleged here, supervisory personnel affirmed a decision that they knew to have been imposed in violation of Plaintiff s due process rights, thus continuing a deprivation of liberty without due process of law. Plaintiff claims that he was denied due process by reason of the withholding of information on confidentiality grounds at his disciplinary hearing. He also alleges that he appealed to, or sought reconsideration from, Defendants Prack, Bezio and Cook. In his appeal and reconsideration-request papers, his attorney identified the withholding of information as grounds for the infirmity of the decision and argued that the reliance on confidential information denied Plaintiff the ability to defend himself at the hearing. (Compl. Ex R, Nov. 15, 2007, appeal letter; Compl. Ex. V, Dec. 11, 2007, appeal letter.) Defendants Prack, Bezio and Cook each denied an appeal or request for reconsideration. Read in the light most favorable to Plaintiff his Complaint and supporting documents allege sufficiently the personal involvement of Prack, Bezio and Cook, as they are alleged to have had the power, and to have refused, to vacate a penalty they knew had been imposed in violation of Plaintiff's due process rights, thus violating Plaintiff's constitutional rights by knowingly continuing

a deprivation of liberty without due process of law. Accordingly, the motion will be denied to the extent it seeks dismissal of Plaintiff s due process claims against Prack, Bezio and Cook.

*Qualified Immunity*

**\*10** Government officials performing discretionary functions generally enjoy qualified immunity from civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would know." *Dawkins v. Gonyea,* 646 F.Supp.2d 594, 612–13 (S.D.N.Y.2009) (citation omitted). "A right is clearly established if (1) the law is defined with reasonable clarity, (2) the Supreme Court or the Second Circuit has recognized the right, and (3) a reasonable defendant [would] have understood from the existing law that [his] conduct was unlawful." *Johnson v. Goord,* 487 F.Supp.2d 377, 398 (S.D.N.Y.2007) (citation omitted). Furthermore, prison officials, including hearing officers, are "charged with knowledge of relevant decisional law, especially the decisions of the circuit in which they perform their official duties." *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989).

The right to adequate notice of a prison disciplinary hearing has been clearly established by both the Supreme Court and the Second Circuit. *See Dawkins v. Gonyea,* 646 F.Supp.2d 594, 613 (2009) (citing *Wolff v. McDonnell,* 418 U.S. 539, 555–56 (1974), and *Sira v. Morton,* 380 F.3d 57, 70 (2d Cir.2004)). The right to call witnesses at such a hearing has also been clearly established by both courts, subject to certain safeguards, which are also clearly established. *Kingsley v. Bureau of Prisons,* 937

F.2d 26, 30 (2d Cir.1991) (citing *Ponte v. Real,* 471 U.S. 491, 495 (1985)). The Second Circuit has also clearly established that "an independent assessment is necessary to satisfy the 'some evidence' standard when a disciplinary decision is based solely on confidential information" and that an inmate has a "due process right to know the evidence upon which a discipline ruling is based." *Id.* at 614 (citing *Sira,* 380 F.3d at 77, 74). Accordingly, there is an insufficient basis for the Court to find at this stage that any Defendants are entitled to qualified immunity. As this matter proceeds, Defendants may, of course, proffer evidence and reassert their qualified immunity defense.

*CONCLUSION*

For the foregoing reasons, Defendants' motion to dismiss the Amended Complaint is granted with regard to all claims brought against Defendants in their official capacities, the Eighth Amendment claim and the due process claims premised on ineffective assistance of counsel and the untimely issuance of a hearing record. The motion to dismiss is denied in all other respects. This Memorandum Order resolves docket entry number 15. This case remains referred to Magistrate Judge Katz for general pretrial management.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2011 WL 1842294

Footnotes

1    Plaintiff's Amended Complaint references exhibits attached to the original Complaint. All exhibits referenced by the Amended Complaint are considered to be incorporated therein.

KeyCite Yellow Flag - Negative Treatment

On Reconsideration in Part Marom v. City of New York, S.D.N.Y., July 29, 2016

2016 WL 916424
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Yotam Marom, Miriam Rocek,
and Don Fitzgerald, Plaintiffs,

v.

The City of New York, New York City Police
Department ("NYPD") Chief of Department
Joseph Esposito, NYPD Deputy Inspector
Edward Winski, NYPD Lieutenant Frank
Viviano, NYPD Sergeant Fior Blanco, Nypd Legal
Bureau Officer Oleg Charnyavsky, NYPD Officer
Michael Galgano, Shield No. 2671, NYPD Officer
Cynthia Boyle, Shield No. 6663, NYPD Officer
Steven Valentine, Shield No. 13585, and NYPD
Officers John and Jane Doe #1-15, Defendants.

15-cv-2017 (PKC)
|
Signed 03/07/2016

**Attorneys and Law Firms**

Gideon Orion Oliver, New York, NY, for Plaintiffs.

Andrew Joseph Lucas, Joy Tolulope Anakhu, Lamar
Devaughn Winslow, NYC Law Department, Office of the
Corporation Counsel, New York, NY, for Defendants.

## MEMORANDUM AND ORDER

CASTEL, U.S.D.J.

**\*1** Plaintiffs Yotam Marom, Miriam Rocek, and Don
Fitzgerald bring this action against the City of New York,
eight named individual defendants employed by the New
York City Police Department ("NYPD"), specifically
Chief of Department Joseph Esposito, Deputy Inspector
Edward Winski, Lieutenant Frank Viviano, Sergeant Fior
Blanco, Legal Bureau attorney Oleg Charnyavsky, Officer
Michael Galgano (Shield No. 2671), Officer Cynthia
Boyle (Shield No. 6663), and Officer Steven Valentine

(Shield No. 13585), and 15 unnamed individual NYPD
Officers (Officers John and Jane Doe #1-15), asserting
nine claims under 42 U.S.C § 1983 and the First, Fourth,
Sixth, and Fourteenth Amendments. Plaintiffs claim that,
while participating in a protest in Zuccotti Park marking
the six-month anniversary of the Occupy Wall Street
("OWS") movement, or in the aftermath of the protest,
they were denied certain protected rights. They maintain
that they were falsely arrested, subjected to excessive
use of force, excessive detention, and malicious abuse of
process, prevented from exercising their First Amendment
rights, deprived of their rights to a fair trial, and denied
the equal protection of the laws. The defendants now
move to dismiss the complaint pursuant to Rule 12(b)
(6), Fed. R. Civ. P. For reasons that will be explained,
the motion is granted as to all claims except for: (1)
Yotam Marom's and Miriam Rocek's false arrest, First
Amendment retaliation, and certain failure to intervene
claims; and, (2) Don Fitzgerald's claim of excessive force.

THE FACTS ALLEGED

For the purposes of defendants' motion, all non-
conclusory factual allegations set forth in plaintiffs' First
Amended Complaint (the "FAC") are accepted as true,
see Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), and all
reasonable inferences are drawn in favor of the plaintiffs
as the non-movants, see In re Elevator Antitrust Litig., 502
F.3d 47, 50 (2d Cir. 2007).

Plaintiffs bring their claims against three categories
of defendants. First, plaintiffs allege that the City of
New York, through its agents in the NYPD, adopted
policies aimed at depriving OWS protestors of their
constitutional rights. (FAC ¶¶ 11, 105). Second, plaintiffs
allege that Chief of Department Esposito, Deputy
Inspector Winski, Lieutenant Viviano, Sergeant Blanco,
and Legal Bureau attorney Charnyavsky, whom the
plaintiffs call "supervisory defendants," were personally
involved in designing and supervising policies that
caused the deprivation of their constitutional rights.
(FAC ¶¶ 12, 14-15). Third, plaintiffs allege that
Officers Galgano, Boyle, and Valentine, as well as the
remaining unnamed defendants, were personally involved
in depriving plaintiffs of their rights by implementing the
allegedly unconstitutional policies designed by the City
and the supervisory defendants. (FAC ¶¶ 13, 16).

I. Events of March 17, 2012.

On March 17, 2012, plaintiffs Marom, Rocek, and Fitzgerald allege that they were "lawfully present" in Zuccotti Park (also known as Liberty Plaza) in connection with the six month anniversary of the OWS movement. (FAC ¶¶ 157, 175, 196). That same evening, the NYPD "raided Liberty Plaza" and arrested many OWS protestors, including the three plaintiffs. (FAC ¶¶ 151-52).

### A. Yotam Marom.

**\*2** Plaintiffs claim that NYPD Officers "violently arrested" Marom, "forcibly escorted" him to an NYPD-arranged holding area and eventually transported him to NYPD's Midtown South Precinct. (FAC ¶ 159, 161, 163). Marom alleges that he was handcuffed tightly for several hours in connection with his arrest. (FAC ¶ 165). According to the FAC, the police sent Marom to 100 Centre Street where he was arraigned before a New York City Criminal Court Judge "approximately 40 or more hours after his arrest." (FAC ¶¶ 166-67). The FAC also claims that Officer Galgano swore out "an accusatory instrument charging Mr. Marom and another person with various offenses based on false allegations," including that Galgano observed Marom inside Zuccotti Park resisting arrest by sitting down, interlocking arms with other protestors, and refusing to place his arms behind his back after the police gave dispersal orders. (FAC ¶ 171). Marom alleges that Officer Galgano did not actually observe those things himself. (FAC ¶ 172).

### B. Miriam Rocek.

Rocek was allegedly working as a "volunteer street medic" during the March 17, 2012 OWS protest. (FAC ¶ 175). She claims that an unidentified NYPD supervisor specifically targeted her for arrest and said "get her first, she's number one." (FAC ¶ 177). Two male NYPD officers then "grabbed Ms. Rocek by her arms, pulled her by her arms, and threw her onto the ground, so that she ended up face-down on the ground." (FAC ¶ 178). The officers allegedly ripped her jacket during the process. (FAC ¶ 187). Even though Rocek was not resisting arrest, officers were telling her to stop resisting and to just relax. (FAC ¶¶ 179-81). Rocek then said "[f]uck you, don't tell me to relax" to the officers, to which an officer allegedly said "[f]ine, fuck you then," "twisted her arm back as he placed plastic flexcuffs

on her," and told her to "[g]et up." (FAC ¶¶ 182-84). The flexcuffs were tight on Rocek's wrist and remained on her for approximately four hours. (FAC ¶ 190). Rocek alleges that the police dragged her by her hair and pulled her up on to her feet because she was unable to get up on her own. (FAC ¶ 185). The police transported Rocek to 100 Centre Street where she was arraigned approximately 24 hours after her arrest. (FAC ¶ 193). The FAC asserts that Officer Boyle "filled out NYPD paperwork stating that he [sic] had seen Ms. Rocek engage in certain conduct when he [sic] had in fact not done so." (FAC ¶ 140).

### C. Don Fitzgerald.

Don Fitzgerald alleges that NYPD officers grabbed him and threw him face-down on the ground while arresting him during the March 17, 2012 "raid" on Zuccotti Park. (FAC ¶ 198). While on the ground, an unidentified NYPD officer allegedly hit Fitzgerald "at least ten times in the face while saying, '[s]top resisting!'" (FAC ¶ 199). The police handcuffed Fitzgerald tightly and transported him to the Midtown South Precinct. (FAC ¶¶ 201, 203). Approximately 30 hours after the police arrested Fitzgerald, they transported him to 100 Centre Street where he was arraigned in New York City Criminal Court. (FAC ¶¶ 204-05). Fitzgerald claims that his face was swollen and painful for around a week after his arrest. (FAC ¶ 206). He also claims that Officer Valentine "filled out NYPD paperwork stating that he had seen Mr. Fitzgerald engage in certain conduct when he had in fact not done so." (FAC ¶ 141).

### D. Processing of Plaintiffs' Arrests.

Plaintiffs allege that after NYPD officers removed them from Zuccotti Park and brought them to the Midtown South Precinct, defendants Blanco, Charnyavsky, Galgano, Boyle, and Valentine conspired to falsify arrest paperwork. (FAC ¶ 117). While at the NYPD's Midtown South Precinct, Blanco and Charnyavsky allegedly "met with and supervised Galgano, Boyle, and Valentine, along with all other approximately eight assigned arresting officers." (FAC ¶ 114). Blanco and Charnyavsky instructed Galgano, Boyle, Valentine, and the others "regarding what to write in their NYPD arrest processing paperwork related to plaintiffs' and other purportedly related arrests." (FAC ¶ 115). According to plaintiffs, this

process resulted in Blanco and Charnyavsky instructing and assisting Galgano, Boyle, and Valentine "in creating false narratives" regarding plaintiffs behavior in Zuccotti Park. (FAC ¶ 117). Plaintiffs claim that Galgano, Boyle, and Valentine—who filled out paperwork allegedly swearing they saw plaintiffs engage in certain conduct —never actually saw Marom, Rocek, or Fitzgerald in Zuccotti Park that day. (FAC ¶¶ 132, 134, 136). Plaintiffs claim they were prosecuted for criminal offenses based on those statements, which they allege were false, (FAC ¶ 147), and that each plaintiff eventually accepted an Adjournment in Contemplation of Dismissal (an "ACD") to resolve the cases stemming from their arrests. (FAC ¶¶ 173, 194, 207). [1]

II. NYPD Policies and Practices.

**\*3** Plaintiffs further allege that their unlawful treatment by the NYPD on March 17, 2012 occurred because of two specific policies concerning mass protests that the City of New York, through individual defendant Esposito and others, adopted during a series of meetings leading up to the "raid" on Zuccotti Park. First, the City and supervisory defendants refined and adopted a "policy and practice related to OWS of denying persons arrested at demonstrations individual consideration for release with summonses," which plaintiffs label the "No-Summons Policy." (FAC ¶¶ 59-64). Second, the City and supervisory defendants refined and adopted a "policy and practice related to the centralized processing of arrestees in a single mass arrest processing center including the involvement of NYPD Legal Bureau and Criminal Justice Bureau agents in the creation of boilerplate NYPD documents containing false information," which plaintiffs claim was part of "an unreasonably lengthy and punitive mass arrest processing plan" they call "MAPP." (FAC ¶ 65). According to plaintiffs, the No-Summons Policy and MAPP were specifically directed at OWS protestors. (FAC ¶ 67).

They allege that those two policies differ drastically from the standard policing procedures codified in the NYPD Patrol Guide. (FAC ¶ 69). The standard procedures, according to plaintiffs, call for persons "detained and arrested for non-criminal violations ... as well as most misdemeanor offenses, who are carrying proper identification and have no outstanding arrest warrants, [to be given] individualized determinations of eligibility for release with a Universal Summons or [Desk Appearance

Ticket ("DAT") ]." (FAC ¶ 69). The plaintiffs allege that the substitution of the No-Summons Policy and MAPP in place of the standard procedures resulted in longer detainment periods for OWS protestors. (FAC ¶¶ 70-73). Plaintiffs claim that these policies derived from "ill-will toward [protestors'] perceived association with OWS," (FAC ¶ 78), and defendants' desire to "deter and/or prevent [protestors] from participating in further OWS-related demonstrations," (FAC ¶ 80).

Plaintiffs also claim that the City utilized similar policies and practices against protestors during the 2004 Republican National Convention (the "RNC"). (FAC ¶¶ 29-31). According to plaintiffs, the City's RNC policies led to unconstitutional results including the widespread failure to make individualized determinations of probable cause, (FAC ¶ 38); the use of excessive force by police officers, (FAC ¶ 39); and, unnecessarily long pre-arraignment detention periods for arrestees, (FAC ¶ 40). The City subsequently "failed to develop and implement adequate training in connection with, and to supervise and/or discipline their subordinates in connection with," mass protest activities, "despite decades of litigation" spurred by the RNC policies, among others. (FAC ¶¶ 45, 26).

On that basis, plaintiffs claim that the City and the "supervisory defendants" knew or should have known that the "NYPD's plans for policing and mass arrest processing" used in connection with the March 17, 2012 OWS protest "would result in unlawful arrests, excessive use of force, excessive detentions, malicious abuse of process, fabrication of evidence, and other unlawful conduct that would lead to constitutional rights violations." (FAC ¶ 105). And, despite that knowledge, the supervisory defendants failed to intervene to prevent or remediate the injuries suffered by the plaintiffs, (FAC ¶ 148), which included "physical, psychological and emotional injuries, mental anguish, suffering, humiliation, embarrassment, and other damages," (FAC ¶¶ 174, 195, 208).

## DISCUSSION

I. Legal Standard.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Iqbal, 556 U.S. at 678 (quoting Bell Atlantic v. Twombly, 550 U.S.

544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. "The plausibility standard ... asks for more than a sheer possibility that a defendant has acted unlawfully." Id. Legal conclusions and "[t]hreadbare recitals of the elements of a cause of action," are not entitled to any presumption of truth. Id.

II. Plaintiffs' Section 1983 Claims.

**\*4** To state a claim under section 1983, a plaintiff must allege that state officials, acting under color of state law, deprived her of a right guaranteed to her by the Constitution or federal law. 42 U.S.C. § 1983; see Graham v. Henderson, 89 F.3d 75, 79 (2d Cir. 1996). Here, plaintiffs' claims are predicated on allegations that they were: (a) falsely arrested, (b) subjected to excessive force, (c) subjected to excessive detention, (d) victims of malicious abuse of process, (e) deprived of their rights to a fair trial under the Sixth Amendment, (f) deprived of their rights under the First Amendment, and, (g) deprived of the equal protection of the laws under the Fourteenth Amendment. Plaintiffs also allege that the named individual defendants were personally involved in, and failed to intervene to protect plaintiffs from, the deprivation of their rights, see Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994), and that the City of New York is liable for the alleged constitutional violations, see Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 696 (1978). The Court will examine each of these claims in turn.

A. False Arrest Claim.

As an initial matter, plaintiff Don Fitzgerald withdraws his false arrest claim because his arrest was not actually resolved with an ACD, as originally pled, but rather with a guilty plea to disorderly conduct, which is a "violation" and not a crime. (Plaintiffs' Memorandum of Law in Opposition, 4); see N.Y. Penal Law § 240.20. [2] Even if he had not withdrawn his false arrest claim, a "plaintiff can under no circumstances recover if he was convicted of the offense for which he was arrested." Cameron v. Fogarty, 806 F.2d 380, 387 (2d Cir. 1986); see Sealey v. Fishkin, 96 cv 6303 (RR), 1998 WL 1021470, at \*4 (E.D.N.Y. Dec. 2, 1998) (granting summary judgment dismissing false arrest claim on the basis that plaintiff was convicted, on his own guilty plea, to disorderly conduct, a "violation" rather than a crime).

Marom's and Rocek's false arrest claims remain. Claims for false arrest brought under section 1983 "are 'substantially the same' as claims for false arrest ... under state law." Jocks v. Tavernier, 316 F.3d 128, 134 (2d Cir. 2003). "To state a claim for false arrest under New York law, plaintiffs must show that '(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged.'" Savino v. City of New York, 331 F.3d 63, 75 (2d Cir. 2003) (quoting Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994)). Defendants argue that plaintiffs have not adequately pled facts showing that the arrests of the plaintiffs "was not otherwise privileged," and, alternatively, that defendants had probable cause to arrest Marom and Rocek. In response, plaintiffs contend that there was no probable cause to arrest or that the alleged basis for probable cause is improper because the arresting officers did not personally observe plaintiffs' conduct.

**\*5** In order to state a claim for false arrest, plaintiffs "must show that ... [their] confinement was not otherwise privileged." Savino, 331 at 75. Essentially, this element amounts to determining whether there was legal justification for the challenged arrest—in most cases, whether there was probable cause. See Benjamin v. United States, 554 F. Supp. 82, 85 (E.D.N.Y. 1982). The FAC includes no factual content regarding the arrests aside from the assertion that, prior to being "violently" arrested by police, all three named plaintiffs were "lawfully present" in Zuccotti Park "in connection with the six month anniversary of the OWS movement." (FAC ¶¶ 157, 175, 196).

Defendants argue that plaintiffs' assertion that they were "lawfully present" is a legal conclusion and not a statement of fact upon which a claim for relief can be based. They also argue that the FAC does not state a plausible false arrest claim because it fails to describe any of the surrounding circumstances leading to the arrest. Defendants assert that, because showing that an arrest was "not otherwise privileged" is an element of a prima facie claim for false arrest, plaintiffs must actually allege sufficient factual content to permit the Court to reasonably infer that the arrest was unjustified. And, the federal pleading standards would seem to require plaintiffs, at a minimum, to do just that. See Iqbal, 556 U.S. at 678 ("The plausibility standard ... asks

for more than a sheer possibility that a defendant has acted unlawfully.") On that basis, defendants argue that plaintiffs' false arrest claim cannot survive a motion to dismiss.

Claims in federal court are governed by federal pleading standards; in the case of section 1983 claims alleging false arrests, state law supplies the elements of the claim. The New York Court of Appeals has held that plaintiffs need not allege "want of probable cause" when stating a false arrest claim based on a warrantless arrest. Broughton v. State, 37 N.Y.2d 451, 458 (1975). This is because, as a matter of substantive law, there is a presumption that "[w]henever there has been an arrest and imprisonment without a warrant" the arrest is unlawful. Id.; Jenkins v. City of New York, 478 F.3d 76, 88 (2d Cir. 2007) ("Where an officer makes an arrest without a warrant, the presumption arises that the plaintiff's arrest was unlawful"). In such cases, it is defendants who bear the burden "of proving that probable cause existed for the plaintiff's arrest" as an affirmative defense. Savino, 331 F.3d at 76 (citing Broughton, 37 N.Y.2d at 458). Thus, the requirement that plaintiffs "show that ... [their] confinement was not otherwise privileged" is satisfied simply by alleging that the arrest was made without a warrant. Because it is reasonable to infer from the FAC that plaintiffs were arrested without a warrant, plaintiffs Marom and Rocek have stated a plausible claim for false arrest despite the paucity of facts alleged in the FAC.

Given the lack of factual content alleged in the FAC, it is impossible for the Court to determine, as a matter of law, that there was probable cause to arrest. This also precludes the Court from being able to determine, at this stage, whether defendants are protected from liability by the doctrine of qualified immunity. See Savino, 331 F.3d at 71 (quoting Mandell v. Cty. of Suffolk, 316 F.3d 368, 385 (2d Cir. 2003)) ("[U]nder the doctrine of qualified immunity, a government official performing discretionary functions is shielded from liability for civil damages if his conduct did not violate plaintiff's clearly established rights or if it would have been objectively reasonable for the official to believe that his conduct did not violate plaintiff's rights.")

B. Excessive Force Claim.

**\*6** A claim of excessive use of force during an arrest is analyzed under Fourth Amendment principles. Graham v. Connor, 490 U.S. 386, 394 (1989). To prevail, the plaintiff must show that the defendants' use of force was objectively unreasonable "in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. at 397. Marom alleges that he was "violently arrested," (FAC ¶ 159), and that he was handcuffed tightly for several hours in connection with his arrest. (FAC ¶ 165). Rocek alleges that officers "grabbed [her] by her arms, pulled her by her arms, and threw her onto the ground, so that she ended up face-down on the ground," (FAC ¶ 178); that officers ripped her jacket, (FAC ¶ 187); that an officer "twisted her arm back as he placed plastic flexcuffs on her," (FAC ¶ 183); that officers dragged her by her hair and pulled her up onto her feet, (FAC ¶ 185); and, that her flexcuffs were tight and remained fastened for approximately four hours, (FAC ¶ 190). Fitzgerald alleges that officers grabbed him and threw him face-down on the ground, (FAC ¶ 198), that an unidentified NYPD officer hit him "at least ten times in the face" (FAC ¶ 199), and that the police handcuffed him tightly, (FAC ¶ 203). Fitzgerald also claims that his face was swollen and painful for around a week after his arrest. (FAC ¶ 206). The Court will first address plaintiffs' excessive force claims regarding the use of handcuffs and then will address the balance of plaintiffs' excessive force claims.

"Although handcuffs must be reasonably tight to be effective, [ ], overly tight handcuffing can constitute excessive force." Lynch ex rel. Lynch v. City of Mount Vernon, 567 F. Supp. 2d 459, 468 (S.D.N.Y. 2008) (internal citation omitted). "[I]n evaluating the reasonableness of handcuffing, a Court is to consider evidence that: 1) the handcuffs were unreasonably tight; 2) the defendants ignored the [plaintiffs'] pleas that the handcuffs were too tight; and 3) the degree of *injury to the wrists*." Id. (quoting Esmont v. City of New York, 371 F.Supp.2d 202, 215 (E.D.N.Y. 2005) (emphasis in original). "Courts in this Circuit have generally found that handcuffing does not suffice for an excessive force claim unless it causes some injury beyond temporary discomfort or bruising." Omor v. City of New York, 13 cv 2439 (RA), 2015 WL 857587, at *7 (S.D.N.Y. Feb. 27, 2015); see also Lynch, 567 F. Supp. at 468-69 (collecting cases).

While the FAC alleges that all three plaintiffs were handcuffed tightly, there are no allegations that any of the three ever complained to law enforcement about their handcuffs and that defendants ignored those complaints, and there are no allegations that any plaintiff experienced

injuries because of the handcuffs. Marom and Fitzgerald do claim they were handcuffed for "several hours," (FAC ¶¶ 165, 203), and Rocek claims she was handcuffed for "four hours," (FAC ¶ 190), but courts in this district have held other claims alleging similar periods of handcuffing insufficient to state a claim for excessive force. See, e.g., Higginbotham v. City of New York, 105 F. Supp. 3d 369, 377 (S.D.N.Y. 2015) (three hours); Omor, 2015 WL 857587, at *7 (four to five hours); Bender v. City of N.Y., 09 cv 3286 (BSJ), 2011 WL 4344203, at *6 (S.D.N.Y. Sept. 14, 2011) (fourteen hours). Because the FAC only contains allegations that plaintiffs were handcuffed tightly for several hours, it fails to state a plausible excessive force claim based on defendants' use of handcuffs.

With regard to the remaining allegations of excessive force alleged to have been used by defendants, "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." Graham, 490 U.S. at 396. "'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers,' [], violates the Fourth Amendment." Id. (quoting Johnson v. Glick, 481 F.2d 1028, 1033 (2d Cir. 1973)) (internal citation omitted). Courts in this district have regularly held that a plaintiff must have sustained some injury to maintain a claim of excessive force. See, e.g., Acosta v. City of New York, 11 cv 856 (KBF), 2012 WL 1506954, at *10 (S.D.N.Y. Apr. 26, 2012); Wims v. New York City Police Dep't, 10 cv 6128 (PKC), 2011 WL 2946369, at *4-5 (S.D.N.Y. July 20, 2011). That injury, however, need not be severe. See Robison v. Via, 821 F.2d 913, 924 (2d Cir. 1987) (denying summary dismissal of excessive force claim where plaintiff "testified that she suffered bruises lasting a 'couple weeks'").

**\*7** In the case of Marom, the FAC fails to state a claim for excessive force. Marom alleges only that he was "violently arrested." The FAC does not explain what specific acts the unidentified officers took against Marom on March 17, 2012 or whether Marom suffered any injuries as a result of the arrest. In the absence of more detailed allegations, Marom has failed to plausibly allege an excessive force claim. See, e.g., Bender, 2011 WL 4344203, at *6 (dismissing excessive force claim where plaintiff claimed only that she was "turn [ed] [ ] upside down, handcuff[ed] [ ] multiple times, [and] physically assault[ed]") (alterations in original).

The FAC also fails to state a plausible excessive force claim with respect to Rocek. The most severe of Rocek's excessive force allegations are that officers "grabbed Ms. Rocek by her arms, pulled her by her arms, and threw her onto the ground," (FAC ¶ 178), and that officers dragged her by her hair and pulled her up onto her feet, (FAC ¶ 185). The FAC does not, however, allege that Rocek sustained any injuries. Because Rocek does not assert that defendants injured her, allegations that defendants used this minimal amount of force during an arrest are not sufficient to defeat a motion to dismiss. See, e.g., Acosta, 2012 WL 1506954, at *10 (dismissing excessive force claim where plaintiff alleged that an officer "pushed his wrist into his pocket, punched him in the chest, threw him to the ground face first, forcibly handcuffed his left arm, and attempted to manipulate his right arm into handcuffs as well"); Wims, 2011 WL 2946369, at *4 (dismissing excessive force claim where plaintiff asserted that "he was pulled out of his car and 'thrown flat on [his] face unto the filthy ground'")

Conversely, Fitzgerald does allege a plausible claim for excessive use of force. Fitzgerald asserts that an unidentified NYPD officer hit him "at least ten times in the face," (FAC ¶ 199), and that, as a result, his face was swollen and painful for around a week. (FAC ¶ 206). In contrast to Marom's and Rocek's claims, Fitzgerald alleges that he was injured during his arrest. While his injuries were slight, a plaintiff need not suffer severe injuries to make out a plausible claim for excessive use of force. See Robison, 821 F.2d at 924. In the present case, the combination of the amount of force allegedly used— ten hits to the face—with the injuries allegedly sustained —a swollen and painful face for about a week—permit Fitzgerald's excessive force claim to survive a motion to dismiss.

In sum, the only excessive force claim that survives defendants' motion to dismiss is Fitzgerald's claim arising out of an unidentified officers' repeated hits to his face.

### C. Excessive Detention Claim.

The Fourth Amendment also "governs the procedures applied during some period following an arrest." Bryant v. City of New York, 404 F.3d 128, 136 (2d Cir. 2005). Again, the Fourth Amendment's reasonableness test is one of "objective reasonableness," meaning that the subjective motivations of individual officers have no bearing on whether a seizure was reasonable under

the Fourth Amendment. Id. "In the context of pretrial detention, the Supreme Court has held that, when there has been a warrantless arrest, the Fourth Amendment requires a prompt judicial determination of probable cause as a prerequisite to an extended pretrial detention." Id.; see Gerstein v. Pugh, 420 U.S. 103, 113-14 (1975). The Supreme Court subsequently clarified what it meant by "prompt" judicial determination of probable cause and held that "a jurisdiction that provides judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement." Cty. of Riverside v. McLaughlin, 500 U.S. 44, 56 (1991). In sum, "[w]hat is constitutionally required is that, except in extraordinary circumstances, the arrestee be given a hearing into probable cause for the arrest within 48 hours." Bryant, 404 F.3d at 138; see also McLaughlin, 500 U.S. at 56 ("Examples of unreasonable delay are delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual, or delay for delay's sake."). In New York, because probable cause determinations are made at arraignments, the Fourth Amendment requires that an arrestee be arraigned within 48 hours. See Bryant, 404 F.3d at 138.[3]

**\*8** Plaintiffs have failed to plead a plausible claim for excessive detention. According to the FAC, Marom was detained for "40 hours or more" prior to being arraigned, (FAC ¶ 167); Rocek was detained for 24 hours, (FAC ¶ 193); and Fitzgerald was detained for "30 or more hours," (FAC ¶ 205). Because plaintiffs' pre-arraignment detention did not exceed 48 hours, their detention period was presumptively reasonable.

Moreover, plaintiffs has failed to make any plausible, non-conclusory allegations showing that the length of their detention resulted from "extraordinary circumstances." McLaughlin, 500 U.S. at 56. The FAC alleges that plaintiffs' were detained "for the purpose of gathering additional evidence to justify the arrest," (FAC ¶ 77), "for delay's sake," (FAC ¶ 79), and "based on malicious, bad faith intent to inhibit or punish" them, (FAC ¶ 75), but those allegations are entirely conclusory and simply parrot the bases for finding "extraordinary circumstances." The fact that each plaintiff was arraigned on charges of resisting arrest, (N.Y. Penal Law § 205.30), second-degree obstruction of governmental administration, (N.Y. Penal Law § 195.05), disorderly conduct violation, (N.Y. Penal Law § 240.2), and trespass violation, (N.Y. Penal Law

140.05), undermines the plausibility of the assertion that plaintiffs were held longer in order for police to gather evidence of those charges. (Winslow Decl., Ex. C). And, the fact that each plaintiff was detained for a substantially different period of time undermines the plausibility of the assertion that they were detained because of defendants' systemic ill-will towards OWS protestors. For all of the foregoing reasons, plaintiffs' excessive detention claims are dismissed.

D. Malicious Abuse of Process Claim.

State law provides the elements of a section 1983 claim based on malicious abuse of process. See Savino, 331 F.3d at 76. "In New York, a malicious abuse-of-process claim lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse or justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." Cook v. Sheldon, 41 F.3d 73, 80 (2d Cir. 1994). To establish that a defendant employed legal process "in order to obtain a collateral objective that is outside the legitimate ends of the process," a plaintiff must show more than just a malicious motive. Savino, 331 F.3d at 77; see also Curiano v. Suozzi, 63 N.Y.2d 113, 117 (1984) ("A malicious motive alone, however, does not give rise to a cause of action for abuse of process."). "A plaintiff must establish that the defendants had an improper *purpose* in instigating the action." Savino, 331 F.3d at 77 (emphasis in original).

While plaintiffs allege, albeit in a conclusory fashion, that a number of defendants conspired to falsify arresting documents against plaintiffs, (FAC ¶ 117), and that plaintiffs were prosecuted on the basis of those false documents, (FAC ¶ 147), they do not allege any facts permitting a plausible inference that defendants did so "in order to obtain a collateral objective that is outside the legitimate ends of the process." Sheldon, 41 F.3d at 80. Plaintiffs do not identify any possible collateral objective. The allegation that defendants falsified documents permits the Court to infer that defendants intended to do plaintiffs harm, but, an evil motive is not enough to sustain a claim for malicious abuse of process. See Savino, 331 F.3d at 77-78 (holding that plaintiff failed to state a malicious abuse of process claim where he alleged that his investigation and arrest by the defendants was motivated by the defendants' desire to seek vindication for embarrassment the plaintiff caused the City of New

York). Plaintiffs' claims for malicious abuse of process will be dismissed.

E. Right to a Fair Trial Claim.

**\*9** "When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial." Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 130 (2d Cir. 1997); see also Morse v. Fusto, 804 F.3d 538, 548 (2d Cir. 2015). A plaintiff need not have proceeded to a full trial on the merits in order to have an actionable section 1983 claim based on the denial of a fair trial. See Ricciuti, 124 F.3d at 127 (plaintiffs bringing a section 1983 claim for right to a fair trial had their criminal charges dismissed pre-trial); Canario v. City of New York, 5 cv 9343 (LBS), 2006 WL 2015651, at \*1 (S.D.N.Y. July 12, 2006) (plaintiffs original criminal charges were dismissed pre-trial).

As described above, plaintiffs allege that defendants Blanco, Charnyavsky, Galgano, Boyle, and Valentine conspired to create, and created, false arresting documents against plaintiffs. (FAC ¶ 117). Specifically, plaintiffs claim that defendants Blanco and Charnyavsky instructed and assisted Galgano, Boyle, and Valentine "in creating false narratives" regarding plaintiffs behavior in Zuccotti Park. (FAC ¶ 117). They claim that Galgano, Boyle, and Valentine—who filled out arresting paperwork allegedly swearing they saw plaintiffs engage in certain conduct —never actually saw Marom, Rocek, or Fitzgerald in Zuccotti Park that day. (FAC ¶¶ 132, 134, 136). Plaintiffs assert that "[b]ased on those false statements, Plaintiffs were prosecuted for criminal offenses." (FAC ¶ 147).

Those assertions, however, are not sufficient to plausibly allege a fair trial claim. Critically, plaintiffs fail to assert how, in what way, or to what effect, the defendants specifically falsified their arrest processing paperwork. A fair trial claim cannot survive a motion to dismiss based only on broad and conclusory allegations the officers created "false narratives" about what they saw. See Abdul-Rahman v. City of New York, 10 cv 2778 (ILG), 2012 WL 1077762, at \*12 (E.D.N.Y. Mar. 30, 2012) (dismissing a plaintiff's fair trial claim "because he has presented only the most conclusory and generalized allegations, failing to specify in what way the statements, information, or testimony were false or even in what material respect the charges against him were false").

The claim that the false reports were "likely to influence a jury's decision" is also entirely speculative. See Ricciuti, 124 F.3d at 130. The Officers would have had to testify to the purportedly false statements included in the arresting paperwork in court, as the arrest reports, if they included inculpatory evidence against plaintiffs, would have been inadmissible on their own on Confrontation Clause grounds. See Crawford v. Washington, 541 U.S. 36, 59 (2004) (stating Confrontation Clause rule applicable to "[t]estimonial statements of witnesses absent from trial"); See also United States v. Garcia, 282 F. App'x 14, 24 (2d Cir. 2008) (permitting two officers to read from arrest reports and holding that there was no Confrontation Clause violation "because both police officers were witnesses subject to cross-examination by the defendants testifying about their own prior recollection of events"). This kind of speculative chain of events does not suffice to state a plausible fair trial claim. See Brown v. City of New York, 2014 U.S. Dist. LEXIS 181736, \*10 (E.D.N.Y. Dec. 23, 2014) (dismissing right to fair trial claim based on allegedly false statements contained in arrest paperwork); see also Blair v. City of New York, 03 cv 1485(SLT) (CLP), 2009 WL 959547, at \*11 (E.D.N.Y. Mar. 31, 2009) ("Falsified or fabricated evidence alone does not amount to a constitutional violation, however. The constitutional violation occurs when such evidence is admitted at trial and impairs the truth-seeking function of the court proceedings.").

F. First Amendment Claim.

1. Retaliation.

**\*10** As an initial matter, Fitzgerald's First Amendment retaliation claim will be dismissed on the basis that there was probable cause to arrest him. The existence of probable cause will defeat a First Amendment claim "premised on the allegation that defendants prosecuted a plaintiff out of a retaliatory motive." Fabrikant v. French, 691 F.3d 193, 215 (2d Cir. 2012); see also Mozzochi v. Borden, 959 F.2d 1174, 1180 (2d Cir. 1992) ("An individual does not have a right under the First Amendment to be free from a criminal prosecution supported by probable cause, [even if it is] in reality an unsuccessful attempt to deter or silence criticism of the government."). Fitzgerald pled guilty to a disorderly conduct violation arising from his arrest on March 17, 2012. (Plaintiffs' Memorandum of Law in Opposition, 4);

see N.Y. Penal Law § 240.20. Because "a conviction of the plaintiff following the arrest is viewed as establishing the existence of probable cause," Cameron, 806 F.2d at 387, Fitzgerald's First Amendment retaliation claim will be dismissed at this stage.

Marom's and Rocek's retaliation claims, however, remain in issue. "To plead a First Amendment retaliation claim a plaintiff must show: (1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by his exercise of that right; and (3) the defendant's actions caused him some injury." Dorsett v. Cty. of Nassau, 732 F.3d 157, 160 (2d Cir. 2013). To satisfy the first element, plaintiffs must allege that they were engaged in speech protected by the First Amendment. Defendants argue that plaintiffs have failed to establish this element because plaintiffs allege only that they were present in Zuccotti Park.

"It is well established that '[t]he First Amendment affords protection to symbolic or expressive conduct as well as to actual speech.'" Church of Am. Knights of the Ku Klux Klan v. Kerik, 356 F.3d 197, 205 (2d Cir. 2004) (quoting Virginia v. Black, 538 U.S. 343 (2003)). The test for determining whether conduct is sufficiently expressive to implicate the First Amendment is whether "'[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it.'" Id. (quoting Texas v. Johnson, 491 U.S. 397, 404 (1989)) (alterations in original). "The party asserting that its conduct is expressive bears the burden of demonstrating that the First Amendment applies [ ] and that party must advance more than a mere 'plausible contention' that its conduct is expressive." Id. (internal citation omitted).

Plaintiffs allege that they were present in Zuccotti Park "in connection with the six month anniversary of the OWS movement." (FAC ¶¶ 157, 175, 196). While they do not explicitly state that they were "protesting for" or "supporting" or "engaging in political speech with" the OWS movement, they assert that they "participated in a First Amendment Assembly." (FAC ¶ 2). In the context of the FAC, the Court finds it reasonable to infer that plaintiffs used the phrases "in connection with six-month anniversary of the OWS movement" and "participated in a First Amendment Assembly" as shorthand for alleging that they were present in Zuccotti Park with the intention of supporting the OWS movement and its

political message. That inference also applies to Rocek, whom plaintiffs allege was volunteering as a street medic in connection with the OWS movement. (FAC ¶ 175). However, because plaintiffs' allege only that they were present in Zuccotti Park "in connection with" the six-month anniversary of OWS, the question remains whether supportive presence at a political rally, without more, qualifies as expressive conduct.

Courts in this district have held that physical occupation of Zuccotti Park in connection with an OWS rally constitutes expressive conduct. Gersbacher v. City of New York, 14 cv 7600 (GHW), 2015 WL 5692178, at *8 (S.D.N.Y. Sept. 25, 2015); Meyers v. City of New York, 14 cv 9142 (ALC), 2015 WL 6503825, at *14 (S.D.N.Y. Oct. 27, 2015); cf. Pluma v. City of New York, 13 cv 2017 (LAP), 2015 WL 1623828, at *8 (S.D.N.Y. Mar. 31, 2015) (holding that plaintiff who admitted to being "a bystander and citizen journalist witnessing the event," rather than a protester in OWS, was not engaged in expressive conduct). This Court agrees with those holdings. The test for expressive conduct is whether "[a]n intent to convey a particularized message was present, and [whether] the likelihood was great that the message would be understood by those who viewed it." Johnson, 491 U.S. at 404. A fair reading of the FAC is that plaintiffs intended to convey a particularized message of political support for OWS with their presence in, and occupation of, Zuccotti Park. The Court also concludes that such a message would have been sufficiently clear to any passerby —even if plaintiffs were not shouting or holding signs. It is plausible to conclude that an individual that chooses to physically associate with the OWS movement in its iconic locale on its six-month anniversary was engaging in expressive conduct protected by the First Amendment.

**\*11** Plaintiffs must also plausibly allege that defendants' actions against them were motivated or substantially caused by the exercise of their First Amendment rights and that defendant's actions caused him some injury. Regarding the third element—injury— plaintiffs can show "*either* that [their] speech has been adversely affected by the government retaliation or that [they have] suffered some other concrete harm." Dorsett, 732 F.3d at 160 (emphasis in the original). Criminal charges qualify as "some other concrete harm." See Smith v. Campbell, 782 F.3d 93, 100 (2d Cir. 2015) (holding that the "issuance of the tickets was an injury in that it subjected [plaintiff] to a state action requiring that she either appear in court,

pay a fine, or both"). Defendants' arrest of Marom and Rocek qualifies as an injury to them because it both halted their speech immediately and subjected them to criminal charges.

Regarding the second element—that defendants arrested them *because* they were exercising their First Amendment rights—the FAC includes no factual content regarding the circumstances surrounding plaintiffs' arrests. The only pertinent allegation made in the FAC is that prior to being "violently" arrested by police, all three plaintiffs were "lawfully present" in Zuccotti Park "in connection with the six month anniversary of the OWS movement." (FAC ¶¶ 157, 175, 196). Marom and Rocek fail to describe any part of the interaction between themselves and the police or recount what they or the police were doing at or around the time they were arrested. While the law in no way requires plaintiffs' to set forth a detailed account of the events surrounding their claims in order to survive a motion to dismiss, it does require enough factual content to allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678.

A court in this district has previously held that a plaintiff involved in an OWS protest in 2011 adequately pled the second element of a retaliation claim by alleging only that officers arrested him while he was engaged in First Amendment speech. Meyers, 2015 WL 6503825, at *12; see also Gersbacher, 2015 WL 5692178, at *8 (denying motion to dismiss retaliation claim where plaintiff alleged he was arrested due to his participation in Occupy Wall Street). The district court based its holding on the Second Circuit's decision in Smith v. Campbell, 782 F.3d 93, 100 (2d Cir. 2015). In that case, the Circuit held that an officer's appearance at the plaintiff's house to deliver traffic tickets "mere hours" after plaintiff engaged in protected speech by complaining about the officer's prior conduct to his superiors "was sufficiently proximate to imply that the issuance of the tickets was motivated by [the plaintiff's] complaint." Campbell, 782 F.3d at 100. It was on that basis—the proximity in time between the plaintiffs' protected speech and the defendants' act—that the court in Meyers concluded that the plaintiff alleged a plausible retaliatory motivation for his arrest. Meyers, 2015 WL 6503825, at *12.

Even though the facts alleged by the plaintiff in her complaint in Smith v. Campbell provided ample factual

support, beyond mere proximity in time, for the inference that the officer's conduct was in retaliation for the plaintiff's protected speech, 782 F.3d at 96, the Court concludes that Marom's and Rocek's allegation that they were "lawfully present in Liberty Plaza in connection with the six month anniversary of the OWS movement" and were subsequently arrested, (FAC ¶¶ 157-59, 175-77), is adequate to state a retaliatory motive. But see Anemone v. Metro. Transp. Auth., 629 F.3d 97, 120 (2d Cir. 2011) (affirming summary judgment denying a retaliation claim where the timing of allegedly impermissible action "reflected instead the steady accumulation of misconduct" by plaintiff and not a retaliatory motive). Thus, Marom and Rocek have stated a plausible First Amendment retaliation claim. The Court acknowledges that the claim, like all claims, may look very different at the summary judgment stage and mere temporal proximity may ultimately prove to be insufficient for a reasonable jury to rule in Marom's and Rocek's favor.

### 2. Time, Place, and Manner Restriction.

**\*12** In addition to their retaliation claim, it appears that plaintiffs also challenge "the restrictions imposed by defendants on plaintiffs' First Amendment rights" as being unconstitutional time, place, and manner restrictions. (FAC ¶ 242).

> "[E]xpressive activity, even in a quintessential public forum, may interfere with other important activities for which the property is used. Accordingly, [the Supreme Court] has held that the government may regulate the time, place, and manner of the expressive activity, so long as such restrictions are content neutral, are narrowly tailored to serve a significant governmental interest, and leave open ample alternatives for communication."

Paulsen v. Gotbaum, 982 F.2d 825, 828 (2d Cir. 1992) (quoting Burson v. Freeman, 504 U.S. 191, 197 (1992)). It is not clear, however, what plaintiffs are asserting were improper time, place, and manner restrictions.

The FAC, read in a light most favorable to plaintiffs, could be alleging that the rules governing the use of Zuccotti Park were unconstitutional time, place, and manner restrictions. To that end, plaintiffs cite several zoning regulations that deal with a variety of issues regarding the park: the requirement that at least 50% of the sidewalk must be free of obstruction, (FAC ¶ 50), the process for making physical modifications to the park, (FAC ¶¶ 51-52), the requirement that all prohibitions on conduct in the park must be clearly posted in writing, (FAC ¶ 53), and the requirement that "public plazas shall be accessible to the public at all times, except where the [New York City Planning Commission] has authorized a nighttime closing," (FAC ¶ 55). However, plaintiffs make no allegations explaining how any of these regulations could plausibly be an improper time, place, and manner restriction on plaintiffs' First Amendment activity. They do allege that police erected barricades around Zuccotti Park beginning on November 15, 2011, (FAC ¶ 93), and "ratified and enforced arbitrary and shifting criteria determining who could enter the park," (FAC ¶ 94). But, plaintiffs fail to specifically identify any regulation or allege how that regulation was unconstitutional.

Instead, plaintiffs allege that defendants violated the rules regarding Zuccotti Park when arresting OWS protestors on March 17, 2012. And, to the extent the FAC is alleging that the NYPD's conduct itself was somehow an unconstitutional time, place, and manner restriction, plaintiffs only make reference to two actual "policies:" the No-Summons and MAPP policies. According to plaintiffs own complaint, however, those policies dealt with how arrested protestors would be processed by the NYPD. Plaintiffs do not claim that those policies were related to the decision to arrest OWS protestors in the first place. And, to the extent the police arrested plaintiffs in violation of the First Amendment, that constitutional deprivation is covered by plaintiffs' First Amendment retaliation claim. In sum, even assuming that Zuccotti Park is a traditional public forum in which the First Amendment applies with full force, see Bogart v. City of New York, 13 cv 1017 (NRB), 2015 WL 5036963, at \*9 (S.D.N.Y. Aug. 26, 2015) (describing that the recent decisions in this court involving OWS have assumed, but not clearly held that the First Amendment applies to Zuccotti Park), plaintiffs fail to identify any plausible unconstitutional time, place, and manner restriction.

G. Equal Protection Claim.

**\*13** "There are several ways for a plaintiff to plead intentional discrimination that violates the Equal Protection Clause." Brown v. City of Oneonta, New York, 221 F.3d 329, 337 (2d Cir. 2000). A plaintiff could: (1) "point to a law or policy that expressly classifies persons on [an improper basis];" (2) "identify a facially neutral law or policy that has been applied in an intentionally discriminatory manner;" or, (3) "allege that a facially neutral statute or policy has an adverse effect and that it was motivated by discriminatory animus." Id. It appears from the FAC that plaintiffs are proceeding with an Equal Protection claim based on a selective enforcement theory.

> "[A] violation of equal protection for selective enforcement would arise if: (1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person."

LaTrieste Rest. & Cabaret Inc. v. Vill. of Port Chester, 40 F.3d 587, 590 (2d Cir. 1994) (quoting LeClair v. Saunders, 627 F.2d 606, 609-10 (2d Cir. 1980)).

Plaintiffs claim the OWS protestors were subjected to different policing policies than other similarly situated individuals. In essence, plaintiffs allege that the City, through the supervisory defendants and the NYPD, implemented two different policies regarding persons detained and arrested for non-criminal violations. The first policy, the standard one codified in the NYPD's Patrol Guide, calls for individuals detained and arrested for non-criminal violations to be eligible "for release with a Universal Summons or DAT [Desk Appearance Ticket] rather than being held in custody for arraignment." (FAC ¶ 69). This would reduce the amount of time such individuals spent in custody to between two and four hours. (FAC ¶ 70). In contrast, plaintiffs allege that defendants used a second policy, which plaintiffs called the No-Summons Policy and MAPP, to specifically target

OWS protestors detained and arrested at demonstrations and to deny them individual consideration for release with a summons. (FAC ¶ 64). Instead, the police centralized the processing of OWS protestors, created false documents regarding those protestors, and subjected them to unreasonably lengthy detention periods. (FAC ¶ 65).

Plaintiffs assert that they were subjected to these policing practices because of their political views. In other words, defendants arrested plaintiffs and refused to give them summonses because they intended to inhibit or punish plaintiffs for the exercise of their First Amendment rights. But, plaintiffs plead only conclusory allegations regarding defendants' intent to discriminate against plaintiffs. They allege no factual content that leads to a reasonable inference that defendants used the "No-Summons" and "MAPP" policies specifically against OWS protestors with an intent to discriminate against them or their political message. There is no non-conclusory allegation that defendants have any antipathy toward any aspect of the viewpoint of the OWS protestors. Conclusory allegations alone are not sufficient to establish a plausible equal protection claim. See Turkmen v. Hasty, 789 F.3d 218, 253-54 (2d Cir. 2015) (finding that claims of discriminatory intent are sufficient to defeat a motion to dismiss where plaintiffs alleged that high level officials condoned discriminatory actions by other officials).

Moreover, plaintiffs fail to adequately allege that they were in fact treated differently than other similarly situated persons. The Second Circuit has interpreted "similarly situated" to mean "a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical." Graham v. Long Island R.R., 230 F.3d 34, 40 (2d Cir. 2000). Plaintiffs fail to allege any comparative cases at all. Plaintiffs have also failed to adequately allege that defendants policed the March 17, 2012 OWS demonstration differently than other similarly large and disruptive demonstrations. In fact, while the FAC fails to allege that defendants used the standard policing policy during other similarly large demonstrations, it does allege that other large demonstrations not associated with OWS were subjected to policies similar to the "No-Summons" and "MAPP" policies. Specifically, plaintiffs allege that similar policies were used against demonstrations connected with the

Republican National Convention in 2004. (FAC ¶¶ 29-45).

**\*14** Thus, even assuming that defendants utilized a non-standard policing policy on March 17, 2012, plaintiffs fail to plausibly allege that it was applied selectively against OWS or with an intent to discriminate against OWS protestors. Plaintiffs' equal protection claims do not survive a motion to dismiss.

H. Personal Involvement of Named Defendants.
"It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995) (quoting Wright v. Smith, 21 F.3d 496, 501 (2d Cir. 1994)). Plaintiffs only surviving claims are Marom's and Rocek's false arrest and First Amendment retaliation claims and Fitzgerald's claim for excessive use of force. If the FAC fails to plausibly allege the personal involvement of the individual defendants' in each of those claims, those respective claims must be dismissed as to those particular defendants.

Prior to the Supreme Court's decision in Iqbal, the law in this Circuit regarding when a defendant was "personally involved" in a constitutional deprivation differentiated sharply between subordinate and supervisory officials. See Williams v. Smith, 781 F.2d 319, 323 (2d Cir. 1986); Colon, 58 F.3d at 873. Any defendant, subordinate or supervisory, was liable under section 1983 if he or she "directly participated" in a constitutional deprivation. Williams, 781 F.2d at 323; see also Colon, 58 F.3d at 873. Supervisory officials, however, could also be liable for constitutional deprivations arising from conduct related to his or her supervisory responsibilities. Colon, 58 F.3d at 873. Specifically, the Circuit in Colon held that personal involvement of a supervisor may be established by evidence that:

> (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a

policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference ... by failing to act on information indicating that unconstitutional acts were occurring.

58 F.3d at 873. The "Colon test" permitted courts to find that supervisory officials were "personally involved" in any constitutional deprivation, regardless of the elements of the underlying constitutional provision at issue, if plaintiffs could prove any one of those five factors. See, e.g., Jenkins v. Garvin, 95 cv 3273 (JSM), 1997 WL 414128, at *3 (S.D.N.Y. July 23, 1997) (recognizing that in a section 1983 claim premised on the Eighth Amendment a "prisoner may demonstrate the personal involvement of a supervisor by evidence that shows that the supervisor created or allowed the continuance of a policy under which the constitutional deprivation occurred or was grossly negligent in the supervision of a subordinate").

The Iqbal decision rejected Colon's one-size-fits-all "supervisory liability" test in the context of examining a claim of "invidious discrimination in contravention of the First and Fifth Amendments." 556 U.S. at 676. Emphasizing that "vicarious liability is inapplicable to Bivens and § 1983 suits," the Court held that a supervisory official could be found personally liable for a constitutional deprivation only on the basis of "his or her own misconduct." Id. at 676-77. The Court also held that the factors necessary to establish when a supervisor's actions constituted "misconduct" depended only on "the constitutional provision at issue." Id. at 675-76. For example, on a claim of discrimination in violation of the Fifth Amendment's equal protection component, a plaintiff must establish that each defendant acted with a discriminatory purpose.[4] Id. at 676. A plaintiff cannot establish that a supervisor was liable for discrimination simply by proving that the supervisor knew that a subordinate acted with a discriminatory purpose. Id. Where "purpose rather than knowledge is required to impose Bivens liability on the subordinate for unconstitutional discrimination; the same holds true for an official charged with violations arising from his or her superintendent responsibilities." Id. at 677.

**\*15** The Second Circuit has yet to definitively address the impact of Iqbal on the Colon test in areas outside of discrimination. See Reynolds v. Barrett, 685 F.3d 193, 205 n.14 (2d Cir. 2012) (casting doubt on the Colon test); Raspardo v. Carlone, 770 F.3d 97, 117 (2d Cir. 2014) ("We have not yet determined the contours of the supervisory liability test, including the gross negligence prong, after Iqbal."). In the absence of binding precedent, district courts in this Circuit have divided into two camps. Some courts hold that Iqbal categorically eliminated the second, fourth, and fifth Colon factors. See, e.g., Bellamy v. Mount Vernon Hosp., 07 cv 1801 (SAS), 2009 WL 1835939, at *6 (S.D.N.Y. June 26, 2009) aff'd sub nom. Bellamy v. Mount Vernon Hosp., 387 F. App'x 55 (2d Cir. 2010) ("Only the first and part of the third Colon categories pass Iqbal's muster—a supervisor is only held liable if that supervisor participates directly in the alleged constitutional violation or if that supervisor creates a policy or custom under which unconstitutional practices occurred."). While other courts hold that the viability of the second, fourth, and fifth Colon factors depends on the underlying constitutional claim. See, e.g., Sash v. United States, 674 F. Supp. 2d 531, 544 (S.D.N.Y. 2009) ("Where the constitutional claim does not require a showing of discriminatory intent, but instead relies on the unreasonable conduct or deliberate indifference standards of the Fourth and Eighth Amendments, the personal involvement analysis set forth in Colon v. Coughlin may still apply."); Delgado v. Bezio, 09 cv 6899 (LTS), 2011 WL 1842294, at *9 (S.D.N.Y. May 9, 2011) (holding that "where the claim does not require a showing of discriminatory intent, the Colon analysis should still apply, insofar as it is consistent with the particular constitutional provision alleged to have been violated") (internal quotation marks omitted). Neither sect, however, disputes the viability of the "direct participation" and "policy or custom" factors.

With regard to the disputed second, fourth, and fifth factors of the Colon test, this Court agrees with the latter group. The holding in Iqbal does not stand for the proposition that a supervisor can never be found personally liable for a constitutional deprivation on a showing that he was "grossly negligent" or "deliberately indifferent." It only requires that a supervisor's action—whether direct or through "his or her superintendent responsibilities"—must *itself* violate the terms of the constitutional provision at issue. Iqbal rejected the idea that subordinates and supervisors could be held to

different standards of liability for violations of the same Constitutional right, which, to the majority, amounted to applying the forbidden vicarious liability standard under a different label. But, Iqbal does not insulate supervisors from liability for any act or omission that on its own satisfies "each element of the underlying constitutional tort." Turkmen v. Hasty, 789 F.3d 218, 250 (2d Cir. 2015). The Second Circuit's recent decision in Turkmen v. Hasty supports this reading of Iqbal. 789 F.3d at 250 (holding that plaintiffs stated a plausible 1983 claim for an Eighth Amendment deprivation against certain supervisory defendants whose conduct amounted to "deliberate indifference" because the "underlying constitutional violation requires no more than deliberate indifference").

In the present case, the surviving claims are for false arrest, First Amendment retaliation, and excessive force. Plaintiffs allege that the supervisory defendants were personally involved in each those violations. In line with the view stated above, the second, fourth, and fifth Colon factors should not be viable bases for holding the supervisory defendants liable for the First Amendment retaliation claims because those claims have an intent requirement. See Dorsett, 732 F.3d at 160 (holding that on a claim for First Amendment retaliation plaintiffs must show that a "defendant's actions were motivated or substantially caused by his exercise of [plaintiff's First Amendment rights]"). But, those factors may be viable when it comes to false arrest and excessive force claims because those claims have no state-of-mind requirement, only an objectively reasonable standard. It is not necessary, however, for the Court to weigh in definitively on which of the disputed Colon factors are viable for which claims because plaintiffs fail to plausibly allege any facts showing that the supervisory defendants were "grossly negligent" or "deliberately indifferent." Plaintiffs only plausibly allege that defendants "directly participated" in, and "created a policy or custom" allowing for, their constitutional deprivations.

**\*16** Importantly, even if plaintiffs did establish that one of the supervisory defendants created a policy or custom under which a constitutional deprivation occurred, they "must also establish that the supervisor's actions were the proximate cause of the [their] constitutional deprivation." Raspardo, 770 F.3d at 116 (2d Cir. 2014). Section 1983 specifically extends liability to "every person who ... subjects, *or causes to be subjected*, any citizen of the United

States or other person within the jurisdiction thereof to the deprivation of any [Constitutional rights.]" 42 U.S.C. § 1983 (emphasis added). The Supreme Court has interpreted this language to mean that "Congress did not intend § 1983 liability to attach where such causation was absent." Monell, 436 U.S. at 692. Causation incorporates the tort concept of proximate cause, a concept that has long turned on reasonable foreseeability. See City of Oklahoma City v. Tuttle, 471 U.S. 808, 833 (1985) ("Ordinary principles of causation used throughout the law of torts recognize that 'but for' causation, while probably a necessary condition for liability, is never a sufficient condition of liability."); See also Stanford v. Kuwait Airways Corp., 89 F.3d 117, 125 (2d Cir. 1996) (describing two concepts of foreseeability, with one, "the foreseeability of the specific injury the plaintiff suffered," being related to proximate cause). Where acts of third parties are involved, which will generally be the case in section 1983 claims where a supervisor's liability is premised only on her creation of a "policy or custom," the supervisor may be held liable for "those consequences attributable to *reasonably foreseeable* intervening forces." Warner v. Orange Cty. Dep't of Prob., 115 F.3d 1068, 1071 (2d Cir. 1996) (internal quotation marks omitted) (emphasis added). Thus, if the constitutional deprivation at issue was not a foreseeable consequence of any alleged policy or custom, or the deprivation was caused by some unforeseeable intervening event, plaintiffs have not stated a plausible claim against a supervisory defendant. See Victory v. Pataki, No. 13--3592, 2016 WL 373869, at *15 (2d Cir. Feb. 1, 2016), as amended (Feb. 24, 2016) (affirming dismissal of claims against Governor Pataki for lack of personal involvement where plaintiff only alleges that Governor Pataki had a blanket policy of opposing parole to violent offenders, but does not allege that that policy led the Governor's staff "to intervene in parole decisions" or to ratify "the rescission procedures employed by the Board of Parole").

### 1. False Arrest.

#### i. Officers Galgano, Boyle, and Valentine.

Plaintiffs do not allege that Galgano or Boyle were personally involved in seizing Marom or Rocek from Zuccotti Park. However, they do allege that Galgano and Boyle were personally involved in creating the NYPD paperwork documenting Marom's and Rocek's arrests.

(FAC ¶¶ 139-40). Galgano allegedly filled out the arresting paperwork for Marom, (FAC ¶ 139), and Boyle allegedly filled out the arresting paperwork for Rocek, (FAC ¶ 140). Plaintiffs also allege that the paperwork included "false statements" about what the officers allegedly saw. (FAC ¶¶ 144-45, 147). These allegations are adequate, at this stage, to support claims that Galgano "directly participated" in Marom's false arrest and Boyle "directly participated" in Rocek's false arrest. [5]

"Direct participation" means "intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal." Provost v. City of Newburgh, 262 F.3d 146, 155 (2d Cir. 2001). First, Galgano and Boyle intentionally participated in the respective arrests by filling out the arresting paperwork for each of those plaintiffs. Second, there is a plausible basis to infer that Galgano and Boyle knew that the arrests were unlawful, if indeed they were, because they were tasked with filing the arrests, which presumably included stating the basis for probable cause. While the FAC also alleges that Officer Valentine filled out the arresting paperwork for Fitzgerald, his false arrest claim does not survive the motion to dismiss. Beyond that, there are no allegations that Officer Valentine directly participated in the arrests of, or filled out the arresting paperwork for, Marom and Rocek.

In sum, Marom adequately alleges that Officer Galgano was personally involved in his false arrest and Rocek adequately alleges that Officer Boyle was personally involved in her false arrest.

## ii. Supervisory Defendants.

Marom and Rocek also claim that the named "supervisory defendants"—Chief of Department Esposito, Deputy Inspector Winski, Lieutenant Viviano, Sergeant Blanco, and Legal Bureau attorney Charnyavsky—were personally involved in their false arrests.

The FAC alleges that Blanco and Charnyavsky met with and supervised Officers Galgano and Boyle in connection with processing Marom's and Rocek's arrests. (FAC ¶¶ 127-28). A supervisor can be personally liable if he "participated directly in the alleged constitutional violation." Colon, 58 F.3d at 873. "[O]rdering or helping others to do the unlawful acts, rather than doing them

[oneself]," can constitute "direct participation." Provost, 262 F.3d at 155. Blanco and Charnyavsky allegedly gathered together and conferred with the arresting officers and eight other officers, and "conferred with each other about" what they had observed and what the charges were against plaintiffs. (FAC ¶ 114). And, Blanco and Charnyavsky allegedly "instructed" Officers Galgano and Boyle "regarding what to write in their NYPD arrest processing paperwork," including "creating false narratives." (FAC ¶¶ 115-17). Those allegations, coupled with the allegations that Officers Galgano and Boyle lied about conduct they allegedly did not see, (FAC ¶¶139-40), create a plausible claim that Blanco and Charnyavsky "participated directly in the" purported false arrests of Marom and Rocek with knowledge that they were unconstitutional. Colon, 58 F.3d at 873.

**\*17** Regarding Lieutenant Viviano, the FAC fails to plausibly allege that he was personally involved in Marom's and Rocek's false arrests. Plaintiffs allege that Viviano was responsible for ensuring the accuracy of Galgano's, Boyle's, and Valentine's arrest processing paperwork, (FAC ¶ 112), and that he "knew or should have known that the NYPD's March 17, 2012 mass arrest processing plans and/or practices would result in assigned arresting officers filling out NYPD and criminal court paperwork containing false allegations," (FAC ¶ 125). Neither of those allegations give rise to a plausible inference that Viviano directly participated in either false arrest or created any policy or custom.

Regarding Deputy Inspector Winski, the allegations establishing his personal involvement in the false arrests are substantially the same as those against Viviano. Plaintiffs merely allege that he was the second highest ranking NYPD Officer in the vicinity of Marom's and Rocek's arrests, (FAC ¶ 108); that he, or Defendant Esposito, or both, had the responsibility "to ensure that any arrest teams assigned to process arrests had definite knowledge of each arrest," (FAC ¶ 111); and, that he "knew or should have known that the NYPD's March 17, 2012 mass arrest processing plans and/or practices would result in assigned arresting officers filling out NYPD and criminal court paperwork containing false allegations," (FAC ¶ 125). Again, these allegations do not create a plausible inference that Winski directly participated in, or created a policy causing, the alleged unconstitutional arrests.

Lastly, regarding Chief of Department Esposito, plaintiffs' allegations fit into two categories. First, similar to the aforementioned allegations against Viviano and Winski, Marom and Rocek allege that Esposito was the highest ranking NYPD Officer "in the vicinity" of their arrests, (FAC ¶ 107), and that he was responsible for all supervisory decisions regarding all fellow officers at Zuccotti Park on March 17, 2012, (FAC ¶¶ 109-11). These allegations fail to state a plausible claim that Esposito "participated directly" in Marom's or Rocek's false arrest. Colon, 58 F.3d at 873.

Second, plaintiffs allege that Esposito "created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom." Colon, 58 F.3d at 873. They allege that between September 17, 2011 and March 17, 2012, Esposito was personally involved in planning for policing the OWS protests and in designing and implementing the NYPD's police responses to OWS. (FAC ¶ 61). They also allege that he met with the then-NYPD Commissioner on a regular basis to discuss the OWS protest and that during those meetings the City adopted the "No-Summons" and "MAPP" policies. (FAC ¶ 63-65). According to plaintiffs, the "MAPP" policy called for NYPD Legal Bureau and Criminal Justice Bureau agents to be involved in "the centralized processing of arrestees in a single mass arrest processing center," which led to the "creation of boilerplate NYPD documents containing false information." [6] (FAC ¶ 65). In an endeavor to connect the "MAPP" policy to Marom's and Rocek's allegedly false arrest, plaintiffs assert that Legal Bureau Attorney Charnyavsky instructed Officers Galgano and Boyle to include false information in Marom's and Rocek's arresting documents.

The allegations connecting Esposito to the "MAPP" policy and their attempts to connect the "MAPP" policy to Marom's and Rocek's false arrests are too attenuated to be a plausible basis for showing Esposito's personal involvement. First, the FAC does not "show[ ]" that Esposito was responsible for creating and implementing the "MAPP" policy other than the assertion that he was present during certain meetings with other high ranking NYPD and City decision makers.

**\*18** Second, the FAC fails to plausibly allege that the "MAPP" policy proximately caused the falsified reports or false arrests. In a major population center, multiple individuals may violate the law at a single location and

at approximately the same time. Those situations may dictate that the police arrest many people in a short span of time. Nothing is inherently unlawful or unconstitutional about creating a plan in advance to deal with such occurrences. There is nothing wrong with developing a uniform procedure for all arrests arising out of a large event. Nor is the use of boilerplate forms or specifically trained agents to facilitate the processing of multiple arrests inherently unlawful or unconstitutional. Of course, the entry of knowingly false information on any record, boilerplate or otherwise, is unlawful. The FAC, however, fails to plausibly allege how Esposito or the "MAPP" policy he allegedly created *caused* false information to be relied upon or recorded during the processing of Marom's and Rocek's arrests. Even assuming *arguendo* that certain defendants entered false information into Marom's and Rocek's arrest reports, plaintiffs fail to show how that intervening event was a reasonably foreseeable consequence of the so called "MAPP" policy.

In sum, plaintiffs' claims that Blanco and Charnyavsky were personally involved in the false arrest of Marom and Rocek survive the motion to dismiss, but their claims against Viviano, Winski, and Esposito do not.

### 2. First Amendment Retaliation.

Marom's and Rocek's claims for First Amendment retaliation also survive defendants' motion to dismiss. Those claims are functionally identical to plaintiffs' false arrest claims regarding the alleged basis for personal involvement of the named defendants, with support for the allegation of a retaliatory motive arising from the proximity in time between plaintiffs' expressive conduct and their arrests. Because both claims arise from the same factual allegations—defendants arrested Marom and Rocek without probable cause because they were involved in the Occupy Wall Street protest on March 17, 2012—plaintiffs make identical contentions regarding how the named individual defendants were personally involved in those events. On that basis, the Court's analysis regarding the issue of personal involvement is the same on these claims as it was on the false arrest claims.

Thus, for the reasons explained above, plaintiffs adequately allege that Officer Galgano was personally involved in Marom's First Amendment retaliation claim and that Officer Boyle was personally involved in

Rocek's First Amendment retaliation claim. Marom's and Rocek's claims that Blanco and Charnyavsky were personally involved in their retaliatory arrests also survives defendants' motion to dismiss. However, the claims that Viviano, Winski, and Esposito were personally involved in the plaintiffs' retaliatory arrests do not.

### 3. Excessive Force.

Fitzgerald's excessive force claim, as noted, also survives defendants' motion to dismiss. A single unidentified officer was allegedly responsible for the actual force used against Fitzgerald. (FAC ¶ 198). Nevertheless, Fitzgerald maintains that Officers Galgano, Boyle, and Valentine and the "supervisory defendants" were personally involved in that use of excessive force.

#### i. Officers Galgano, Boyle, and Valentine.

With regard to Officers Galgano and Boyle, plaintiffs do not allege that they saw Fitzgerald in Zuccotti Park, or otherwise participated in or witnessed the use of force against him. And, with regard to Officer Valentine, plaintiffs affirmatively state that he never saw Fitzgerald before Fitzgerald arrived at the Midtown South Precinct. (FAC ¶¶ 136-37). Therefore, the FAC does not plausibly allege that any of the officers were personally involved in the unconstitutional use of force against Fitzgerald. Fitzgerald's excessive force claim is dismissed as to Officers Galgano, Boyle, and Valentine.

#### ii. Supervisory Defendants.

There are no allegations that any of the supervisory defendants participated directly in the use of force against Fitzgerald. The most Fitzgerald alleges is that the supervisory defendants were "in the vicinity" of Zuccotti Park during the protest. For example, the FAC asserts that Esposito was "the highest ranking NYPD officer in the vicinity of Plaintiffs' arrests," (FAC ¶ 107), and that Winksi was "the second-highest-ranking NYPD officer in the vicinity of Plaintiffs' arrests," (FAC ¶ 108). It also alleges that "at least defendants Winski and Viviano were personally involved in OWS-related false arrests in the vicinity of Liberty Plaza." (FAC ¶ 150). These claims of presence in a "vicinity," in the context of a large protest in

Zuccotti Park, do not plausibly allege direct participation in the use of excessive force against Fitzgerald.

**\*19** Plaintiffs do not plausibly allege a claim against Esposito. As already discussed, plaintiffs allege that defendant Esposito helped develop policing policies used in Zuccotti Park on March 17, 2012, (FAC ¶¶ 61, 63-65). They also allege, in a conclusory manner, that the use of force by police in making arrests was excessive or "extreme." (FAC ¶ 86). However, plaintiffs fail to draw any causal connection between the "No-Summons" and "MAPP" policies, which deal with methods of arrest processing and post-arrest disposition, and the use of force against OWS protestors. (FAC ¶ 86). Plaintiffs allege that Esposito helped design similar policing policies for the 2004 RNC protests and that those policies resulted in the use of excessive force by police against many arrestees in 2004. (FAC ¶¶ 30-39). But again, the FAC fails to plausibly allege that the policies were the proximate cause of the use of force against Fitzgerald during this OWS protest. Instead, the facts alleged in the FAC give rise to the reasonable inference that the actual use of force was an unforeseeable intervening act. There is nothing alleged about any of the cited policies from which a police supervisor could reasonably foresee that subordinate officers would use excessive force by reason of those policies. Rule 8(a) requires a party to set forth or "show[ ]" facts that make the allegation plausible. Apart from conclusory allegations, the FAC does not permit a reasonable inference that Esposito created or continued policies that caused the excessive use of force against Fitzgerald.

In sum, plaintiffs do not plausibly allege a basis for holding any of the named individual defendants personally liable for the excessive use of force against Fitzgerald and the claim is dismissed as to them all.

#### I. Failure to Intervene.

Plaintiffs also claim that the named individual defendants are liable for failing to intervene to prevent plaintiffs' alleged constitutional deprivations. Specifically, Marom alleges that the supervisory defendants and Officers Boyle and Valentine failed to intervene to protect his rights; Rocek alleges that the supervisory defendants and Officers Galgano and Valentine failed to intervene to protect her rights; and, Fitzgerald alleges that the supervisory defendants and Officers Galgano and Boyle failed to intervene to protect his rights. Because a "failure to

intervene [ ] claim is contingent upon the disposition of the primary claims underlying the failure to intervene claim," Matthews v. City of New York, 889 F. Supp. 2d 418, 443-44 (E.D.N.Y. 2012); see also Feinberg v. City of New York, 99 cv 12127 (RC), 2004 WL 1824373, at *4 (S.D.N.Y. Aug. 13, 2004), plaintiffs' failure to intervene claims are assessed only as they relate to Marom's and Rocek's false arrest and First Amendment retaliation claims and Fitzgerald's excessive force claim.

"All law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." Anderson, 17 F.3d at 557. "An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: (1) that excessive force is being used, [ ] (2) that a citizen has been unjustifiably arrested [ ] or (3) that any constitutional violation has been committed by a law enforcement official [ ]." Id. However, "[i]n order for liability to attach, there must have been a realistic opportunity to intervene to prevent the harm from occurring." Id.

1. False Arrest Claims.
Rocek alleges that Officers Galgano and Valentine failed to intervene in her unlawful arrest and Marom alleges that Officers Boyle and Valentine failed to intervene in his unlawful arrest. Specifically, the FAC alleges that Galgano, Boyle, and Valentine "gathered together and conferred with each other about what they had observed and what the charges were" regarding Marom and Rocek, prior to filing formal arresting paperwork and further detaining the two plaintiffs. (FAC ¶ 114). On that basis, Rocek plausibly alleges that Galgano and Valentine had a realistic opportunity to intervene in her false arrest and Marom plausibly alleges that Boyle and Valentine had a realistic opportunity to intervene in his false arrest.

Marom and Rocek also allege that the supervisory defendants failed to intervene to stop their false arrests. As an initial matter, Marom and Rocek plausibly allege that Blanco and Charnyavsky were personally involved in their false arrests. Those defendants cannot be liable for both the underlying constitutional deprivation and a failure to intervene to stop themselves from committing that violation. Regarding Viviano's, Winski's, and Esposito's failure to intervene in Marom's and Rocek's false arrest, the two plaintiffs fail to allege any facts showing that

those three supervisory defendants were present during any part of the arrest or arrest processing of Marom and Rocek. For that reason, there is no basis to infer that Winski, Viviano, or Esposito had "a realistic opportunity to intervene to prevent" the false arrests from occurring and there is no plausible failure to intervene claim pled against those defendants.

2. First Amendment Retaliation Claims.
*20 As previously explained, Marom's and Rocek's claims for First Amendment retaliation arise from the same factual allegations as their false arrest claim—defendants arrested Marom and Rocek without probable cause because they were involved in the Occupy Wall Street protest after which Officers Galgano, Boyle, and Valentine, along with Sergeant Blanco and attorney Charnyavsky, gathered together to discuss filing the arresting paperwork for both plaintiffs. As a result, the allegations as to how each of the named defendants are liable for a failure to intervene to prevent Marom's and Rocek's First Amendment retaliation claims are the same as for their false arrest claims. The Court's analysis regarding the plausibility of the failure to intervene claims is the same as well. Marom plausibly alleges that Officers Boyle and Valentine are liable for failing to intervene to prevent his retaliatory arrest and Rocek plausibly alleges that Officers Galgano and Valentine are liable for failing to intervene to prevent her retaliatory arrest. But, neither Marom nor Rocek plausibly allege that Winski, Viviano, or Esposito failed to intervene.

3. Excessive Force Claim.
Fitzgerald fails to plausibly allege that any of the named defendants are liable for failing to intervene to prevent the use of excessive force against him. With regard to Officers Galgano and Boyle, Fitzgerald does not allege that they saw him in Zuccotti Park, nor does he allege that they participated in or witnessed the use of force against him. With regard to Officer Valentine, Fitzgerald affirmatively states that he never saw Fitzgerald before Fitzgerald arrived at the Midtown South Precinct. (FAC ¶¶ 136-37). And, regarding the supervisory defendants, Fitzgerald fails to allege that any of the supervisory defendants were present at the actual scene of Fitzgerald's arrest with a "realistic opportunity" to prevent the use of force.

J. Monell Claims.
Finally, plaintiffs assert that the City of New York is liable for the deprivation of their constitutional rights. "In order to establish municipal liability, 'a plaintiff must show that the violation of his constitutional rights resulted from a municipal custom or policy.'" DeCarlo v. Fry, 141 F.3d 56, 61 (2d Cir. 1998) (quoting Ricciuti v. New York City Transit Auth., 941 F.2d 119, 122 (2d Cir.1991)). A municipality may not be held liable on section 1983 claims solely "by application of the doctrine of *respondeat superior*." Pembaur v. City of Cincinnati, 475 U.S. 469, 478 (1986). Instead, municipal liability can be found where: (1) "a particular municipal action *itself* violates federal law, or directs an employee to do so," Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown, 520 U.S. 397, 404 (1997) (emphasis in original), (2) an "authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right," Id. at 405, (3) unconstitutional "practices [are] so persistent and widespread as to practically have the force of law," Connick v. Thompson, 563 U.S. 51, 61 (2011), and (4) where a municipality's failure to train its employees about their legal duty to avoid violating a citizen's rights amounts to "deliberate indifference," Id. In any case, "a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." Bryan Cty., 520 U.S. at 404.

To succeed in plausibly alleging a claim for municipal liability against the City of New York, the FAC must demonstrate a "direct causal link between" a municipal action and one of the surviving claims: (1) Marom's and Rocek's false arrest claims, (2) Marom's and Rocek's First Amendment retaliation claims, and (3) Fitzgerald's excessive force claim. Plaintiffs list nine potential policies and practices of the City of New York that they believe are bases for municipal liability, (FAC ¶ 269), as well as one claim that the City failed to properly train its police officers. The Court will first address the various alleged municipal practices and then will address the failure to train theory.

1. Municipal Policies and Practices.
**\*21** When alleging a Monell claim based on the existence of a municipal policy or practice, plaintiffs must show that the practice causing the deprivation of federal rights

is "so persistent and widespread as to practically have the force of law." Connick, 563 U.S. at 61. Generally, "a single incident alleged in a complaint, especially if it involved only actors below the policy making level, does not suffice to show a municipal policy." DeCarlo, 141 F.3d at 61. "[T]he mere assertion that a municipality has such a custom or policy is insufficient in the absence of allegations of fact tending to support, at least circumstantially, such an inference." Zahra v. Town of Southold, 48 F.3d 674, 685 (2d Cir.1995) (alterations omitted) (quoting Dwares v. City of N.Y., 985 F.2d 94, 100 (2d Cir1993)).

Three of the alleged municipal policies and practices bear no direct causal link to the constitutional deprivations implicated in the surviving claims. First, the alleged practice of using "arrests and full-blown arrest processing in lieu of issuing summonses for summons-eligible offenses," (FAC ¶ 269g), has no connection to Marom and Rocek being arrested without probable cause, or in retaliation for their speech, or with Fitzgerald being subjected to excessive force. That alleged practice is possibly related to plaintiffs' excessive detention claims, but those have been dismissed.

Second, the alleged practice of "assigning 'arrest teams' of officers who had not witnessed the conduct allegedly giving rise to the need for arrests to 'process' the arrests of multiple arrestees, including by filing out NYPD paperwork and swearing out accusatory instruments containing false information," (FAC ¶ 269h), may relate to plaintiffs' malicious abuse of process or right to a fair trial claims because of the implication that materials were regularly falsified, but neither of those underlying claims has survived the motion to dismiss.

Third, the alleged practice of "inserting NYPD Legal Bureau and CJB agents into a special Mass Arrest Processing Plan using a centralized Mass Arrest Processing Center that manufactured false business and court records after the fact," (FAC ¶ 269i), similarly may relate to plaintiffs' dismissed malicious abuse of process and fair trial claims, but has no plausible causal link to the surviving claims.

In contrast, the remaining six alleged municipal policies and practices bear some plausible connection to plaintiffs surviving claims. Plaintiffs allege that the City has practices whereby the NYPD applies the prohibition

against "violation-level trespass," (FAC ¶ 269e), and the prohibition on disorderly conduct, (FAC ¶ 269f), against protestors without justification. And, that the City has a practice of treating groups of protestors as a "unit" for "mass arrest" without first giving meaningful notice or opportunities for dispersal. (FAC ¶ 269d). Presumably, plaintiffs are alleging that these three practices regularly lead to false arrests.

Similarly, plaintiffs allege that the City has two practices whereby the NYPD unreasonably restricted protected activities in Zuccotti Park between September 2011 and March 17, 2012, (FAC ¶ 269a), and continually fails to provide adequate opportunities to disperse before arresting protestors engaged in First Amendment activity, (FAC ¶ 269b). Presumably, plaintiffs are alleging that these practices led, and continue to lead, to retaliatory arrests without probable cause. Plaintiffs also allege that there is an NYPD policy and practice of using excessive force against protestors. (FAC ¶ 269c).

For each of these policies, Plaintiffs fail to allege sufficient factual content allowing for the plausible inference that any one of them were "so persistent and widespread as to practically have the force of law." Connick, 563 U.S. at 61. Plaintiffs allege that these policies were "persistent and widespread" on the basis of purported connections to the events of prior demonstrations. For example, the FAC includes allegations that, during the RNC protests in 2004, the City's "crowd and disorder control planning" and "mass arrest and mass arrest processing plans" led to mass arrests, a failure to make individualized probable cause determinations, and excessive force. (FAC ¶¶ 37-39). And, it cites, in blunderbuss fashion, a number of lawsuits brought against the City for actions during that and various other protests in the early 2000s. (FAC ¶ 26). Plaintiffs, however, fail to assert which—if any—of those lawsuits led to findings of liability against the City for false arrests, First Amendment retaliatory arrests, or excessive force. According to the FAC, only one of the referenced cases led to any finding of guilty or liability: a conviction of a police officer for falsifying police records. (FAC ¶ 26, citing People v. Pogan, 06416-2008 (Sup. Ct. N.Y. Co.)). Plaintiffs also fail to specifically connect any of the mentioned lawsuits or the RNC allegations to the specific policies and practices they allege in their Monell claims in this action. On that basis, the FAC lacks sufficient factual content tending to show, even circumstantially, the existence of municipal policies and practices responsible for the plaintiffs constitutional deprivations.

### 2. Failure to Train.

**\*22** Plaintiffs' last theory of Monell liability is based on the City's failure to train its police officers about their legal duty to avoid violating a citizen's rights—namely, using excessive force and making false or retaliatory arrests during mass protests. See Connick, at 61. They allege that the City, through its agents in the NYPD, knew or should have known that the mass arrest policies used in 2004 during the RNC protests led officers to use excessive force against protestors and to falsely arrest protestors for engaging in First Amendment activity. (FAC ¶¶ 42-45). And, that the City thereafter failed to properly train officers to ensure that similar constitutional deprivations would not occur under comparable circumstances again— such as the March 17, 2012 "raid" on Zuccotti Park. (FAC ¶ 45).

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." Connick, 563 U.S. at 61. Plaintiffs must show that a municipality's failure to train its employees amounted to "deliberate indifference." Id. "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Id. (quoting Bryan Cty., 520 U.S., at 410). Generally, "[a] pattern of similar constitutional violations by untrained employees is [ ] necessary to demonstrate deliberate indifference for purposes of failure to train." Id. at 62 (internal quotation marks omitted). A plaintiff must also "demonstrate that the policymaker's inaction was the result of conscious choice and not mere negligence." Cash v. Cty. of Erie, 654 F.3d 324, 334 (2d Cir. 2011) (internal quotation marks omitted). "[D]eliberate indifference may be inferred where the need for more or better supervision to protect against constitutional violations was obvious, [ ], but the policymaker fail[ed] to make meaningful efforts to address the risk of harm to plaintiffs." Id. (internal citations and quotation marks omitted).

At the motion to dismiss stage, the Second Circuit utilizes a three-prong test to determine whether plaintiffs have demonstrated a municipality's "deliberate indifference" in the context of a failure to train claim. Walker v. City of New York, 974 F.2d 293, 297-98 (2d Cir. 1992). "First, the plaintiff must show that a policymaker knows to a

moral certainty that her employees will confront a given situation." Id. at 297 (internal quotation marks omitted). "Second, the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation." Id. And, third, "the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." Id. at 298. Where all three elements are established a plaintiff has stated a plausible Monell claim based on a failure to train. Id.; see also Amnesty Am. v. Town of W. Hartford, 361 F.3d 113, 130 n. 10 (2d Cir. 2004).

Plaintiffs have failed to make this threshold showing. It is plausible to infer from the FAC, and is matter of general common sense, that NYPD decision makers are aware that their officers, at some point, will need to arrest protestors taking part in a large demonstration. (FAC ¶¶ 29, 59-64), and that NYPD officers mishandling large protests could cause constitutional deprivations, (FAC ¶¶ 26, 38-40). However, plaintiffs fail to plausibly allege that there is a history of the NYPD mishandling mass protesting situations on a scale that could be reasonably construed as setting out a pattern or practice of constitutional abuse.

As previously explained, plaintiffs only factual support for the assertion that there is a pattern of the NYPD causing similar constitutional deprivations are the allegations about the 2004 RNC protests and the mention of various other section 1983 lawsuits brought against the City. (FAC ¶¶ 26, 37-39, 42). However, the allegations regarding the RNC protest are plaintiffs' own conclusions, unsupported by facts, that the NYPD's actions in 2004 caused a substantial number of constitutional violations. And, the allegations concerning previous section 1983 lawsuits fail to explain which—if any—lawsuits led to findings of liability against the NYPD for constitutional violations, beside the one conviction of an NYPD officer. (FAC ¶ 26). They also do not allege that testimony was taken during any of those lawsuits that shows a pattern and practice of constitutional abuse. Plaintiffs do cite a joint study produced by The Global Justice Clinic at NYU Law School and the Walter Leitner International Human Rights Clinic at Fordham Law School, but that paper references 130 "alleged incidents of physical force [in New York City] ... which warrant investigation by authorities." (Suppressing Protest: Human Rights Violations in the U.S. Response to Occupy Wall Street (July 25, 2015), p.1, http://hrp.law.harvard.edu/criminal-justice/suppressing-protest-human-rights-violations-in-the-us-response-to-occupy-wall-street/). Neither a newspaper report nor an academic paper reporting on incidents that ought to be investigated is a showing of anything entitled to a presumption of truth.

**\*23** In sum, plaintiffs fail to plausibly allege the City, through the NYPD, engaged in a pattern or practice of similar constitutional deprivations against protestors. See Pluma, 2015 WL 1623828, at \*12 (holding that allegations of a "handful of dissimilar incidents occurring over the course of more than a decade is too sparse to put the City on notice that the NYPD's training program produces officers who are likely to commit constitutional violations through their deployment of pepper spray"); cf. Connick, 563 U.S. at 62 (holding that four overturned Brady convictions "could not have put [the defendant] on notice that the office's *Brady* training was inadequate with respect to the sort of *Brady* violation at issue here"). In addition, plaintiffs allege no facts explain how policing the OWS protest "presents [NYPD officers] with a difficult choice of the sort that training or supervision will make less difficult." While the bar at this early stage of litigation is modest, See Amnesty Am., 361 F.3d at 130 n.10 (interpreting Walker test to have held that, at the motion to dismiss stage, plaintiffs are not required to identify a specific deficiency in a municipality's training program or to establish a causal link between the lack of training and the misconduct to establish a failure to train claim), plaintiffs' simply do not meet the standard of plausibility on this, or any other, theory of Monell liability.

CONCLUSION

Defendants' motion to dismiss is granted in part and denied in part. Specifically, all claims are dismissed except for: (1) Yotam Marom's false arrest and First Amendment retaliation claims against defendants Galgano, Blanco, and Charnyavsky and the unidentified defendants who physically arrested him, as well as his related failure to intervene claims against defendants Boyle and Valentine; (2) Miriam Rocek's false arrest and First Amendment retaliation claims against defendants Boyle, Blanco, and Charnyavsky, and the unidentified defendants who physically arrested her, as well as her related failure to intervene claims against defendants Galgano and Valentine; and, (3) Don Fitzgerald's claim for excessive

use of force against the unidentified defendants who hit him. All claims against the City of New York, Winski, Viviano, and Esposito are dismissed and they are no longer parties to this action.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2016 WL 916424

Footnotes

1    Plaintiffs' memorandum of law in opposition, however, states that Fitzgerald's charges were actually resolved with a guilty plea to a disorderly conduct, which, under New York Law is not a crime but a "violation." (Memorandum of Law in Opposition, 4).

2    The Certificate of Disposition for Fitzgerald states that he pled guilty to N.Y. Penal Law § 240.20, which prohibits various acts as "disorderly conduct." It is a "violation" rather than a crime. (Declaration of Lamar Winslow in Support of Defendant's Motion to Dismiss ("Winslow Decl."), Ex. C). It is appropriate for the Court to consider the Certificates of Disposition at this stage because plaintiffs repeatedly reference that their cases were disposed of on ACDs, (see FAC ¶¶ 173, 194, 207), and thus the Certificates of Disposition setting forth the disposition of their arrests are incorporated by reference in, and are integral to, the FAC. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153-54 (2d Cir. 2002) (holding that district court could properly consider the text of contracts on motion to dismiss because Amended Complaint was "replete with references to the contracts" and the content of the contracts was integral to the Amended Complaint); see also San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Companies, Inc., 75 F.3d 801, 809 (2d Cir. 1996).

3    Plaintiffs argue that under New York law and the New York State Constitution "a delay in arraignment of anything over 24 hours is presumptively unreasonable." (Plaintiffs' Memorandum of Law in Opposition, 35). Even assuming arguendo that plaintiffs' understanding of the requirements of New York's law and constitution is correct, plaintiffs' present claims are brought pursuant to section 1983, which provides a remedy for the deprivation of federal or US Constitutional rights. See Cox v. Warwick Valley Cent. Sch. Dist., 654 F.3d 267, 272 (2d Cir. 2011).

4    The Supreme Court noted that Bivens actions are the "federal analog to suits brought against state officials under" section 1983. Iqbal, 556 U.S. at 675.

5    Damages for a false arrest claim "cover the time of detention up until issuance of process or arraignment," Wallace v. Kato, 549 U.S. 384, 390 (2007), not just the initial seizure.

6    The "No-Summons" policy, which was "related to OWS of denying persons arrested at demonstrations individual consideration for release with summonses," (FAC ¶ 64), only bears a causal relationship to the dismissed excessive detention claims.

2019 WL 315058
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Maleatra MONTANEZ, Plaintiff,

v.

CITY OF SYRACUSE; Police Officer Chester
D. Thompson; Chief of Police Frank L. Fowler;
and Police Captain Thomas Galvin, Defendants.

6:16-cv-00550 (BKS/TWD)
|
Signed 01/23/2019

**Attorneys and Law Firms**

For Plaintiff: Edward Sivin, Sivin & Miller, LLP, 20 Vesey
Street, Suite 1400, New York, NY 10007.

For Defendants City of Syracuse, Frank L. Fowler,
and Thomas Galvin: Khalid Bashjawish, Assistant
Corporation Counsel, City of Syracuse, 233 E.
Washington Street, Suite 300, Syracuse, NY 13202 John
G. Powers, Paul J. Tuck, Hancock Estabrook LLP, 1500
AXA Tower I, 100 Madison Street, Syracuse, NY 13202.

**MEMORANDUM-DECISION AND ORDER**

Brenda K. Sannes, U.S. District Judge

**I. INTRODUCTION**

**\*1** Plaintiff Maleatra Montanez brings this action
against Defendants City of Syracuse (the "City"), Police
Officer Chester D. Thompson, Chief of Police Frank
L. Fowler, and Police Captain Thomas Galvin. (Dkt.
No. 1). These claims arise from Plaintiff's allegation
that, on February 14, 2015, Thompson, a patrol officer
with the Syracuse Police Department ("SPD"), reported
to her residence in response to a 911 call and, while
he was there, directed her to engage in sexual acts
with him. (Dkt. No. 1).[1] Plaintiff brings: (1) a battery
claim against Thompson and the City; (2) an intentional
infliction of emotional distress ("IIED") claim against
Thompson and the City; (3) a prima facie tort claim
against Thompson and the City; (4) a negligent hiring,
training, supervision, and retention claim against the
City; (5) a Fourth Amendment excessive force and
unreasonable search and seizure claim against Thompson;

(6) a Fourteenth Amendment substantive due process
claim against Thompson; (7) a supervisory liability claim
against Fowler; (8) a supervisory liability claim against
Galvin; and (9) a Monell municipal liability claim against
the City. (Id.). The City, Fowler, and Galvin[2] move
for summary judgment under Rule 56 of the Federal
Rules of Civil Procedure. (Dkt. No. 89). Plaintiff does
not oppose dismissal of her battery, IIED, prima facie tort,
and negligent hiring claims against the City but otherwise
opposes summary judgment and submits evidence in
support of her contention that there are material issues
of fact requiring trial. (Dkt. No. 97, at 5). Defendants
move to strike certain aspects of that evidence, (Dkt. No.
102), and Plaintiff opposes the motion to strike. (Dkt.
No. 107). The Court held oral argument on January 8,
2019. For the reasons that follow, Defendants' motion for
summary judgment is granted in part and denied in part,
and Defendants' motion to strike is denied.

**II. FACTS**[3]

**A. Thompson's Employment at SPD**[4]
**\*2** Thompson began his employment as a patrol officer
with the SPD on January 3, 1997. In general, during his
shifts, Thompson worked by himself—without a partner
—and drove a marked SPD vehicle. (Dkt. No. 99-3, at 9).
On February 15, 2015, the day after he allegedly sexually
assaulted Plaintiff, Thompson was suspended pending
investigation of Plaintiff's complaint. (Dkt. No. 89-31,
at 4). The SPD terminated Thompson's employment
following the investigation. (Dkt. No. 89-10, ¶ 91). Prior to
the incident at issue in this case, Thompson was the subject
of five complaints, four of which the SPD investigated or
responded to in some manner.

**B. Prior Complaints**

**1. 1999 to 2001 – Bassett/Malenick Complaint**

Cheryle Bassett has submitted a declaration detailing
the following contact with Thompson. (Dkt. No. 99-10).
Bassett met Thompson at some point between 1999 and
2001, when he pulled over her motor vehicle "because
of a traffic infraction." (Dkt. No. 99-10, ¶¶ 1, 3; Dkt.
No. 99-16, ¶ 2). Bassett told Thompson that she was
struggling financially and "he offered to lease to [her] a
portion of a house that he managed" in Syracuse. (Dkt.

No. 99-10, ¶ 3). Bassett states that, after she moved in, she fell behind on rent. (*Id.* ¶ 4). Thompson "began to make sexual advances, which [Bassett] did not rebuke." (*Id.*). Bassett and Thompson "had sexual relations for several weeks and during that time period [Bassett] paid little or no rent." (*Id.*). Subsequently, Bassett was arrested for prostitution. (*Id.* ¶ 5). During an interview with SPD officers, "in an attempt to avoid the criminal charges," Bassett told them about her relationship with Thompson. (*Id.*). According to Bassett, "[t]his appeared to anger the officers," and the charges were dismissed. (*Id.*).

Bassett states that, after "this incident," Thompson was angry with her, and their relationship ended. (*Id.* ¶ 6). Thompson demanded that she pay the back rent, which she was unable to do, and "then demanded that [Bassett] have sex with him," but Bassett "told him that [she] did not want to." (*Id.*). Bassett remained at the residence and attempted to pay Thompson what she owed. (*Id.*). Thompson, however, "threatened" eviction if she "did not have sex with him." (*Id.*). Bassett states that, "[o]ver the next several months," "Thompson showed up at the [residence] at various hours of the day and night, mostly unannounced and often in uniform, and raped me." (*Id.* ¶ 7).

At some point during this time period, Bassett became friends with John Malenick, to whom she confided "what Chester Thompson was doing to [her]." (*Id.* ¶ 8). Malenick advised her to report Thompson to the police, but she "was afraid to do so." (*Id.*). Malenick "then took it upon himself to contact the [SPD] to notify them of what Chester Thompson was doing" to Bassett. (*Id.*). Malenick has submitted a declaration regarding his report. (Dkt. No. 99-16, ¶ 6). In late 2001 or early 2002 Malenick told an officer at SPD's Internal Affairs [5] that he believed Thompson "had forced [Bassett] to have sex with him and that he threatened to evict her ... if she didn't have sex with him." (*Id.*). The officer asked whether Malenick had any direct proof of the accusation. (*Id.*). When Malenick said that he did not, the officer responded that "without any direct proof there was nothing that could be done." (*Id.*). There is no evidence of an investigation.

### 2. 2002 – Health Insurance Complaint

**\*3** In 2002, the SPD received information concerning Thompson's 2000 application for, and procurement of,

health insurance coverage for his ex-wife, whom he had divorced in 1995. (Dkt. No. 99-18, at 9). On the application, Thompson filled in the date of marriage but left the marital status box blank. (Dkt. No. 99-18, at 10). As Thompson's ex-wife "appear[ed] not to be an eligible dependent," the SPD commenced an internal investigation. (Dkt. No. 99-18, at 7). As part of the investigation, Captain John Agne from the Human Resources Division and Captain Mark McArdle from the Patrol Services Division, searched SPD records, made inquiries to the health insurance office, and interviewed Thompson. (Dkt. No. 99-18, at 7–12). Captain Agne concluded that his investigation showed "a pattern of the [sic] less than truthful behavior of Ofc. Thompson, as well as the fact that he may have participated in criminal behavior by filing these documents and receiving insurance benefits that he is not entitled to." (*Id.* at 8). Then-Chief of Police Dennis DuVal found Thompson in violation of the SPD's Rules and Regulations governing unbecoming conduct, unsatisfactory performance, and performance of duties, and on October 17, 2002, he issued a letter of reprimand reminding Thompson "that future acts in violation of the Rules & Regulations would bring discredit upon yourself and this Department and would be dealt with more severely." (Dkt. No. 99-18, at 1). [6] Defendant Galvin personally served the letter on Thompson. (*Id.*).

### 3. 2005–Complaint From Woman at Syracuse Corporation Counsel

According to an October 6, 2005 SPD interdepartmental memo, a woman employed by the Syracuse Corporation Counsel made a complaint of "Unbecoming Conduct" against Thompson ("the SCC complaint"). (Dkt. No. 99-20, at 1). The woman complained that Thompson had "struck up a conversation" with her outside a bar and "offered to follow her home to make sure she made it there safely." (*Id.*). "[O]nce they arrived at her home ... he walked her on to the porch," and then she "opened the door to let herself in and Officer Thompson walked inside." (*Id.*). The woman said "goodbye so Officer Thompson would leave and Officer Thompson said he needed a hug first." (*Id.*). "She gave him a hug so he would leave and he left." (*Id.*). "[O]n another night," Thompson was working and saw the woman getting out of her car; Thompson thought she flashed her lights "at him wanting to talk." (*Id.*). The woman, however,

"related [to Thompson] that she was only locking her car remotely." (*Id.*). Thompson provided a different account of these events. He acknowledged knowing her but stated that "she asked him to follow her home" and that he did not go inside, "request a hug," or "receive or give a hug to her." (*Id.*). The SPD determined that "all that was needed at this time was to talk to Officer Thompson and instruct him not to contact" her; SPD did not speak to her. (*Id.*). Thompson agreed to comply with the instruction "not to have further contact" with her. (*Id.*).

### 4. 2006 – Buske Complaint

In 2006, Candy Buske made a complaint to the SPD about Thompson. (Dkt. No. 99-8, at 14). Buske was "incarcerated at the time ... on a Robbery charge" and "made it known that she had information about two Syracuse police officers that she would like to provide in order to obtain leniency on her ... pending criminal charge." (Dkt. No. 89-10, ¶ 37). Then-Chief of Police Gary Miguel[7] instructed Galvin, who was the head of the SPD's Office of Professional Standards ("OPS"), *see supra* note 5, to open an investigation. (Dkt. No. 89-10, ¶¶ 4, 34). Galvin interviewed Buske at the jail on May 17, 2006 (*Id.* ¶ 38). Buske acknowledged that she had a drug habit that she supported through prostitution. (Dkt. No. 99-21, at 1, 11). Buske stated that, in February or March 2006, she was walking "in the area of No. State St ... between three and four in the morning," when a marked SPD car "pulled up next to" her. (*Id.* at 11). Buske stated that the police officer in the car, whom she identified as Thompson, "called [her] by name and asked if [she] was working." (*Id.*). Thompson told her to "get into the back seat of the car" so he could "run [her] name." (*Id.*). After Buske got into the car, they drove "around the north side of the city" and talked. (*Id.*). Buske believed that there was a warrant for her arrest for violating probation, but concluded that Thompson did not check her name because he did not speak on the radio, use the computer, or ask for her identification. (*Id.*). Thompson asked her if she "would do something for him," which Buske knew meant "something sexual." (*Id.*). Buske "was afraid [Thompson] would arrest [her] if [she] refused" so she said she would. (*Id.*). Thompson asked Buske to "give him a blow job" and she agreed. (*Id.*). Thompson got into the back seat of the car, "unzipped his pants and [Buske] performed oral sex on him." (*Id.* at 12). Afterwards, Thompson gave her twenty dollars, dropped her off, and said he would like to

see her again. (*Id.*). Buske stated that she saw Thompson three weeks later, again in a marked SPD vehicle, and that he asked her to meet him in "a little while"; she agreed but "never went." (*Id.*). In addition, Buske "indicated that her adult daughter, who was also a prostitute and a drug user, also knew, and had some dealings with, Officer Thompson." (Dkt. No. 89-10, ¶ 43).

**\*4** Galvin "pulled" Thompson's "activity Detail Reports from the beginning of 2006 on occasions where he was working the North side of the City, to see if [he] could place [Thompson] at the location described by Ms. Buske." (*Id.* ¶ 44). "The reports did not conclusively confirm the information provided by Ms. Buske." (*Id.*). Galvin presented a photo array to Buske; "[s]he picked out a photo of Chester Thompson as the police officer that had paid her for oral sex." (*Id.* ¶ 45). Galvin obtained a sworn statement from Buske and included it in the investigation file. (*Id.* ¶ 46).

Galvin states that he also contacted Cari Buske, Candy Buske's daughter, who told him that she met Thompson "in late 2005 or early 2006, and that afterward, Thompson would contact her via cell phone wanting to meet her in person." (*Id.* ¶ 47). Cari Buske stated that she never "had any relationship with him." (*Id.*). Galvin "subpoenaed Cari Buske's cell phone records to try to determine whether Chester Thompson's number appeared," but it did not. (*Id.* ¶ 48). Galvin also researched both Candy and Cary Buske's criminal histories, which contained arrests for prostitution. (*Id.* ¶ 49).

Galvin interviewed Thompson regarding the allegations by Candy and Cari Buske. (*Id.* ¶ 50). Thompson said that "he was, from time to time, involved in investigations on the North side of the City that involved him stopping prostitutes to obtain information ... on drug houses and illegal weapons possession, because he assumed that ... prostitutes may have inside information on other criminal activity." (*Id.* ¶ 51). Thompson "denied ever having Candy Buske in his police vehicle" or "engaging in any sexual activity with ... any ... prostitute, while he was on duty." (*Id.* ¶ 52). Thompson, however, "admitted that approximately eight months previously he had another prostitute [in] his vehicle, who he could not identify." (*Id.* ¶ 53). Thompson told Galvin that he "did not notify the dispatcher of the transport." (Dkt. No. 99-21, at 6).

During the interview, Galvin showed Thompson a picture of Cari Buske, who was "also a prostitute." (*Id.* at 2, 5). Thompson told Galvin that "he had dealt with her on a call six to eight months ago" and "at that time" obtained her cell phone number. (*Id.* at 5). Thompson acknowledged that he called Cari Buske "on a personal note" "three or four times" and that he should not have called her because "he was married." (*Id.*). Thompson indicated that he "may have" tried to meet with Cari Buske "but that did not occur." (*Id.*). Galvin noted that Thompson was "extremely agitated" during the interview, which led Galvin "to question [Thompson's] denial." (Dkt. No. 89-10, ¶ 56).

Following the interview, Thompson submitted a memo to Galvin regarding Candy Buske's complaint and his knowledge of Cari Buske. (Dkt. No. 99-21, at 9–10). Thompson stated that he stopped Candy Buske six months before, that he asked her why she was in the area, and that Candy Buske responded that she was searching for her daughter Cari Buske, "whom she believed to be in a troubled situation." (*Id.* at 9). As the memo detailed, Thompson told Candy Buske that he knew who her daughter was and that, if he saw Cari, he would tell her that her mother was looking for her. (*Id.*). In his memo, Thompson acknowledged that he called Cari Buske's "cell phone approximately 6 times" but did so "at her request" to discuss "matters which she had questions about of a police nature." (*Id.*). Thompson acknowledged that, "approximately 6 to 8 months" previously, a female he believed to be a prostitute "flag[ged] [him] down and ask[ed] if [he] could transport her"; however, Thompson did "not recall if [he] called out on this occasion or not." (*Id.*).

**\*5** The same day, Galvin completed a case report for Chief Miguel about the complaint against Thompson summarizing his investigation. (*Id.* at 1–7). Galvin noted that there were inconsistencies between Thompson's interview and the memo Thompson submitted after the interview: "His [memo] was consistent with what was stated during the interview, with the exception of telephoning Cari Buske. It was no longer done 'inappropriately,' 'on a personal note' but be called her cell phone approximately six times 'at her request' as she had questions of a police nature." (*Id.* at 6).

In the case report, Galvin concluded that the "basic allegation made by Candy Buske" against Thompson had

"not been substantiated" [8] but that "some concerns have been raised." (*Id.* at 6). Galvin explained that "Officer Thompson was extremely agitated during the interview, and after having been apprised of Buske's allegation asked several times if that was the only complaint against him. He ... appeared to have a questionable relationship with prostitutes, repeatedly telephoning Cari Buske 'on a personal note,' and giving one a ride without contacting the dispatcher." (*Id.*). Next to "Recommendation," Galvin wrote: Thompson "violated the Departmental Rules and Regulations regarding persons in police vehicles. Disciplinary action initiated." (*Id.*).

"Consistent with the SPD disciplinary process," Galvin prepared a Discipline Report stating: "In the month of January or February 2006, Officer Chester Thompson did transport a female in his assigned police unit without permission and without notifying the dispatcher," in the SPD's Rules and Regulations. (*Id.* at 16). Galvin sent the Discipline Report, "Investigative Case Report, the entire investigation file, and a summary of Officer Thompson's prior disciplinary history" to "the chain of command" and to Chief Miguel. (Dkt. No. 89-10, ¶ 58).

Though he recommended a finding of unsubstantiated as to Buske's allegations, because Galvin found her "description of events as being plausible" and Thompson had been "very nervous" during his interview, Galvin advised Chief Miguel that because Thompson "worked the midnight shift ... [a]nd that's when prostitutes are out working and they can be manipulated sometimes" it was "something that should be monitored." (Dkt. No. 99-8, at 14–16). Ultimately, "[t]he chain of command ... recommended," and Chief Miguel ordered, that Officer Thompson be disciplined with a formal letter of reprimand for transporting "a female in his assigned police unit." (Dkt. No. 89-10, ¶¶ 59–60; Dkt. No. 99-21, at 16). Chief Miguel adopted the finding that the Buske allegation was not substantiated. (Dkt. No. 99-21, at 7).

On July 26, 2006, Galvin served the letter of reprimand, signed by Chief Miguel, on Thompson. Dkt. No. 89-10. The letter also contained a reminder "that future acts in violation of the Rules and Regulations would bring discredit upon yourself and this Department and would be dealt with more severely." (Dkt. No. 89-14, at 14).

Thompson's duties did not change following Buske's complaint: the SPD did not place any restrictions on him,

and he was not aware of any additional monitoring. (Dkt. No. 99-3, at 192). Thompson testified that Galvin never expressed any disapproval of his interactions with Candy Buske or Carrie Buske. (*Id.* at 193).

### 5. 2014 – Melissa Popcun-Roach Complaint

**\*6** On June 2, 2014, the SPD received a complaint by "Patricia Popcun over the alleged activities of an unidentified [SPD] officer and her thirty-five-year-old daughter Melissa Popcun Roach" at Melissa's home on Cayuga Street in Syracuse. (Dkt. No. 99-6, at 1, 4). Galvin initiated an investigation, and interviewed Popcun, who related that her daughter Melissa had told her that:

> a Syracuse Police officer followed her into her apartment unannounced and uninvited ... and that she told the officer that she didn't want any trouble because she already had problems with the police. The officer told her that he would take care of any police problems in exchange for oral sex, which [she] then gave him.

(Dkt. No. 99-5, at 1). Popcun also relayed to Galvin that Melissa said that "[s]he performed the act and the officer left" and that the officer had "worn a wedding ring." (Dkt. No. 99-6, at 1; Dkt. No. 89-10, ¶ 68). Galvin testified that Popcun told him that she felt what the officer had done "wasn't right" and that he had taken "advantage of her daughter, who was a heavy drinker and bipolar medication [sic] and that she was a drug abuser," and that "the officer should have been aware that [her daughter, Melissa,] was not capable of consent." (Dkt. No. 99-8, at 47).

To "determine the identity of the officer in question," Galvin reviewed the Officer Activity Detail Reports for June 1, 2014, and found that Thompson and Officer Thomas Nicolini had responded to the Cayuga Street area "on an animal complaint." (Dkt. No. 89-10, ¶ 72). Since "of the two, only Officer Thompson wore a wedding band," Galvin identified Thompson "as the potential subject." (*Id.*).

Galvin then interviewed Nicolini, who confirmed that he and Thompson had responded to a call in the Cayuga Street area, where a "pit bull ... had been found running lose." (Dkt. No. 99-6, at 2; Dkt. No. 89-10, ¶ 73). According to Galvin, Nicolini stated that, while they were there, "they were approached by a woman named Melissa," who "stated she had information regarding the owner of the dog that was the subject of the complaint." (Dkt. No. 89-10, ¶ 73).[9] Nicolini reported that "[i]t appeared that Melissa was intoxicated as she was stumbling when she walked and there was alcohol on her breath." (Dkt. No. 99-6, at 5). Nicolini told Melissa "to leave this area due to the aggressive dog." (*Id.*). After Melissa went back inside her apartment, Thompson went to the apartment for roughly 10-15 minutes, and returned "with no more information." (*Id.* at 2, 5).

Galvin next interviewed Thompson, who "admitted going into Melissa Popcun[-Roach's] apartment ... to attempt to collect information from her about the animal control complaint that was being investigated," "denied that anything improper occurred but indicated that he was not able to learn anything useful from her regarding the investigation." (Dkt. No. 89-10, ¶ 75). Galvin directed Thompson to prepare a written statement, which Galvin "included in the investigation file." (*Id.*; Dkt. No. 99-6, at 6). In his written statement, Thompson maintains that he "spoke briefly" with Melissa in her apartment "for approximately 10 minutes regarding the neighbors [sic] dog." (*Id.*).

**\*7** Galvin did not obtain a written statement or affidavit from Popcun or Melissa. In a declaration filed in connection with this summary judgment motion, Popcun states that she spoke with Galvin a second time after her daughter was upset about the fact that Popcun reported the incident to the police. (Dkt. No. 89-21, ¶¶ 9–10). Popcun told Galvin that her "daughter did not intend to cooperate with the investigation and that if they pursued it with her she would likely say it didn't happen." (*Id.* ¶ 10). Galvin did not interview or attempt to interview Melissa Popcun-Roach. (Dkt. No. 99-8, at 9).[10] After completing the investigation, Galvin prepared a case report and recommended that the case be closed as "unsubstantiated." (Dkt. No. 99-6, at 3). As described below, Plaintiff has highlighted discrepancies in the evidence regarding aspects of this report, including: (1) Galvin's report that Melissa "refused to meet" and

"was not available," (*Id.* at 2) and (2) Galvin's report that Melissa had "retracted her accusations .. soon after they were made," and that Melissa "said it did not happen," (*Id.* at 1–2).

Galvin has explained that he recommended a finding of "unsubstantiated" because he "could not corroborate through first-hand testimony that the incident did occur" and "there were serious credibility issues with Melissa Popcun[-Roach] based on her mother's credible representations that her daughter was struggling with substance abuse and had recanted her original account of the events in question." (Dkt. No. 89-10, ¶ 80; Dkt. No. 99-6, at 1–3). In his report, Galvin stated that "Officer Thompson and I discussed at length the fact that any allegation of impropriety could be prevented by using basic common sense and avoiding certain situations. He was reminded of the penalties should such conduct be verified as true. He understood the Departments [sic] concerns." (Dkt. No. 99-6, at 2). Galvin testified that, during the course of the investigation, he became "aware" of the Buske allegations, which he had investigated in 2006, eight years before. (Dkt. No. 99-8, at 21). The Buske allegations are not referred to in the Popcun-Roach case report.

Upon completion of the case report, Galvin sent the Popcun-Roach case file, including the report, to Rebecca Thompson,[11] a deputy chief at the SPD for review and signature. (Dkt. No. 99-9, at 8, 20–21). Deputy Chief Thompson testified that at the time she reviewed the case file, she had no questions or follow up for Galvin. (Dkt. No. 99-9, at 21–22). When she was asked during her deposition about the indication in the case report that Popcun-Roach "refused to meet with any police officers," Deputy Chief Thompson responded that Galvin had told her that he had "reached out" to Melissa Popcun-Roach but that "she would not return any of his calls or give him any information." (*Id.* at 23). Chief Deputy Thompson "concurred with the investigation of Captain Galvin, that it was unfounded" and signed the case report. (*Id.* at 31).

**\*8** Chief of Police Fowler, as the "final decision" maker, conducted the "final review" of the Popcun-Roach report. (Dkt. No. 99-7, at 28). Fowler testified that he understood that the SPD had received a "complaint from a mother who alleged that her daughter ... had been coerced to perform oral sex on Officer Thompson." (*Id.* at 22). The only document in the file Fowler recalled receiving

in connection with the Popcun-Roach investigation was the case report. (*Id.* at 33). According to his declaration, Fowler "carefully considered all the facts and noted, as discussed by Captain Galvin, that there was no first hand testimony that the act had actually occurred." (Dkt. No. 89-3, ¶ 60). Fowler testified that "Captain Galvin made every effort to contact the subject of the investigation" but "wasn't able to speak with her." (Dkt. No. 99-7, at 41). Although Fowler found Ms. Popcun's allegations "concerning," he determined that "the evidence was not sufficient to substantiate that Officer Thompson had committed misconduct," and explained this "was a judgment call made based on consideration of all the evidence and the investigation experience of myself and Captain Galvin." [12] (Dkt. No. 89-3, ¶ 61). Fowler signed the Popcun-Roach case report, adopting the recommendation that the case be closed as "unsubstantiated." (Dkt. No. 99-6, at 3). [13] During his deposition, when Fowler was asked whether, "[a]t the time that [he] signed off on this report" he was "concerned about the possibility that Chester Thompson had done what was alleged and that he might do it again in the future," he responded: "No." (Dkt. No. 99-7, at 40).

Thompson testified that he was never disciplined in connection with Popcun-Roach's allegations, that his duties with the SPD did not change following the investigation, that he did not perceive that he was being "monitored any more closely than before" the allegations, and that he was not asked to undergo any training. (Dkt. No. 99-3, at 234–35).

### C. 2015 Montanez Incident

Thompson met Plaintiff Maleatra Montanez approximately eight months after the Popcun-Roach incident. Plaintiff alleges the following. On February 14, 2015, she "called 911 to report that her sister had taken [Plaintiff's] minor daughter from Syracuse to Alabama without [Plaintiff's] permission." (Dkt. No. 98, ¶ 62). Thompson, who was already at Plaintiff's building on an unrelated call, responded to Plaintiff's apartment. (Dkt. No. 99-3, at 18–19). Plaintiff and her newborn son were in the apartment. (Dkt. No. 99-2, ¶ 4). Once inside her apartment, Thompson, who was in uniform and equipped with his service weapon and a baton, (Dkt. No. 99-3, at 53–54), told Plaintiff she "was pretty," "commented on [her] rear end and made a sexual comment about [her] lips." (Dkt. No. 99-2, ¶ 5). "He also started to rub himself

in his groin area over his pants" and "then removed his penis from his pants and told [Plaintiff] to 'suck it.' " (*Id.*). Plaintiff "did not try to fight Officer Thompson, but ... told him 'Whoa, we don't have to do this.' " (*Id.*). "In response, he just repeated, 'suck it.' " (*Id.*). Plaintiff "was terrified for [her] safety and for the safety of [her] newborn son, so [she] began to give Officer Thompson oral sex." (*Id.*). Thompson then told Plaintiff "to get a condom" and raped her. (*Id.* ¶¶ 7–8). The next day, February 15, 2015, Plaintiff went to a local hospital, where she reported that she "had been raped by a Syracuse police officer with the last name 'Thompson.' " (*Id.* ¶ 9). [14]

**\*9** Fowler learned of the incident the same day Plaintiff reported it, on February 15, 2015. Dkt. No. 89-13. Following a briefing, Fowler met with Thompson's supervisor and the police officer who initially interviewed Plaintiff, referred the matter to the district attorney's office for investigation, and, after conferring with Galvin, suspended Thompson pending investigation. (Dkt. No. 89-3, ¶¶ 29–33; Dkt. No. 89-10, ¶ 88). Galvin states that he "recommended the immediate suspension of Officer Thompson ... pending further investigation of the allegations" "based, in part, on [his] prior experience with Officer Thompson, including the nature of the allegations, though unproven, from the 2006 Buske and 2014 Popcun complaints." (Dkt. No. 89-10, ¶ 88).

Galvin commenced an investigation, which included interviews of Plaintiff and Thompson, and provided their versions of the incident in a case report dated February 20, 2015. (Dkt. No. 99-24). Galvin recounted the following aspect of his interview of Thompson:

> This writer asked Officer Thompson why he thought it would be allowable for an officer to engage with a complainant in sex, whether consensual or not, while on duty. He replied he did not think it would be a problem. I asked if he recalled my having counseled him six months before in regards to an allegation having been made at the time that he had allowed a vulnerable female (drugs, mental) to perform oral sex

on him while he was on duty and he said that he did.

(Dkt. No. 99-24, at 4). Galvin recommended that disciplinary action be initiated. (*Id.*).

An SPD discipline report dated February 24, 2015 contains findings that Thompson violated SPD's Rules and Regulations governing unbecoming conduct. (Dkt. No. 89-5, at 31). The report describes the violation as follows: "On 14 February 15 while on duty and during the course of his official duties, Officer Thompson did engage in sexual intercourse and fellatio with a female complainant while conducting an investigation at her residence." (*Id.*). The report is signed by Galvin and Fowler. (*Id.*). According to the report, on February 24, 2015, Galvin notified Thompson that he was terminated. A certificate of conviction dated January 11, 2016 indicates that Thompson was convicted of official misconduct in violation of New York Penal Law § 195.00 [15] and sentenced to three years of probation. (Dkt. No. 89-9).

**D. Rumors and Other Alleged Incidents**

Plaintiff has submitted evidence of Thompson's alleged sexual activity with respect to four other women while on duty. (Dkt. No. 99-15; Dkt. No. 99-23; Dkt. No. 99-3, at 139–40; 195–209, 236–43). It is undisputed, however, that these alleged incidents "were not officially reported to the SPD." (Dkt. No. 107, at 6).

Plaintiff has also offered the deposition testimony of John Baggett, who was an SPD police officer at the same time as Thompson, (Dkt. No. 99-14, at 11, 30), who testified that "rumors were running rampant throughout the SPD" concerning allegations that, while on duty, Thompson had "sexually assaulted" women. (*Id.* at 44–45). Baggett could not "pinpoint" when, during his approximately 21-year career, he first started hearing those rumors, (*Id.* at 22), but he believed Miguel might have been Chief of Police when they first came out, (*id.* at 49). To illustrate how "widespread" the rumors were throughout the SPD, Baggett explained that, even though he did not work with or "run in the same circles" as Thompson, the rumors "got to [him] somehow." (*Id.* at 23). Both Galvin and Fowler testified, however, that they had no knowledge of these rumors. (Dkt. No. 99-8, at 30; Dkt. No. 99-7, at 59).

### E. Brown Declaration

**\*10** In opposition to Defendants' motion for summary judgment, Plaintiff filed a declaration by Robert Brown, whom she offers as an expert in the area of internal investigations into allegations of police misconduct as well as "strateg[ies] and penalties" in connection with criminal cases against members of a police force. (Dkt. No. 107, at 8). Brown has been "a practicing attorney [16] with an emphasis on criminal defense" for the past 17 years. (Dkt. No. 99-13, ¶ 4). Prior to becoming an attorney, Brown worked for the New York Police Department ("NYPD"), from which he retired "with the rank of captain." (*Id.* ¶ 1). As captain, Brown "supervised over two-hundred members of the NYPD." (*Id.*). Brown was also "the Commanding Officer and Chief Investigator of the NYPD's Special Prosecutor's Office." (*Id.*). In this role, he "investigated allegations of police misconduct and conducted administrative interrogations ... of police personnel accused of high-profile corruption and serious misconduct"; further, he "conducted a department-wide review of all open cases against members of the NYPD and made recommendations regarding strategy and penalties." (*Id.*).

Brown states that his declaration is based on his review of "various documents and deposition testimony generated in connection with" this matter, including the SPD General Rules and Procedure Manual; relevant literature regarding issues of police integrity and proper responses to allegation of police misconduct; and his "years of training and experience" as a criminal defense lawyer and employment with the NYPD and New York City Housing Police Department ("NYCHPD"). (*Id.* ¶ 6). In Brown's opinion, Galvin failed to address "reported instances of misconduct by Thompson" "in a manner that was consistent with" the SPD Manual. (*Id.* ¶ 15). According to Brown, although the SPD manual "prohibits officers from knowingly associating with persons known to have a reputation of criminal conduct except in the performance of their assigned duties, and further prohibits officers from utilizing their on-duty time in the pursuit of private business or association," Galvin did not discipline or recommend discipline against Thompson "for knowingly associating for personal reasons with Cari Buske, a known prostitute." (*Id.*). Brown further notes that, "[w]hen interviewing Thompson in connection with the Buske, Popcun, and Montanez incidents, Galvin also failed to

record the interviews mechanically or by a stenographer," "failed to interview Popcun's daughter," "failed to obtain an affidavit from Popcun or her daughter," and "failed to document what he alleges were his unsuccessful attempts to obtain the cooperation of Popcun and her daughter, as required by the Manual." (*Id.*). In Brown's opinion, Fowler and Galvin "should have made every attempt to interview Popcun's daughter," and "Popcun's alleged statement to Galvin that she did not want her daughter to be interviewed—even if true—did not justify Galvin's failure to interview the daughter." (*Id.* ¶ 18). Brown opines that, following the Popcun-Roach investigation, "the SPD definitely should have implemented" increased monitoring and supervision of Thompson. (*Id.* ¶ 19). Brown further opines that the SPD's "investigations and responses to these prior reported allegations also deviated materially from good and accepted standards of police practice, including the SPD's own internal rules and policies." (*Id.* ¶ 7).

### III. MOTION TO STRIKE

Defendants seek an order striking from Plaintiff's statement of material facts paragraphs concerning: (1) "rumors that Chester Thompson sexually assaulted women while on duty"; (2) "sexual misconduct about which the SPD was never notified"; and (3) "the declaration of Robert Brown." (Dkt. No. 102-1, at 2).

**\*11** The evidence concerning "rumors" and Thompson's alleged sexual misconduct against four women, about which the SPD was never formally notified, is discussed above. (*See supra* Section II.D). While the Court finds this evidence insufficient to raise a material issue of fact, (*see infra* Section V.B.2.b.) the Court declines to strike paragraphs concerning this evidence from Plaintiff's statement of material facts.

The Court also declines to strike the paragraph in Plaintiff's statement of material facts that cites Brown's declaration. Plaintiff cites Brown's declaration only once in her statement of material facts, (Dkt. No. 98, ¶ 3), and it is one cite among six. Paragraph 3 of Defendants' statement of material facts, and Plaintiff's responses, are as follows:

> 3. The Office of Professional Standards ("OPS") is responsible for the SPD's internal affairs function and investigates any internal or external complaints made against any SPD officers whose conduct is a violation

of law or otherwise fails to comply with SPD policies, rules, or regulations. *See* Fowler Decl. at ¶¶ 8, 9.

*Plaintiff admits only that OPS is responsible for the SPD's internal affairs function and is **obligated** to investigate internal or external complaints made against any SPD officers whose conduct is a violation of law or otherwise fails to comply with SPD policies, rules, or regulations, but denies any suggestion that OPS always complied with that obligation. Specifically, OPS and its predecessor in name, the Internal Affairs Division, either failed to investigate allegations of sexual predation by Chester Thompson or failed to conduct any meaningful investigation of those allegations. See Exhibit 4 (Affidavit of Melissa Popcun), Exhibit 5 (Affidavit of Patricia Popcun), Exhibit 10 (Declaration of Cheryle Bassett), Exhibit 11 (SPD General Rules and Procedure Manual (the Manual), Vol. 1, Article 3, titled "Sex Crime Investigations," Sections 22.13(A)(1),(3), & (9) and Section 22.14(A)(3), Exhibit 13 Declaration of Robert Brown), and Exhibit 15 (Declaration of John Malenick).*

(Dkt. No. 98, ¶ 3). As the proposition for which Plaintiff cites Brown's declaration is supported by other admissible evidence—specifically, the Popcun and Popcun-Roach affidavits (Dkt. Nos. 99-4, 99-5)—and Plaintiff has not offered it for any other purpose, Defendant's motion to strike "the portion of Plaintiff's opposition to Defendants' Statement of Material Facts that relies on the Brown Declaration, as well as the Brown Declaration itself," (Dkt. No. 102-1, at 14), is denied as moot. Any dispute regarding the admissibility of Brown's testimony at trial should be addressed by the parties in a motion in limine. Accordingly, Defendants' motion to strike is denied.

## IV. STANDARD OF REVIEW

Under Federal Rule of Civil Procedure 56(a), summary judgment may be granted only if all the submissions taken together "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. A fact is "material" if it "might

affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *see also Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson* ). The movant may meet this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

**\*12** If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial." *Anderson*, 477 U.S. at 248, 250, 106 S.Ct. 2505; *see also Celotex*, 477 U.S. at 323-24, 106 S.Ct. 2548; *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775, 780 (2d Cir. 2003).

## V. DISCUSSION

### A. State Law Claims

#### 1. Battery, IIED, Prima Facie Tort, and Negligent Hiring Claims

Defendants seek, and Plaintiff does not oppose, dismissal of her battery, IIED, prima facie tort, and negligent hiring claims against the City. (Dkt. No. 97, at 5). Accordingly, those claims are dismissed against the City.

#### 2. Negligent Training, Supervision, and Retention

The City moves for summary judgment dismissing the negligent training, supervision, and retention claims as barred by governmental immunity. (Dkt. No. 89-1, at 20–24). Plaintiff argues that the City is not entitled to governmental immunity because its responses to "prior allegations of malfeasance by Thompson were either ignored, involved no real exercise or discretion, or involved an exercise of discretion that violated the SPD's own internal rules and policies." (Dkt. No. 97, at 23).

"New York courts have held governmental employers liable for placing employees, like police officers who are known to be violent, in positions in which they can harm others." *Gonzalez v. City of New York*, 133 A.D.3d 65, 68 (1st Dep't 2015). "A necessary element of a cause of action alleging negligent retention or negligent supervision is that the 'employer knew or should have known of the employee's propensity for the conduct which caused the injury.' " *Bumpus v. N.Y.C. Transit Auth.*, 47 A.D.3d 653, 654, 851 N.Y.S.2d 591 (2d Dep't 2008) (quoting *Kenneth R. v. Roman Catholic Diocese of Brooklyn*, 229 A.D.2d 159, 161, 654 N.Y.S.2d 791 (2d Dep't 1997) ).

Under New York law, municipalities, however, enjoy governmental immunity when "official action involves the exercise of discretion or expert judgment in policy matters, and is not exclusively ministerial." *Mon v. City of New York*, 78 N.Y.2d 309, 313, 574 N.Y.S.2d 529, 579 N.E.2d 689 (1991). Immunity "insulates a municipality for its employees' performance of their duties where the ... conduct involves the exercise of professional judgment such as electing one among many acceptable methods of carrying out tasks, or making tactical decisions." *Johnson v. City of New York*, 15 N.Y.3d 676, 681, 917 N.Y.S.2d 10, 942 N.E.2d 219 (2010) (quoting *McCormack v. City of New York*, 80 N.Y. 2d 808, 811, 587 N.Y.S.2d 580, 600 N.E.2d 211 (1992) (internal quotations omitted) ). When, however, "the retention of an employee may involve a known risk of bodily harm to others, the field in which [a police official's] discretion may be exercised ... is limited [and] is superseded by the duty to abate that risk if in related circumstances danger to others is reasonably to be perceived." *McCrink v. City of New York*, 296 N.Y. 99, 106, 71 N.E.2d 419 (1947). Further, "immunity ... presupposes that judgment and discretion are exercised in compliance with the municipality's procedures, because 'the very basis for the value judgment supporting immunity and denying individual recovery becomes irrelevant where the municipality violates its own internal rules and policies and exercises no judgment or discretion.' " *Johnson*, 15 N.Y.3d at 681, 917 N.Y.S.2d 10, 942 N.E.2d 219 (quoting *Haddock v. City of New York*, 75 N.Y.2d 478, 485, 554 N.Y.S.2d 439, 553 N.E.2d 987 (1990) ).

**\*13** A municipality is not, therefore, entitled to summary judgment based on immunity if there is a question of fact as to whether the employees' conduct at issue violated

applicable procedures. *See, e.g., id.* (affirming summary judgment in favor of the city after finding no question of fact "as to whether officers' discharge of their firearms violated the [NYPD deadly physical force] guideline"); *Newsome v. Cty. of Suffolk*, 109 A.D.3d 802, 802–03, 971 N.Y.S.2d 208 (2d Dep't 2013) (denying summary judgment to municipality because there was "[a] question of fact with respect to whether the conduct of the dog's handler was consistent with acceptable police practice"); *Galapo v. City of New York*, 219 A.D.2d 581, 582–83, 631 N.Y.S.2d 366 (2d Dep't 1995) (finding "triable issues of fact with respect to whether Officer Martin's actions were consistent with or in contravention of the procedures relating to use of firearms as set forth in the New York City Police Department Patrol Guide"); *see also Lubecki v. City of New York*, 304 A.D.2d 224, 235, 758 N.Y.S.2d 610 (1st Dep't 2003) (ruling that city is not immune when "the evidence established that the police violate clearly established protocols and procedures" concerning the discharge of weapons).

In this case, construing the record in the light most favorable to Plaintiff, the SPD was aware of allegations that Thompson had forced a woman (Bassett) to have sex with him on threat of eviction in 2001; coerced another woman (Buske) who was afraid of being arrested to give him oral sex in 2006; and offered to expunge the criminal record of an intoxicated woman (Popcun-Roach) in exchange for oral sex in 2014. Although there was no investigation of, and thus no exercise of discretion regarding, the first allegation concerning Bassett, the City argues that this complaint is "immaterial" and cannot be a "cause in fact or proximate cause" of Plaintiff's injuries because "over thirteen years separates the alleged ... complaint and the incident at issue." (Dkt. No. 103, at 7–8). The City further argues because Galvin and Fowler exercised discretion in investigating and responding to Thompson's two other alleged acts of misconduct (Buske and Popcun-Roach), governmental immunity applies. (Dkt. No. 89-1, at 23). [17]

Even assuming that the first two complaints (Bassett and Buske) were temporally too distant to be a proximate cause of Plaintiff's injuries, or, in the case of the Buske complaint, the investigation entailed an exercise of discretion to which immunity attaches, there are triable issues of fact as to whether Galvin's actions in the Popcun-Roach investigation were consistent with the

SPD's procedures and within the realm of acceptable practice.

The procedures governing complaints of police officer misconduct require that the supervisor or command officer "document a preliminary investigation to include: (a) [i]nterviewing the complainant; (b) [o]btaining, as soon as practical, an affidavit ... containing details of his/her complaint; [and] (c) [l]ocating and interviewing available witnesses." (Dkt. No. 99-11, at 47). [18] Galvin himself acknowledged "the importance of interviewing every percipient witness to an event" and agreed that he would consider contacting Popcun-Roach to be the "most essential aspect of [his] investigation." (Dkt. No. 89-10, ¶ 78; Dkt. No. 99-8, at 42).

 **\*14** Galvin maintains his decision not to interview Popcun-Roach "was a very difficult judgment call," (Dkt. No. 89-10, ¶ 78), and the Defendants argue that the City of Syracuse is immune from any errors in the judgments made by Galvin and Fowler in their discretionary decisions. Plaintiff, on the other hand, argues she has raised a triable issue of fact as to whether Galvin's acts were a consistent and acceptable method of complying with SPD procedures, noting that not only did Galvin not interview Popun-Roach or obtain any affidavit from Popcun-Roach, but that he has provided entirely different explanations for this failure. (Dkt. No. 97, at 8–9).

In his case report Galvin stated that Popcun-Roach "was not available" and "refused to meet with any police officers investigating her claim." (Dkt. No. 99-6, at 2). Chief Deputy Thompson and Fowler, the officers who were responsible for deciding whether to adopt his recommendation that the complaint be deemed unsubstantiated, testified that Galvin told them that he had "reached out" to Popcun-Roach but that "she would not return any of his calls or give him any information," (*see also* Dkt. No. 99-7, at 41 (Fowler testifying that "Captain Galvin made every effort to contact the subject of the investigation" but "wasn't able to speak with her") ). His case report does not refer to any attempts to contact Popcun-Roach, and Galvin acknowledged during his deposition that he did not in fact attempt to contact Popcun-Roach. (Dkt. No. 99-8, at 9).

Plaintiff notes that Galvin's most recent explanation for not interviewing Popcun-Roach is "completely different" from what he reported in his report and what he told

his superiors. (Dkt. No. 97, at 9). In his deposition and declaration submitted in support of his motion for summary judgment, Galvin states that Popcun was "adamant that [he] not speak with her daughter," who "had bipolar problems" and "was an alcoholic," because Popcun was raising her daughter's child and "was afraid that if she had sent to the police to talk to her daughter about the alleged incident" it might cause a "rift" and "some problem with the parents raising the ... child." (Dkt. No. 99-8, at 34). This explanation is not reflected in Galvin's report, any statement from Popcun or any other contemporaneous records concerning the investigation. To the extent that this was in fact Galvin's discretionary decision, it was undocumented and apparently unknown to the supervisors tasked with reviewing Galvin's report and making a judgment regarding Thompson's conduct.

In addition, Galvin stated in the case report, and to Fowler, that Popcun told him that "her daughter [had] refuted the claim and said it did not happen." (Dkt. No. 99-6, at 1). Since Galvin did not interview Popcun-Roach or obtain an affidavit from either Popcun or Popcun-Roach, there is no witness statement documenting this alleged refutation. And Popcun avers that she told Galvin something different; she states that she said that Melissa "did not intend to cooperate with the investigation and that if they pursued it with her she would likely say it didn't happen." (Dkt. No. 89-21, ¶ 21). The difference between a representation that an alleged victim threatened to recant an allegation to avoid speaking to law enforcement and a representation that an alleged victim expressly stated that that the alleged incident "never happened," may be material to a decision-maker assessing both the investigation and whether the alleged misconduct was substantiated. Indeed, Fowler stated in his declaration that he "carefully considered," among other things, the fact that "Melissa Popcun, had, according to her mother, recanted the story and 'said that it did not happen,' " in determining that "the evidence was not sufficient to substantiate that Officer Thompson had committed misconduct." (Dkt. No. 89-3, ¶¶ 60–61).

 **\*15** There are, therefore, factual questions as to whether Galvin complied with the SPD's procedures requiring that he document an investigation including an interview of the complainant, and an affidavit containing details of the complaint and interview available witnesses. (Dkt. No. 99-11, at 47) (section 8.16(D)(2) ). Since the outcome of that investigation was determinative of

whether Thompson would return to his solo patrol duties, unsupervised and without additional training, which "may involve a known risk of bodily harm to others," if, as he was likely to, he encountered vulnerable individuals on patrol, *McCrink*, 296 N.Y. at 106, 71 N.E.2d 419, "the field in which [the officers'] discretion" could be exercised, was "limited" and "superseded by the duty to abate that risk if in related circumstances danger to others is reasonably to be perceived." *Id.* Thus, while Galvin had the authority to exercise discretion in his investigation, under the circumstances of this case, there is a triable issue of fact as to whether he exercised that discretion consistent with SPD's procedures and whether it was one of "many acceptable methods of carrying out" the investigation. *Kenavan v. City of New York*, 70 N.Y.2d 558, 569, 523 N.Y.S.2d 60, 517 N.E.2d 872 (1987), *superseded by statute on other grounds as recognized by Galapo v. City of New York*, 95 N.Y.2d 568, 721 N.Y.S.2d 857, 744 N.E.2d 685 (2000).

Citing *Mon*, the City argues that where a municipality's officers have exercised discretion, a procedural violation does not render governmental immunity inapplicable, and that it is only inapplicable when there is a "total failure to exercise discretion." (Dkt. No. 103, at 3). In *Mon*, the Court of Appeals found that the discretionary hiring of the employee at issue did not violate the applicable civil service rules because the rules were "permissive," the "applicant's nondisclosures" of a prior disorderly conduct conviction was not "such as would mandate his disqualification" under the rules, and "any violation" of the "provisions" "was because the officials *did exercise their discretion*, but did so improperly." 78 N.Y.2d at 316–17, 574 N.Y.S.2d 529, 579 N.E.2d 689. In contrast, here, the SPD's provisions governing an investigation are not permissive, (*see* Dkt. No. 99-11, at 47 ("Command Officer ... *shall* ... document a preliminary investigation to include ...) (emphasis added) ). And here, unlike *Mon*, there is a triable question of fact as to whether Galvin exercised his discretion in compliance with SPD procedures. It will be up to the jury to decide whether his alleged negligent investigation was "an error of judgment and immune from liability," or was, instead, "outside the realm of accepted practice and therefore actionable." *See Kenavan*, 70 N.Y.2d at 571, 523 N.Y.S.2d 60, 517 N.E.2d 872 (Titone, J. dissent). Thus, the City's motion for summary judgment dismissing the negligent retention, supervision, and training claim on grounds of governmental immunity is denied. [19]

**B. Section 1983 Claims**

**1. Plaintiff's Constitutional Claim**

Plaintiff alleges that Thompson violated her Fourth Amendment right "to be free from the use of excessive force and unreasonable searches and seizures" and her Fourteenth Amendment right to substantive due process. (Dkt. No. 1, ¶¶ 78–81). The parties have not addressed which constitutional provision applies to Plaintiff's allegations. Although Thompson was in Plaintiff's apartment in response to a 911 call, and thus on police business, there is no evidence that Thompson sexually assaulted Plaintiff during the course of an arrest or seizure or that Plaintiff was under suspicion of criminal activity. Thus, for the purposes of this motion, the Court assumes that Plaintiff's "claim is appropriately analyzed pursuant to the Fourteenth Amendment's guarantee of substantive due process." *Poe v. Leonard*, 282 F.3d 123,137 (2d Cir. 2002) (citing, *inter alia, Haberthur v. City of Raymore*, 119 F.3d 720, 723–24 (8th Cir. 1997) (concluding that the plaintiff, who was not under arrest or under suspicion of criminal activity, adequately alleged that police officer's sexual assault violated her substantive due process right to bodily integrity or privacy) and *Jones v. Wellham*, 104 F.3d 620, 628 (4th Cir. 1997) (holding that claim brought by a plaintiff, who was not arrested or a criminal suspect but was raped by a police officer, was properly viewed as asserting a violation of her substantive due process right to bodily integrity under the Fourteenth Amendment, rather than as a violation of her Fourth Amendment rights) ).

**\*16** "The substantive component of due process encompasses, among other things, an individual's right to bodily integrity free from unjustifiable governmental interference." *Lombardi v. Whitman*, 485 F.3d 73, 79 (2d Cir. 2007) (citing *Washington v. Glucksberg*, 521 U.S. 702, 720, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997) ). The Second Circuit has explained, however, that "the Due Process Clause 'does not transform every tort committed by a state actor into a constitutional violation.' " *Id.* (quoting *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 202, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989) ). "Government action resulting in bodily harm is not a substantive due process violation unless 'the government action was so egregious, so outrageous, that it may fairly

be said to shock the contemporary conscience.' " *Id.* (quoting *Pena v. DePrisco*, 432 F.3d 98, 112 (2d Cir. 2005) ).

Courts have recognized a police officer's use of his position to coerce sex as a violation of a right to bodily integrity that violates substantive due process. *See, e.g., Villanueva v. City of Scottsbluff*, 779 F.3d 507, 513 (8th Cir. 2015) (noting that an encounter in which a woman who was followed home by "an on-duty, armed, and uniformed officer," who entered her house "demanded that she undress, and had sexual intercourse with her," was "an egregious, nonconsensual entry into the body which was an exercise of power without any legitimate government objective," even though she did not object); *see also United States v. Giordano*, 260 F.Supp.2d 477, 484 (D. Conn. 2002) (explaining that the Fourteenth Amendment right to bodily integrity "includes the right to be free from ... coerced sexual activity."); *c.f. Poe*, 282 F.3d at 139 (holding that police officer's manipulation of the situation in making a police training video "to ensure that [the plaintiff] would be videotaped unclothed from the waist up" "all while purporting to act for the benefit of the police academy" qualified as "conscience-shocking" in violation of the Fourteenth Amendment). Mindful of these principles, the Court turns to Defendants' motion for summary judgment on the federal claims.

## 2. Supervisory Liability

Defendants Galvin and Fowler seek summary judgment dismissing Plaintiff's claims that their failure to supervise and discipline Thompson caused the violation of her constitutional rights. Plaintiff opposes dismissal of her supervisory liability claims.

"A supervisor may not be held liable under section 1983 merely because his subordinate committed a constitutional tort." *Poe*, 282 F.3d at 140. As the Second Circuit has explained, the personal involvement of supervisory personnel may be shown through evidence that they: (1) directly participated in the violation; (2) failed to remedy that violation after learning of it through a report or appeal; (3) created, or allowed to continue, a policy or custom under which the violation occurred; (4) had been grossly negligent in managing subordinates who caused the violation; or (5) exhibited deliberate indifference by failing to act on information

indicating that an unconstitutional act was occurring. *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995). "In addition to satisfying one of these requirements, a plaintiff must also establish that the supervisor's actions were the proximate cause of the plaintiff's constitutional deprivation." *Raspardo v. Carlone*, 770 F.3d 97, 116 (2d Cir. 2014).

Before proceeding to the merits, the Court must address the argument Defendants Fowler and Galvin have advanced concerning the continued viability of the *Colon* factors. (Dkt. No. 89-1, at 24). Defendants assert that, in view of *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), the personal involvement of a supervisory defendant may no longer "be proven by evidence that the supervisory defendant's conduct met any of the five so-called *Colon* factors, which, inter alia, purported to equate 'personal involvement' with types of indirect involvement." (*Id.*). Thus, Defendants argue, where, as here, there is no evidence that they "participated in, were present for, ordered, or acquiesced to the alleged sexual assault of the Plaintiff," they cannot be held liable. (Dkt. No. 89-1, at 24).

**\*17** In *Ashcroft v. Iqbal*, the Supreme Court explained that "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." 556 U.S. 662, 676, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). The Court noted that "[t]he factors necessary to establish a *Bivens* violation will vary with the constitutional provision at issue." *Id.* There, the alleged constitutional violation was discrimination based on race, religion or national origin, in violation of the First and Fifth Amendment. *Id.* at 668–69, 129 S.Ct. 1937. For such claims, "the plaintiff must plead and prove that the defendant acted with discriminatory purpose." *Id.* at 677, 129 S.Ct. 1937. The Court rejected the plaintiff's argument that a supervisor may be liable for "knowledge and acquiescence in their subordinates' use of discriminatory criteria to make classification decisions among detainees," because "purpose, rather than knowledge is required" to impose liability. *Id.*

While "*Iqbal* has ... engendered conflict within our Circuit about the continuing vitality of the supervisory liability test set forth in *Colon*," *Reynolds v. Barrett*, 685 F.3d 193, 205 n.14 (2d Cir. 2012), the Second Circuit has not resolved this conflict, *see Hogan v. Fischer*, 738 F.3d 509, 519 n.3 (2d Cir. 2013) ("We express no view on the

extent to which the Supreme Court's decision in *Ashcroft v. Iqbal*, ... 'may have heightened the requirements for showing a supervisors' personal involvement with respect to certain constitutional violations.' " (quoting *Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013) ) ).

As Defendants note, some district courts have held that only the first and third *Colon factors* survive Iqbal. (Dkt. No. 89-1, at 25 (citing *Bouche v. City of Mount Vernon*, No. 11-cv-5246, 2012 WL 987592, at *8, 2012 U.S. Dist. LEXIS 40246 (S.D.N.Y. Mar. 23, 2012) ) ). However, "neither the Second Circuit nor the Supreme Court has endorsed this reading of *Iqbal*," and the Court declines to follow that caselaw. *Doe v. New York*, 97 F.Supp.3d 5, 12 (E.D.N.Y. 2015) (quoting *Cano v. City of New York*, 44 F.Supp.3d 324, 336 (E.D.N.Y. 2014) ); *see also Marom v. City of New York*, No. 15-cv-2017, 2016 WL 916424, at *15, 2016 U.S. Dist. LEXIS 28466 (S.D.N.Y. Mar. 7, 2016) ("The holding in *Iqbal* does not stand for the proposition that a supervisor can never be found personally liable for a constitutional deprivation on a showing that he was 'grossly negligent' or 'deliberately indifferent.' ").

As Defendants also note, some courts have continued to apply the *Colon* factors. *See, e.g., Lebron v. Mrzyglod*, No. 14-cv-10290, 2017 WL 365493, at *4, 2017 U.S. Dist. LEXIS 9751 (S.D.N.Y. Jan. 24, 2017) (noting that "[s]ome courts have simply concluded that, in the absence of Second Circuit precedent suggesting otherwise, they will continue to apply the Colon test.") (citing *Doe*, 97 F.Supp.3d at 12 and *Johnson v. Fischer*, No. 12-CV-210, 2015 WL 670429, at *7 n.6, 2014 U.S. Dist. LEXIS 182153 (N.D.N.Y. August 5, 2014), *report and recommendation adopted by*, 2015 WL 670429, 2015 U.S. Dist. LEXIS 18601 (N.D.N.Y. Feb. 17, 2015) ). Defendants urge the Court not to adopt this position because the Supreme Court reversed the Second Circuit's application of the *Colon factors in Iqbal*. (Dkt. No. 89-1, at 25–26).

Many district courts have considered "the constitutional provision at issue," *Iqbal*, 556 U.S. at 676, 129 S.Ct. 1937, in determining whether to apply the *Colon* factors. *See, e.g., Delgado v. Bezio*, No. 09-cv-6899, 2011 WL 1842294, at *9, 2011 U.S. Dist. LEXIS 51917 (S.D.N.Y. May 9, 2011); *Qasem v. Toro*, 737 F.Supp.2d 147, 151–52 (S.D.N.Y. 2010). Some of these courts have concluded that "where the claim does not require a showing of discriminatory intent, the *Colon* analysis should still

apply insofar as it is 'consistent with the particular constitutional provision alleged to have been violated.' " *Id.* They have thus applied the *Colon* factors when the constitutional claim relies on "the unreasonable conduct or deliberate indifference standards of the Fourth, Eight or Fourteenth Amendments." *Shepherd v. Powers*, No. 11-cv-6860, 2012 WL 4477241, at *10, 2012 U.S. Dist. LEXIS 141179 (S.D.N.Y. Sept. 27, 2012) (collecting cases). Other courts have applied the *Colon* factors as long as the constitutional violation at issue does not require a showing of discriminatory intent. *See, e.g., Carpenter v. Apple*, No. 15-cv-1269, 2017 WL 3887908, at *9, 2017 U.S. Dist. LEXIS 143296 (N.D.N.Y. Sept. 5, 2017) (collecting cases).

**\*18** The Court agrees with the reasoning of the cases holding that the *Colon* analysis may still apply where the claim does not require a showing of discriminatory intent, "insofar as it is 'consistent with the particular constitutional provision alleged to have been violated.' " *Delgado v. Bezio*, No. 09-cv-6899, 2011 WL 1842294, at *9, 2011 U.S. Dist. LEXIS 51917 (S.D.N.Y. May 9, 2011) (quoting *Qasem*, 737 F.Supp.2d at 151–52; *see also Marom v. City of New York*, No. 15-cv-2017, 2016 WL 916424, at *15, 2016 U.S. Dist. LEXIS 28466 (S.D.N.Y. Mar. 7, 2016) (noting that all five *Colon* factors should be viable for false arrest and excessive force claims based on an objectively reasonable standard, but not for First Amendment retaliation claims which have an intent requirement; *Sash v. United States*, 674 F.Supp.2d 531, 544 (S.D.N.Y. 2009) ("Where the constitutional claim does not require a showing of discriminatory intent, but instead relies on the unreasonable conduct or deliberate indifference standards of the Fourth and Eighth Amendments, the personal involvement analysis set forth in *Colon v. Coughlin* may still apply.") ). In this case because Plaintiff's claims do not require a showing of discriminatory intent and are based on the unreasonable conduct standard of the Fourteenth Amendment, the Court will apply the *Colon* factors.

### a. Defendant Galvin

Plaintiff argues that Galvin acted with gross negligence and deliberate indifference in supervising and disciplining Thompson.[20] (Dkt. No. 97, at 26). The Second Circuit has explained that " 'gross negligence' denotes a higher degree of culpability than mere negligence" and "is 'the

kind of conduct where the defendant has reason to know of facts creating a high degree of risk of ... harm to another and deliberately acts or fails to act in conscious disregard or indifference to that risk.' " *Raspardo*, 770 F.3d at 116 (quoting *Poe*, 282 F.3d at 140 n.14, 146). "The standard of gross negligence is satisfied where the plaintiff establishes that the defendant-supervisor was aware of a subordinate's prior substantial misconduct but failed to take appropriate action to prevent future similar misconduct before the plaintiff was eventually injured." *Id.* Thus, Plaintiff "must allege sufficient facts to raise a triable issue of fact as to whether [Galvin] knew or should have known that there was a high degree of risk that [Thompson] would behave inappropriately with a woman [while on duty], but either deliberately or recklessly disregarded that risk by failing to take action that a reasonable supervisor would find necessary to prevent such a risk, and that failure caused a constitutional injury to [Plaintiff]." *Poe*, 282 F.3d at 142.

Here, viewed in the light most favorable to Plaintiff, there is evidence that Galvin received two complaints —the 2006 Buske complaint and 2014 Popcun-Roach complaint—that Thompson, while on duty, had coerced women into sexual acts. Galvin acknowledged having concern about Buske's complaint because he found her "description of events as being plausible" and Thompson was "very nervous" during his interview. Although Galvin recommended that Buske's complaint be deemed "unsubstantiated," he advised Chief Miguel that Thompson's midnight shift hours "should be monitored" because prostitutes working those hours can be manipulated. Although Galvin recommended that the next complaint, from Popcun-Roach, be deemed "unsubstantiated," there is evidence from which a reasonable factfinder could infer that Galvin's investigation of that complaint was inadequate. *See H.H. v. City of New York*, 11-cv-4905, 2017 WL 3396434, at *8, 2017 U.S. Dist. LEXIS 124317 (E.D.N.Y. Aug. 7, 2017) ("Unsubstantiated allegations may form the basis of a deliberate indifference claim where there is evidence to suggest that the investigation into the allegations was inadequate."). As previously described, Galvin never attempted to interview Popcun-Roach, and yet represented in his case report that Popcun-Roach "was not available" and "refused to meet with any police officers investigating her claim." (Dkt. No. 99-6, at 1–2). There is nothing in the record of the investigation or in the record currently before the Court to support Galvin's

deposition testimony that Popcun was "adamant" that she not speak with her daughter. And Galvin's report that Popcun-Roach "retracted" her claim, and "said it didn't happen" are not supported by what Popcun states she told Galvin. Plaintiff has adduced evidence that Popcun-Roach was willing to speak to police and tell "them about what happened with the police officer."

**\*19** Drawing all inferences in favor of Plaintiff, the evidence, if credited, would allow a reasonable factfinder to conclude that Galvin, in failing to adequately investigate the Popcun-Roach complaint, was indifferent to the truth of the allegations that Thompson had engaged in coercive sexual conduct, and "exhibited gross negligence or deliberate indifference to a high risk" that Thompson would violate the rights of other women, and that Galvin's deliberate indifference caused Thompson to violate Plaintiff's rights. *Poe*, 282 F.3d at 140; *see also Fiacco v. City of Rensselaer*, 783 F.2d 319, 328 (2d Cir. 1986) ("[I]f the City's efforts to evaluate the claims were so superficial as to suggest that its official attitude was one of indifference to the truth of the claim, such an attitude would bespeak an indifference to the rights asserted in those claims."). Thus, in view of these factual disputes, summary judgment as to Galvin's supervisory liability is inappropriate.

### b. Defendant Fowler

Plaintiff argues that Defendant Fowler's testimony that he was not "concerned about the possibility that in the future Thompson would do to others what he was accused of having done to [Popcun-Roach]" and his failure to take "precautionary or remedial steps with respect to Thompson" demonstrate his "deliberate indifference to the rights of others." (Dkt. No. 97, at 26). Thus, Plaintiff alleges that Fowler was grossly negligent in the exercise of his supervisory duties.

To establish gross negligence Plaintiff must adduce evidence that Fowler had "reason to know of facts creating a high degree of risk of physical harm to another and deliberately act[ed] or fail[ed] to act in conscious disregard or indifference to that risk." *Poe*, 282 F.3d at 140 n.14. The evidence suggesting that Fowler had reason to know that Thompson may have posed a risk of using his position as a police officer to coerce women to engage in sexual acts consists of his evaluation of the Popcun-Roach

case report and Galvin's testimony that he advised Fowler there had been a "similar" complaint against Thompson involving a "vulnerable person" eight years before. (Dkt. No. 99-8, at 25–26). There is no other evidence about what Fowler knew about Buske's complaint, which was several years before Fowler became chief, and Plaintiff does not rely on Galvin's limited testimony. Plaintiff in fact cites to Fowler's testimony that he was *unaware* of Buske's complaint, as evidence of SPD's inadequate response to the Popcun-Roach investigation. (Dkt. No. 97, at 10) (citing Dkt. No. 99-7 at 43, 44, 57) (emphasis added). In any event, this limited evidence about a "similar" complaint that a prior chief deemed unsubstantiated is, in and of itself, insufficient to raise a material issue of fact as to Fowler's gross negligence.

The Popcun-Roach case report recommended a finding of "unsubstantiated" and indicated that the alleged victim "refused to meet with any police officers," was "not available" for interview and had "retracted" her allegations "soon after they were made" and "said it did not happen." (Dkt. No. 99-6, at 2–3). [21] Nothing in the report or information *provided to Fowler* indicated otherwise. Thus, the Popcun-Roach investigation would not allow an inference that Fowler knew or had reason to know that Thompson posed a high risk of using his position as a police officer to coerce women to engage in sexual acts. *See Raspardo*, 770 F.3d at 124 (concluding that the "prior incidents of misconduct" by the subordinate, which involved, among other things, "allegations concerning improper comments and behavior toward female officers and personnel," "an inappropriate joke about a female officer," picking up female officers in his patrol vehicle despite being ordered not to, and the inappropriate use of a mobile messaging system," all of which supervisor was aware of and in response to which "disciplined [subordinate] through verbal counseling" "were not sufficient to put [supervisor] on notice that [subordinate] was likely to sexually harass" female officers).

**\*20** Further, to the extent Plaintiff contends the Popcun-Roach complaint should have prompted Fowler to review Thompson's disciplinary history, such a contention would not raise a material issue of fact as to Fowler's gross negligence. The Buske complaint was deemed unsubstantiated, and "[s]upervisors cannot be expected to reinvent the wheel with every decision, for that is administratively unfeasible; rather, they are entitled to rely

upon the decisions of their predecessors or subordinates so long as those decisions do not appear to be obviously invalid, illegal or otherwise inadequate." *Poe*, 282 F.3d at 144; *see also Cecere v. City of New York*, 967 F.2d 826, 829 (2d Cir. 1992) ("Absent some indication to a supervisor that an investigation was inadequate or incompetent, supervisors are not obliged either to undertake de novo investigations or to cross examine subordinates reasonably believed to be competent as to whether their investigations were negligent.").

Plaintiff cites Baggett's testimony that there were "rampant" rumors regarding Thompson's sexual misconduct toward women while on duty as evidence that Fowler was on notice that Thompson was prone to sexual misconduct with respect to women. Plaintiff argues that the evidence regarding Thompson's sexual misconduct with respect to four other women "corroborates Officer Baggett's testimony that rumors of prior sexual assault by Thompson were rampant." (Dkt. No. 107, at 7). While allegations that other officers were in a position to have seen Thompson's conduct is consistent with Baggett's testimony concerning rumors, [22] Baggett's testimony is conclusory in nature. It contains no specifics concerning the content of the rumors, where they came from, who spread them, or when they were circulating. Further, there is no evidence that Fowler was aware of the rumors or that any complaints had been made to the SPD concerning Thompson's conduct with respect to these four women. Thus, the rumors and evidence of unreported incidents are insufficient to create a material issue of fact as to whether Fowler had notice that there was a high degree of risk that Thompson would coerce sex from women while on duty. *See, e.g., Romero v. City of New York*, 839 F.Supp.2d 588, 608 (E.D.N.Y. 2012) ("[T]he unspecified rumors circulating among students at Richmond Hill about a possible relationship between Mr. Benavides and Ms. Doe is not sufficient to constitute actual knowledge by school officials of sexual harassment, particularly where there is no evidence that any NYCDOE officials even heard the rumors."). Accordingly, Fowler is entitled to summary judgment dismissing the supervisory liability claim.

### c. Qualified Immunity

Defendants Galvin and Fowler argue that they are entitled to qualified immunity because there are no facts that would have placed them on notice that their conduct

violated the Plaintiff's "clearly established" rights and because their decision-making is "only arguably incorrect in hindsight." (Dkt. No. 89-1, at 27; Dkt. No. 103, at 9–10). [23] "Qualified immunity shields public officials from liability for civil damages if their actions were objectively reasonable, as evaluated in the context of legal rules that were 'clearly established' at the time." *Poe*, 282 F.3d at 132 (quoting *Vega v. Miller*, 273 F.3d 460, 466 (2d Cir. 2001) ). "In deciding 'questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry.' " *Raspardo*, 770 F.3d at 113 (quoting *Tolan v. Cotton*, 572 U.S. 650, 655, 134 S.Ct. 1861, 188 L.Ed.2d 895 (2014) ). "The first prong 'asks whether the facts, taken in the light most favorable to the party asserting the injury ... show the officer's conduct violated a federal right[,] ... [and] [t]he second prong of the qualified-immunity analysis asks whether the right in question was clearly established at the time of the violation.' " *Id.* (quoting *Tolan*, 572 U.S. at 655–56, 134 S.Ct. 1861); *see also Kisela v. Hughes*, ––– U.S. ––––, 138 S.Ct. 1148, 1152, 200 L.Ed.2d 449 (2018) (per curiam) ("Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." (quoting *White v. Pauly*, ––– U.S. ––––, 137 S.Ct. 548, 551, 196 L.Ed.2d 463 (2017) ) ). An officer "cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Plumhoff v. Rickard*, 572 U.S. 765, 778–79, 134 S.Ct. 2012, 188 L.Ed.2d 1056 (2014). "Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Id.* (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) ).

**\*21** Here, as Plaintiff has failed to raise a material issue of fact as to Fowler's supervisory liability, the first prong is met, and the Court need proceed no further in the qualified immunity analysis as to Fowler. [24] But the Court has found that the facts, taken in the light most favorable to Plaintiff, raise a material issue of fact as to whether Galvin was grossly negligent in the investigation of and response to allegations of sexual coercion by Thompson. Thus, the Court must turn to the second prong of the qualified immunity analysis; this requires consideration of whether the law Thompson allegedly violated was clearly established as well as whether the supervisory

liability theory under which Plaintiff seeks to hold Galvin liable was clearly established. *Grice v. McVeigh*, 873 F.3d 162, 169 (2d Cir. 2017) ("Defendants are entitled to qualified immunity on a supervisory liability claim unless the actions of the supervisor and the subordinate both violate clearly established law."); *see also Poe*, 282 F.3d at 135 (explaining that the court "must determine whether both laws, the law violated by [the subordinate] and the specific supervisory liability theory under which [the plaintiff] wishes to hold [the supervisor] liable, were clearly established by ... the time of the incident.").

Thompson's alleged conduct of sexually assaulting Plaintiff after she allowed him into her apartment in response to her 911 call, if proved, "would constitute a violation of Plaintiff's substantive due process right to bodily integrity, a right which was clearly established" in 2015. *Atwood v. Town of Ellington*, 468 F.Supp.2d 340, 352 (D. Conn. 2007). The supervisory liability theory under which Plaintiff seeks to hold Galvin liable was also clearly established at the time of the incident: "Case law clearly establishes that a supervisor may be liable for failing to screen or otherwise inquire about his subordinates or into their actions." *Poe*, 282 F.3d at 141 (citing *Fiacco*, 783 F.2d at 331 (finding sufficient evidence to support a jury's conclusion that a police chief was deliberately indifferent "to whether or not excessive force was used[ ]" based on the failure "to conduct a nonsuperficial investigation into civilian claims of excessive force") ). Thus, in order to defeat a police supervisor's claim of qualified immunity, Plaintiff

> must allege sufficient facts to raise a triable issue of fact as to whether [the supervisor] knew or should have known that there was a high degree of risk that [the subordinate] would behave inappropriately with a woman during his assignment, but either deliberately or recklessly disregarded that risk by failing to take action that a reasonable supervisor would find necessary to prevent such a risk, and that failure caused a constitutional injury. The issue [with respect to] qualified immunity then, is whether a plaintiff "has ... proffer[ed] sufficient evidence to meet this standard."

*Raspardo*, 770 F.3d at 123–24 (quoting *Poe*, 282 F.3d at 142).

Here, there are material issues of fact regarding whether Galvin conducted a nonsuperficial investigation into Popcun-Roach's allegation that Thompson, while on

duty, coerced her, while she was intoxicated and suffering from mental health issues, to perform oral sex by promising to help with her police problems. Specifically, the material issues of fact include: (i) whether Galvin misrepresented in his case report and to his superiors that Popcun-Roach refused to meet with police officers, was not available and had retracted her allegation; (ii) whether Galvin failed to account for his "lingering concerns" about Buske's prior allegation of similar coercive sexual misconduct when investigating the Popcun-Roach complaint; and (iii) whether Galvin failed to caution Thompson about such conduct. (Dkt. No. 99-3, at 231–34). On this record, considering all inferences in the light most favorable to the Plaintiff, the Court finds that there are material issues of fact as to whether Galvin knew or should have known that there was a high degree of risk that Thompson would coerce sex from a woman while on duty, and whether, in failing to adequately investigate the Popcun-Roach complaint or caution Thompson in any manner, Gavin disregarded that risk, and that his failure caused Plaintiff's alleged constitutional injury. Accordingly, given these disputed facts, a finding of qualified immunity is inappropriate at this stage.

### 3. Municipal Liability

**\*22** "For the purpose of Section 1983, a municipality is not vicariously liable for the acts of its employees," *Green v. City of New York*, 465 F.3d 65, 80 (2d Cir. 2006) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978) ), but a municipality is liable when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury," *Monell*, 436 U.S. at 694, 98 S.Ct. 2018. "To hold a municipality liable in such an action, 'a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right.' " *Zahra v. Town of Southold*, 48 F.3d 674, 685 (2d Cir. 1995) (quoting *Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983) ).

A municipal policy or custom may be established where the facts show: (1) a formal policy, officially promulgated by the municipality, *Monell*, 436 U.S. at 690, 98 S.Ct. 2018; (2) action taken by the official responsible for

establishing policy with respect to a particular issue, *Pembaur v. Cincinnati*, 475 U.S. 469, 483–84, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); (3) unlawful practices by subordinate officials so permanent and widespread as to practically have the force of law, *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127–30, 108 S.Ct. 915, 99 L.Ed.2d 107 (1985); or (4) a failure to train or supervise that amounts to "deliberate indifference" to the rights of those with whom the municipality's employees interact, *City of Canton v. Harris*, 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). "[A] municipal policy may be inferred from the informal acts or omissions of supervisory municipal officials." *Zahra*, 48 F.3d at 685. Further, "municipal inaction such as the persistent failure to discipline subordinates who violate civil rights could give rise to an inference of an unlawful municipal policy of ratification of unconstitutional conduct." *Batista*, 702 F.2d at 397; *see also Turpin v. Mailet*, 619 F.2d 196, 200 (2d Cir. 1980) (holding that "where senior personnel have knowledge of a pattern of constitutionally offensive acts by their subordinates but fail to take remedial steps, the municipality may be held liable for a subsequent violation if the superior's inaction amounts to deliberate indifference or to tacit authorization of the offensive acts").

In this case, Plaintiff's theory of municipal liability is that the City's failure to adequately investigate the complaints against Thompson and supervise him properly amounted to deliberate indifference to the rights of those with whom he interacted as an SPD patrol officer. (Dkt. No. 97, at 27–28). "Where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a deliberate choice, that acquiescence may be properly thought of as a city policy or custom that is actionable under § 1983." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 126 (2d Cir. 2004) (Sotomayor, J.) (internal quotation marks omitted).

Deliberate indifference, however, "is a stringent standard of fault," *Connick v. Thompson*, 563 U.S. 51, 70, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011) (quoting *Board of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 410, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) ), "and necessarily depends on a careful assessment of the facts at issue in a particular case," *Cash v. County of Erie*, 654 F.3d 324, 334 (2d Cir. 2011). The Second Circuit has instructed that "[t]he operative inquiry is whether those facts demonstrate that

the policymaker's inaction was the result of 'conscious choice' and not 'mere negligence.' " *Id.* (quoting *Amnesty Am.*, 361 F.3d at 128). Deliberate indifference, therefore, "may be inferred where 'the need for more or better supervision to protect against constitutional violations was obvious,' but the policymaker [25] 'fail[ed] to make meaningful efforts to address the risk of harm to plaintiff.' " *Id.* (citation omitted) (quoting first *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995), then *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007) ).

**\*23** Here, Plaintiff cites five complaints made against Thompson during the course of his career with the SPD to support her claim that Defendant City was deliberately indifferent toward Thompson's misconduct. While the health insurance complaint does not reflect sexual misconduct, the SPD concluded that Thompson had engaged in "a pattern of the less [sic] than truthful behavior." (Dkt. No. 99-18, at 8). The SCC complaint, while troubling to the extent it includes an allegation that Thompson walked inside a woman's home uninvited and then demanded a "hug" before he would leave, (Dkt. No. 99-20), is insufficient to show that Defendant City was on notice that Thompson, while on duty, was coercing women to perform sexual acts. The complaints concerning Bassett, Buske, and Popcun-Roach, in contrast, all allege that Thompson engaged in sexual misconduct toward women, and the latter two allege that Thompson engaged in sexual misconduct while on duty. Though Galvin credited Thompson's explanations, and found the Buske and Popcun-Roach complaints to be "unsubstantiated", this meant only that they were "not conclusively disproven but ... there is insufficient evidence to conclude one way or the other whether the alleged conduct occurred." (Dkt. No. 89-10, ¶¶ 16–18). In addition, to the issue of material fact already identified regarding the adequacy of the Popcun-Roach investigation, there are material issues of fact as to whether the SPD received and failed to investigate a complaint about Bassett.

If credited, Plaintiff has provided evidence from which a reasonable factfinder could conclude that, had the City adequately investigated the complaints against Thompson and supervised and disciplined him appropriately,

Plaintiff's rights would not have been violated. The allegations by Buske and Popcun—that, in performing his patrol duties, Thompson coerced women he encountered to perform sexual acts—"sufficiently resemble" his actions toward Plaintiff so as to render Plaintiff's injury "foreseeable." *H.H.*, 2017 WL 3396434, at \*10, 2017 U.S. Dist. LEXIS 124317. Indeed, even after being investigated twice in connection with the Buske and Popcun-Roach complaint, Thompson indicated to Galvin that he "did not think it would be a problem" "for an officer to engage with a complainant in sex, whether consensual or not, while on duty." (Dkt. No. 99-24, at 4). A reasonable jury could find from this evidence that a more thorough investigation and increased supervision and discipline would have prevented Thompson from engaging in such conduct, and, consequently, from violating Plaintiff's rights.

## VI. CONCLUSION

For these reasons, it is hereby

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 89) is **GRANTED** as to the battery, IIED, prima facie tort, and negligent hiring claims against the City and the supervisory liability claims against Fowler; and it is further

**ORDERED** that the battery, IIED, prima facie tort, and negligent hiring claims against the City and the supervisory liability claims against Fowler are **DISMISSED with prejudice**; and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 89) is otherwise **DENIED** in its entirety; and it is further

**ORDERED** that Defendants' motion to strike (Dkt. No. 102) is **DENIED**.

**IT IS SO ORDERED.**

### All Citations

Slip Copy, 2019 WL 315058

---

Footnotes

1    The facts regarding this encounter are disputed. Defendants assert that the sex was consensual. (Dkt. No. 89-1, at 9; Dkt. No. 99-3, at 72–99). Plaintiff says that she complied with Officer Thompson's direction to give him oral sex because

she was terrified; that he raped her after directing her to get a condom; and that she went to the hospital the next day to report the rape. (Dkt. No. 99-2, ¶¶ 5–9). That dispute is immaterial to the resolution of the present motion. Construing the facts in the light most favorable to the Plaintiff, the Court refers to the incident as a sexual assault.

2  For convenience, the Court refers to the City, Fowler, and Galvin collectively as "Defendants." This reference does not include Defendant Thompson, who is represented by separate counsel and has no motion before the Court at this time.

3  The facts are drawn from Defendants' statement of material facts, (Dkt. No. 89-2), Plaintiff's responses thereto (Dkt. No. 98), and the attached affidavits, declarations, exhibits, and depositions. The facts are taken in the light most favorable to Plaintiff.

4  As Defendants seek summary judgment dismissing the negligent training, supervision, and retention claims and § 1983 supervisory and municipal liability claims, the material facts principally relate to Defendants' knowledge of and response to Thompson's alleged misconduct throughout his career as a police officer at the SPD.

5  Defendant Galvin, who was head of the SPD's Internal Affairs Division—later known as the Office of Professional Standards ("OPS")—from 1989 until he retired in June 2015, (Dkt. No. 99-8, at 7–9), states in his declaration that "[t]he purpose of OPS is to receive and fairly investigate any complaints made, whether external or internal, against police officers serving within the Department whose conduct is a violation of law or otherwise a failure to comply with Department policies, rules, or regulations." (Dkt. No. 89-10, ¶ 6).

6  Chief DuVal also suspended Galvin for three days without pay. (*Id.* at 2).

7  Fowler was appointed Chief of Police at some point in 2009. (Dkt. No. 99-7, at 9).

8  Galvin explained that there are three basic findings—unfounded, substantiated, and unsubstantiated—and explained that: "unfounded" means "conduct that is disproved or demonstrated to have not occurred"; "unsubstantiated" means "conduct that is not conclusively disproven but ... there is insufficient evidence to conclude one way or the other whether the alleged conduct occurred"; and substantiated means "there is sufficient evidence to conclude that the misconduct as alleged has actually occurred." (Dkt. No. 89-10, ¶¶ 16–18).

9  Officer Nicolini's written report to Galvin regarding the incident does not mention any conversation indicating that Melissa had information about the dog. (Dkt. No. 99-6, at 5).

10  Melissa Popcun-Roach has submitted an affidavit stating that no one from the SPD "ever contacted [her] or, to [her] knowledge, attempted to contact" her. (Dkt. No. 99-4, at 1). She further states that, had someone from the SPD contacted her, she "would have spoken to them and told them about what happened with the police officer." (*Id.*). She "did not contact anyone at the SPD on [her] own because [she] was not in a good mental state during the time period when this incident happened." (*Id.*). She recounts the incident with Thompson as follows:

Some time in 2014 a [SPD] officer entered my apartment unannounced and without my permission.... I jokingly asked the officer if he could help me with some open traffic tickets. In response, the officer walked over to the couch on which I was seated, unzipped his pants, removed his erect penis, and told me to give him oral sex. The officer had a very scary and demanding demeanor and I was afraid and intimidated by him so I began to give him oral sex.

(*Id.* at 1).

11  There is no familial relation between Defendant Chester Thompson and Chief Deputy Rebecca Thompson.

12  In his declaration, Fowler states that, in determining the "appropriate discipline for substantiated complaints," he reviews, among other things, "the officer's prior performance history and prior disciplinary history." (Dkt. No. 89-3, ¶ 24). The Popcun-Roach case report, however, recommended, and Fowler adopted, a finding of unsubstantiated. (Dkt. No. 99-6, at 3). There is no evidence that Fowler reviewed Thompson's prior history or that SPD policy required such review in the event of an unsubstantiated finding.

13  Fowler stated that, at the time he learned of the "incident regarding Melissa Popcun[-Roach]," he was not aware of any other allegations of sexual impropriety by Thompson, and that he did not learn about Buske's allegations until after the present lawsuit. (Dkt. No. 99-7, at 43–44). Galvin, on the other hand, testified that he apprised Fowler of Galvin's concerns that "this is a second time. Even though there was a gap of eight years, it was a similar allegation. She was a vulnerable person, in my perspective, and it would have been easy to take advantage of that, as it would have been with a prostitute." (Dkt. No. 99-8, at 25–26).

14  Thompson disputes her account. Thompson asserts that Montanez initiated the sexual encounter when she "reached back" and "grabbed [him] in his penis area," as he was about to leave her apartment. (Dkt. No. 99-3, at 72–75). According to Thompson, Montanez then led him into the living room, unzipped his pants and began giving him oral sex. (*Id.* at 72–85). Thompson testified that after about three minutes of oral sex Montanez stood up, told him to wait, and got a condom from her bedroom. (*Id.* at 86–90). According to Thompson, Montanez then again began giving Thompson oral sex and he did not enter her vaginally because he had already ejaculated. (*Id.* at 95–99).

15     New York Penal Law § 195.00, as relevant here, provides that: "A public servant is guilty of official misconduct when, with intent to obtain a benefit or deprive another person of a benefit: 1. He commits an act relating to his office but constituting an unauthorized exercise of his official functions, knowing that such act is unauthorized."

16     As an attorney, Brown has "defended both private citizens and law enforcement officials against various criminal charges," has defended "law enforcement officials against civil and administrative charges," and has "represented plaintiffs and defendants in civil actions involving allegations of police misconduct." (Dkt. No. 99-13, ¶ 4). In addition, he has served as a guest lecturer on "police procedures and culture," "police drug enforcement policy," and "police use of force" at three law schools. (*Id.*).

17     As the commanding officer of OPS and chief of Police, Galvin and Fowler were required to exercise discretion and judgment in the investigation of complaints, determinations regarding whether complaints were substantiated and, if substantiated, determinations regarding the appropriate discipline. The City has submitted evidence outlining the SPD procedures for investigating a complaint against an officer as well as the disciplinary, supervisory, and training options available when needed. (*See, e.g.*, Dkt. No. 89-12 (SPD "Disciplinary System" Policy); Dkt. No. 89-3, ¶ 26 (Fowler Declaration listing disciplinary options); Dkt. No. 89-10, ¶¶ 11–33 (Galvin Declaration detailing "Process for Investigating and Adjudicating Police Misconduct") ).

18     Plaintiff cites the SPD procedures for "sex crime complaints" which require that the investigator "[c]onduct a detailed interview and obtain the victim's affidavit." (Dkt. No. 99-11, at 13, section 22.14(A)(3) ). Defendants argue that this was not a sex crime complaint and rely on the procedures applicable to complaints made against the police. (*Id.* at 43). For the purposes of this motion, the Court has considered the procedures applicable to complaints made against the police.

19     The parties refer to training, supervision, and retention as one claim. As neither party has briefed the substantive elements of these claims, the Court does not address them.

20     To the extent Plaintiff argues that Galvin and Fowler are subject to supervisory liability based on their alleged failure to act on information that a constitutional violation was occurring, (*see* Dkt. No. 97, at 26 ("Fowler and Galvin can be found liable under § 1983 pursuant to the fourth and fifth *Colon* factors, i.e., if they were 'grossly negligent' in supervising Thompson or if they 'exhibited deliberate indifference' rights of others by 'failing to act on information indicating that unconstitutional acts' were being committed by Thompson.") ), the Court notes that there is no evidence that either Galvin or Fowler knew that Thompson allegedly sexually assaulted Plaintiff until after she formally complained the following day. *See, e.g., Raspardo*, 770 F.3d at 124 (finding "no evidentiary basis to conclude that Gagliardi knew that Carlone was sexually harassing Russell or Raspardo and impermissibly allowed this harassment to continue" where the "plaintiffs did not report the sexual harassment of them by Carlone until after Gagliardi had already placed Carlone on administrative leave").

21     Further, according to the report, Galvin and Thompson "discussed at length the fact that any allegation of impropriety could be prevented by using basic common sense and avoiding certain situations" and that Galvin had reminded Thompson "of the penalties should such conduct be verified as true." (Dkt. No. 99-6, at 2).

22     One of the women, for example, who alleges that in 1997 Thompson followed her into a porta potty at a rock concert; locked the door; and raped her inside; described how a uniformed officer with Thompson remained outside the porta potty during the rape. (Dkt. No. 99-15, at 1–2).

23     Defendants also argue that they were only on notice that Thompson had committed acts of consensual sex while on duty, but that ignores the reasonable inferences in Plaintiff's favor, i.e., that Officer Thompson coerced sex while on duty.

24     Even if there were a material issue of fact as to Fowler's gross negligence, Fowler would be entitled to qualified immunity because, interpreting the facts in the light most favorable to Plaintiff, it was not clearly established that Fowler's conduct violated Plaintiff's constitutional rights for the reasons discussed in Section V.B.2.b. *See Poe*, 282 F.3d at 141-147.

25     The City makes no argument with respect to who should be considered a policymaker for purposes of the *Monell* analysis; its argument centers exclusively on deliberate indifference. (Dkt. No. 89-1, at 28–33; Dkt. No. 103, at 10–11).

---

**End of Document**                          © 2019 Thomson Reuters. No claim to original U.S. Government Works.